1  JOSEPH W. COTCHETT (#36324)
   jcotchett@cpmlegal.com
2  PHILIP L. GREGORY (#95217)
   pgregory@cpmlegal.com
3  LAURA E. SCHLICHTMANN (#169699)
   lschlichtmann@cpmlegal.com
4  GERALD S. OHN (#217382)
   gohn@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY**
   San Francisco Airport Office Center
6  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
7  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
8
   Attorneys for Plaintiffs and the Class
9
                    **UNITED STATES DISTRICT COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11

12  **DAN NEIL, CORIE BROWN,**          )  Case No. **CV08-06040 GW**
    **HENRY WEINSTEIN, WALTER**         )
13  **ROCHE, JR., MYRON LEVIN,** and    )  **CLASS ACTION**
    **JACK NELSON**, individuals, on behalf )  **COMPLAINT**
14  of themselves and on behalf of all others )
    similarly situated,                 )  1.   **VIOLATION OF ERISA**
15                        Plaintiffs,   )       **(29 U.S.C. §§ 1001 et seq.) –**
                                        )       **Duty of Prudence;**
          vs.                           )  2.   **VIOLATION OF ERISA**
16                                      )       **(29 U.S.C. §§ 1001 et seq.) –**
    **SAMUEL ZELL;**                    )       **Duty of Loyalty;**
17  **TRIBUNE COMPANY**, a Delaware     )  3.   **VIOLATION OF ERISA**
    corporation;                        )       **(29 U.S.C. §§ 1001 et seq.) –**
18  **GREATBANC TRUST COMPANY,**        )       **Duty to Avoid Conflicts of**
    a Delaware corporation;             )       **Interest;**
19  **EGI-TRB, L.L.C.**, a Delaware     )  4.   **VIOLATION OF ERISA**
    corporation;                        )       **(29 U.S.C. §§ 1001 et seq.) –**
20  **TRIBUNE EMPLOYEE STOCK**          )       **Duty to Monitor;**
    **OWNERSHIP PLAN;**                 )  5.   **VIOLATION OF ERISA**
21  **TRIBUNE COMPANY EMPLOYEE**        )       **(29 U.S.C. §§ 1001 et seq.) –**
    **BENEFITS COMMITTEE;**             )       **Co-Fiduciary Liability;**
22                                      )  6.   **VIOLATION OF ERISA**
    **BETSY D. HOLDEN;**                )       **(29 U.S.C. §§ 1001 et seq.) –**
23  **WILLIAM A. OSBORN;**              )       **Prohibited Transactions;**
                                        )  7.   **BREACH OF FIDUCIARY**
24  **JEFFREY S. BERG;**               )       **DUTIES;**
                                        )  8.   **AIDING AND ABETTING**
25  **BRIAN L. GREENSPUN;**            )       **BREACHES OF FIDUCIARY**
                                        )       **DUTIES**
26  **WILLIAM PATE;**                  )
    **MARY AGNES WILDEROTTER;**        )
27  **FRANK WOOD;** and                )  **DEMAND FOR JURY TRIAL**
                                        )
28  **DENNIS J. FITZSIMONS**           )
                    Defendants         )
_____

                    **CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . .  11

III.  THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

      A.   Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

      B.   Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

      C.   Agency/Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . .  18

      D.   Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      E.   Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

IV.   CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . .  19

V.    PLAINTIFFS ASSERT THE FEDERAL WHISTLE BLOWER
      PROTECTION LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

VI.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . .  23

      A.   The Tribune Was a Collection of Assets Worth Billions of
           Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

      B.   The Deal:  Taking the Tribune Company Private . . . . . . . . . . .  23

           1.   Background and Chronology of the Tribune ESOP
                Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

           2.   Summary of the ESOP Acquisition  . . . . . . . . . . . . . . .  28

           3.   Details of the Highly Leveraged ESOP Acquisition . . . . .  29

           4.   New Credit Agreements . . . . . . . . . . . . . . . . . . . . . . . .  31

      C.   Zell Controls the Zell Entity, the Tribune ESOP and the
           Tribune Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

      D.   Zell Conspired With Insiders and Aided and Abetted the
           Breach of Fiduciary Duties . . . . . . . . . . . . . . . . . . . . . . .  36

      E.   Tribune Troubles:  Layoffs and Buy-Outs of Tribune
           Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

      F.   Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

           1.   The Los Angeles Times Magazine . . . . . . . . . . . . . . . . .  40

           2.   The Tribune Tower . . . . . . . . . . . . . . . . . . . . . . . . . .  41

G.   Overview of ERISA and ESOPs ........................ 42

H.   Overview of Retirement Plans Before and After the ESOP Acquisition ........................................ 45

  1.   The Tribune Retirement Plans Before the ESOP Acquisition ................................... 48

  2.   The Tribune Retirement Plans After the ESOP Acquisition ................................... 45

I.   The Tribune ESOP Fiduciaries ......................... 46

  1.   The ESOP Trustee ............................. 46

  2.   The Plan Administrator ....................... 48

  3.   The New Tribune Board and the Company .......... 49

VII.  CLAIMS FOR RELIEF ................................. 50

FIRST CLAIM
(VIOLATION OF DUTY OF PRUDENCE - ERISA) ........ 50

SECOND CLAIM
(VIOLATION OF DUTY OF LOYALTY/DISCLOSURE - ERISA) ......................................... 52

THIRD CLAIM
(VIOLATION OF DUTY TO AVOID CONFLICTS OF INTEREST - ERISA) ................... 54

FOURTH CLAIM
(VIOLATION OF DUTY TO MONITOR - ERISA) ......... 55

FIFTH CLAIM
(CO-FIDUCIARY LIABILITY - ERISA) ................. 56

SIXTH CLAIM
(PROHIBITED TRANSACTIONS - ERISA) .............. 57

SEVENTH CLAIM
(STATE LAW BREACH OF FIDUCIARY DUTIES) ........ 58

EIGHTH CLAIM
(AIDING AND ABETTING STATE LAW BREACHES OF FIDUCIARY DUTIES) ............................. 62

VIII. PRAYER FOR RELIEF ................................. 63

DEMAND FOR JURY TRIAL ............................... 64

1    Plaintiffs Dan Neil, Corie Brown, Henry Weinstein, Walter Roche, Jr.,

2    Myron Levin, and Jack Nelson, by and through their attorneys, individually and on

3    behalf of all others similarly situated, complain and allege as follows:

4    **I.    INTRODUCTION**

5    *The only security of all is in a free press.  The force of public opinion*

6    *cannot be resisted when permitted to be freely expressed.  It is necessary, to keep the waters pure.*

7    Thomas Jefferson to Lafayette, 1823.

8    *Grave dancing is an art that has many potential benefits. But one must be*

9    *careful while prancing around not to fall into the open pit and join the cadaver.*

10    Sam Zell, 1976[1]

11    1.    This case is about a corporate take-over done through a series of

12    carefully manipulated complex financial transactions involving an Employee

13    Stock Ownership Plan.  Rather than acquire and operate the Tribune Company in

14    the best interests of its employee-owners, Sam Zell exacted severe, long-lasting

15    damage to an institution that citizens in a democracy rely on and require to

16    effectively speak truth to power.

17    2.    In 2006, Samuel Zell developed a plan to devalue a business in a plot

18    to take over the Tribune assets.  His plan was described in his own words:

19    **"Dear Partners,**

      **When we closed the going-private transaction in December [2007], our**

20    **total debt increased to nearly $13 billion. I put $315 million behind that**

      **debt . . . . The employees - you - then acquired 100 percent of the**

21    **company. I acquired an option to buy 40 percent of the company for**

      **$500 to $600 million within the next 15 years.**

22                                    ●●●

      **In the end, you and I together will own a collection of assets**

23    **worth billions of dollars.**

24    Sam Zell, 2008.[2]  (See **Exhibit A**, attached hereto and incorporated herein).

25    _____

26    [1]    Zell, Sam. *The Grave Dancer: A Guide to the Risky Art of Resurrecting Dead Properties.*
      Real Estate Review (1976).

27    [2]    February 2008 edition of Tribune News Special ESOP Edition.

28    _____

                        **CLASS ACTION COMPLAINT**

1  Furthermore, in April 2007, Tribune employees were informed that "At the end of
2  2006, Tribune's pension assets totaled more than $1.7 billion and the plans were
3  overfunded by more than $200 million." (See **Exhibit B**, attached hereto and
4  incorporated herein).

5       3.     Sam Zell's plan could not be clearer.  He took the Tribune Company
6  private with the intention of breaking up and selling the assets because he saw a
7  collection of assets worth billions of dollars that he could purchase at a bargain
8  price with a minimal outlay of his own money.

9       4.     To accomplish his plan, Zell enticed the members of the Tribune
10  Board and aided and abetted Dennis J. FitzSimons, among others, in breaching
11  their fiduciary duties by paying them millions of dollars.  Indeed, the Tribune
12  Company's SEC filing of December 28, 2007 indicated that Zell and the Company
13  created a $25 million pool for a management equity *incentive plan* to provide
14  money for Tribune executives to complete the going-private transaction and retain
15  them over a transition period.  FitzSimons received about $3 million from this
16  pool and a total of approximately $17.7 million in severance and other payouts.

17       5.     Now, Zell and his accessories threaten to destroy the Tribune
18  Company and its assets, which include some of the nation's oldest and best daily
19  newspapers, including the Los Angeles *Times*, the Chicago *Tribune*, and the
20  Baltimore *Sun*, along with several other great daily newspapers.  They are doing so
21  illegally, without consideration for the employee-owners, without respect for the
22  institution, and with a focus on liquidating company assets to line their own
23  pockets.

24  / / /
25  / / /
26  / / /
27  / / /
28

---

**CLASS ACTION COMPLAINT**

2

6.    Since completing his takeover of the Tribune Company in December, 2007, Sam Zell's illegal and irresponsible actions and public statements have damaged the reputation and business of the company he purports to want to preserve. Through both the structure of his takeover and his subsequent conduct, Zell and his accessories have diminished the value of the employee-owned company to benefit himself and his fellow board members. Through their destructive management and self-dealings at the expense of employees, Zell and his co-fiduciaries have repeatedly breached their duties, as fully set forth below.

7.    In 2006, the Tribune Company's SEC filings indicate that Zell created a corporate shell entity called EGI-TRB, L.L.C. "solely for the purpose of entering into and consummating" the highly leveraged transactions that allowed Zell to orchestrate the acquisition of the Tribune Company and establish the Tribune Employee Stock Ownership Plan.

8.    In April 2007, the Tribune Company announced that it had accepted Zell's bid to acquire the Company in a complicated deal that used the Employee Stock Ownership Plan (the "Tribune ESOP") as the springboard. The deal included borrowing billions against the assets - the Tribune Company's debt went from less than **$4 billion** to nearly **$13 billion** overnight. The Company was also converted from a C-corporation to an S-corporation, a tax strategy that allows Zell to avoid paying most corporate taxes. Using a structure allegedly designed to benefit employees (the Tribune ESOP), Zell took over a highly valuable Company, imposed on it the most encumbered balance sheet in the newspaper industry, and avoided any real personal risk or responsibility, all while enjoying the benefits of a tremendously valuable tax structure and letting employee "owners" bear the damaging consequences going forward.

///

///

///

1    9.    The Company's assets included in the purchase were the Los Angeles
2  *Times*, the Chicago *Tribune*, the Baltimore *Sun*, *Newsday*,[3/] and six other dailies
3  (which together generated 75% of the Company's revenues); over 50 web sites; 25
4  television stations; a 31% stake of the Food Network; the Chicago Cubs baseball
5  team; and significant holdings in **real estate** across the country.

6    10.    At the conclusion of the acquisition, the Tribune Employee Stock
7  Ownership Plan bought the Tribune Company for $28 per share, in the first of
8  what would become many breaches of fiduciary duty on the part of Zell and his
9  co-fiduciaries.  Despite the legal mandate to administer the Tribune ESOP (the
10 Tribune Company's only shareholder) solely in the interests of the employee-
11 owners, Zell and his accessories orchestrated what was clearly an imprudent
12 purchase by the Tribune ESOP.  It was a deal designed to benefit corporate
13 insiders at the employees' expense.

14   11.    On <u>April 23, 2007</u>, Zell made his initial investment of $250 million in
15 the Tribune Company, which investment was redeemed when the ESOP
16 Acquisition closed in <u>December, 2007</u>.  Zell orchestrated the acquisition of a
17 company worth ***over $8 billion*** and reporting healthy profits, without putting up
18 any more than ***$315 million*** of his own money.  He did so by imposing on the
19 Tribune Company an additional suffocating ***$8.4 billion*** of debt, so that the
20 Company's total estimated debt surged from less than $4 billion prior to the
21 acquisition to nearly **$13 billion** after the acquisition.

22   12.    On <u>December 20, 2007</u>, Zell made a new investment of $315 million
23 in the form of: (a) a $225 million, eleven year loan, plus (b) $90 million for the
24 right to buy 40% of the Tribune Company for between $500 million and $600
25 million in the next fifteen years.  Upon completion of the deal, the Tribune
26 appointed Zell as Chairman of the Board of the Company, with effective control

27
28   [3]    Since the acquisition, Zell orchestrated the sale of Long Island-based Newsday over the summer of 2008 to Cablevision for approximately $650 million.

**CLASS ACTION COMPLAINT**

4

1  over its operations.  Given Zell's nonexistent record in print media, the
2  appointment clearly served Zell's interests at the expense of the employee-owners.

3       13.  While Zell's interests were served by the transaction, his financial
4  contribution represents less than 4% of the total value of the ESOP acquisition.
5  Because Zell's outlay is primarily debt, Zell has greater protection in the event of
6  bankruptcy; the employee-owners' shares, as equity, would not.  In addition, the
7  majority of the Tribune Company's contributions to employees' retirement funds
8  are now and will continue to be made not to 401(k)'s, but to the Tribune ESOP in
9  the form of Company stock.  Therefore, many employees will have a retirement
10  fund that is heavily invested in a company that is overly-encumbered with debt.

11       14.  Not only was the imprudence of this transaction clear, but its
12  consequences were easily foreseeable.  After engineering the transaction - which
13  essentially let someone buy an $8 billion house without making down payment -
14  Zell redirected the Company's operations from running newspapers to *servicing*
15  *the new debt*.

16       15.  As was widely reported by industry analysts, the price paid for
17  Tribune stock during the acquisition was a significant over-valuation given the
18  debt imposed by Zell.  On November 2, 2007 - over one month before the deal
19  closed - a Lehman Brothers' Newspaper Valuation and Stock Scorecard clearly
20  presented the impact of Zell's debt on the fair market value of the Tribune
21  Company's stock: "Should the Tribune privatization deal break and not occur, we
22  believe that fair value on the stock, if it were to remain an ongoing public entity,
23  would be significantly less than the current stock price. ***Given the added $7 billion***
24  ***in debt to repurchase 126 million shares in the tender offer, we think fair value***
25  ***on the stock would be $7-$8*** per share based on our detailed sum-of-the-parts
26  analysis..." (emphasis added) (See **Exhibit C**, attached hereto and incorporated
27  herein by this reference).
28  / / /

16.     After the purchase closed, Goldman Sachs provided another clear indication of the deal's imprudence: "Tribune's $34 go-private price represents... [a] very rich valuation in the context of the cyclical and secular challenges facing the industry." That report also predicted the measures Zell would take to service his debt: "the transaction leaves very little room for error, particularly given the extremely challenging industry backdrop. The company could potentially face a liquidity crunch fairly quickly... [w]e wouldn't be surprised to see *additional asset sales* beyond the announcements to date..." (See **Exhibit D**, attached hereto and incorporated herein by this reference).

17.     In March, 2008, Standard & Poor's cut the Tribune Company credit rating to "B-," stating that the cut "reflects the concern that Tribune might violate [loan agreements] in the near term... as early as December." Not surprisingly, the Tribune Company's credit rating has been reduced since the take over, and some of its bonds are trading at $0.35 on the dollar. A report from Fitch Ratings in late August 2008 indicated that the Tribune credit rating was further lowered to junk level "CCC," indicating a "real possibility" the issuer could default and that Tribune's ability to meet financial commitments "is vulnerable to deterioration in business and economic conditions." This report states that there is reason to be "concerned about the company's ability to generate cash to meet its interest payments, principal amortization and maturities under its debt obligations."

18.     No prudent consumer, much less a prudent fiduciary, would have paid a grossly-inflated price to buy an $8 billion company that carried with it an additional $8.4 billion in debt, particularly when industry analysts reported that fair market value on the stock was at least $20 *less* **than the price paid**, and when those analysts predicted the significant challenges that would continue to face the industry. By orchestrating what was clearly an imprudent transaction, Zell, his accessories, and the Tribune ESOP administrator, GreatBanc, breached their fiduciary duties to the employee-owners.

---

**CLASS ACTION COMPLAINT**

19.     The consequences are not only borne by the Tribune Company's employees, however.  Because the breaches of fiduciary duty have continued since Zell's acquisition, diminishing the quality of the Company's products along with the Company's value, consequences of the transaction extend far beyond the Tribune Company's newsrooms.  So too does the significance of the acquisition, given that it is a prime example of the very kind of financial manipulation that lays at the heart of the economy's current crisis.  In addition to being a breach of fiduciary duty given Zell's nonexistent record of running media operations, the Zell acquisition took the form of any number of the recently-employed shell deals that have enabled quick-profit corporate and financial raiders to endanger companies, employees and shareholders by saddling them with billions of dollars in debt, and doing so without making any real investment, or accepting any real degree of personal risk in the deal.

20.     As a result, employees now depend for their livelihoods on a company that is both substantially over-leveraged and managed in a way that flies in the face of the purpose of ESOP-owned companies: to benefit and encourage the participation of employees in their own Company.  Zell and his accessories maintain complete control over the Company even though employees of the Tribune Company technically own the Company through the Tribune ESOP. Without having any power over the Company's daily operations, employees of the Tribune Company suffer the direct consequences of Zell's efforts to drive the Tribune Company's most valuable assets - newspapers - into the ground.

21.     In connection with the acquisition, Zell made numerous assurances that employee benefits would remain secure and that the Company needed to focus on revenue because there had been enough expense cuts.  At the December 2007 closing, Zell stated: "I believe this company has spent a significant amount of time in the last five years cutting costs and maybe not enough time on increasing revenue.  So I think our focus and our gut is that we can significantly increase the

---

**CLASS ACTION COMPLAINT**

7

revenue of this company and dramatically increase its profitability going forward." This statement is contrary to all the actions taken by Zell and cohorts.

22.     Since the acquisition, Zell has pursued a strategy of slash and burn with an institution that is important to the public and the employees.  Despite his pre-acquisition promises that employee benefits would remain secure, after suffocating the Company in billions of dollars in debt, Zell began an illegal march - launching mass layoffs and forced resignations of some of the nation's finest, most experienced editors, reporters and others needed to produce high quality publications, and improperly valuing and misusing company assets.  It is reported that Randy Michaels, the Chief Operating Officer installed by Zell stated:

> "An animal with his leg caught in a trap will chew it off, at the moment, we are doing some leg-chewing."[4]

The Tribune Company has cut more than 1,100 employees since the ESOP Acquisition and, after declaring that the employees' pension fund is "overvalued" by $400 million, has **improperly** funded their severance and buyout packages with money taken from the supposedly "overvalued" portion of employees' pension fund (See **Exhibit E**, attached hereto and incorporated herein).

23.     Zell has hired few people with newspaper experience to perform critical leadership functions of the Tribune Company, and has left key positions needed to run the papers empty for months.  Other obvious examples of individuals lacking in experience include the Company's chief operating officer, the executive vice-president and publisher of the Chicago *Tribune*, and the chief administrative officer who oversees the Los Angeles *Times*.

/ / /

/ / /

/ / /

---

[4]     "Sam Zell's Deal From Hell," *Business Week*, July 30, 2008.

**CLASS ACTION COMPLAINT**

24.     Sadly, the institutional integrity of the Los Angeles *Times* and other Tribune papers is being seriously damaged piece by piece. Certain foreign bureaus and the Sunday opinion and book review sections of the largest newspaper in America's second largest media market - the Los Angeles *Times* - have been closed down. Numerous veteran reporters have been terminated from the "California" section of the paper. On <u>July 2, 2008</u>, the Los Angeles *Times* announced that it would cut 150 people, or 17% of its staff. The Los Angeles *Times* Magazine now answers to the *business department* rather than the editorial department, a clear violation of journalistic ethics. The new Magazine promotes itself as an editorial product, breaking a long-held ethical barrier critical to journalism's integrity. While eroding the quality of the Los Angeles *Times* Magazine, Zell and his accessories are also inviting conflicts of interests. For example, as reported, new writers and editors for the Magazine (who report to the business department) are being hired to serve as "critics" for the same businesses from which their department receives financial support. The regular news staff will be forced to write for the Magazine, ensuring that the line between advertizing and reporting remains blurred.

25.     Plaintiffs bring this class action on behalf of themselves and a class consisting of current and former employees of the Company who have rights under the Tribune ESOP, which rights were and are being violated by Defendants.

26.     Defendants include the board members of the Company and the ESOP Trustee, who all engaged in numerous, repeated, and continuing breaches of fiduciary duties by, among other things, engaging in conflicts of interest, self dealing transactions and failures to disclose material information. As a result, the Tribune ESOP borrowed billions to become the sole shareholder of company that is essentially controlled by one man: Sam Zell. Zell obligated the Company, specifically the Tribune ESOP, with substantial debt, including borrowing $7 billion and $4.2 billion in two stages to finance the ESOP acquisition.

**CLASS ACTION COMPLAINT**

27.    Meanwhile, certain corporate insiders of the Company received some **$25 million** in "incentives" for closing this destructive deal.  Following the take over of the Tribune ESOP, Zell and the New Tribune Board began forcing resignations of loyal Tribune employees through buy-outs funded from the employees' supposedly *overfunded* pension plan.  The Tribune Company, the Tribune ESOP, Plaintiffs and the class have suffered measurable monetary losses due to breaches by Defendants and certain Defendants have reaped self-dealing profits from such wrongful conduct.

28.    In this action, Plaintiffs seek to recover all the losses to the Tribune ESOP and the Company caused by Defendants' breaches of fiduciary duties in the form of restitution or damages as applicable.  In addition, Plaintiffs seek disgorgement of any of Defendants' ill-gotten profits for such breaches and an accounting.  Finally, and perhaps most significantly, Plaintiffs seek the removal of Defendants, and each of them, from their fiduciary positions and removal of the Tribune Board in its entirety for their ongoing dereliction of duties.

29.    The claims of Plaintiffs and the class arise under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA") and state law governing corporate fiduciary duties.  As a result of Defendants' violations of law, Plaintiffs and the class seek compensatory damages and/or equitable relief as applicable, including injunctive relief, for themselves and members of Plaintiffs' class.  Furthermore, Defendants have committed and continue to commit the wrongful acts alleged herein knowingly, maliciously and oppressively, and Plaintiffs therefore seek punitive and exemplary damages as applicable in an amount sufficient to punish Defendants, and each of them, and to make an example of them, according to proof.

/ / /

/ / /

/ / /

**CLASS ACTION COMPLAINT**

## II.   JURISDICTION AND VENUE

30.   This Court has jurisdiction over the claims of Plaintiffs and the class pursuant to 28 U.S.C. § 1331 because the action involves questions of federal law: specifically, the application of provisions of the ERISA. 29 U.S.C. § 1132. Additionally, this Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332. This Court has jurisdiction over the state law claims of Plaintiffs and the class pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendants, and each of them, because a substantial portion of the wrongdoing alleged in this Complaint occurred within the Central District of California, and Defendants are authorized to and regularly do conduct business in the Central District of California.

31.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132 because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Central District of California. Moreover, certain Defendants reside or may be found within the Central District of California. 29 U.S.C. § 1132.

## III.   THE PARTIES

### A.   Plaintiffs

32.   Plaintiff **DAN NEIL** has been employed by the Tribune Company in the County of Los Angeles, California, as a journalist at the Los Angeles *Times* since 2003. In 2004, Neil was awarded the Pulitzer Prize for criticism. He is a citizen of the State of California and resides in the County of Los Angeles. Plaintiff Neil is a participant in the Tribune Employee Stock Ownership Plan (the "Tribune ESOP") and a beneficiary of the Tribune Employee Stock Ownership Trust (the "ESOT"), which implements and forms part of the Tribune ESOP (the ESOP and the ESOT are at times referred to collectively as the "Tribune ESOP").

/ / /

/ / /

33.     Plaintiff **CORIE BROWN** was employed by the Tribune Company in the County of Los Angeles, California as a journalist at the Los Angeles *Times* from 2000 until September 2008.  Formerly Newsweek Magazine's West Coast Entertainment Correspondent, Brown won much acclaim during her tenure at the Los Angeles *Times*.  She won the 2006 award for "Best Reporting" by the Association of Food Journalists, and was the 2008 winner of the prestigious Penney-Missouri Lifestyle Journalism award in the food and nutrition category for her story, "A Scorching Future: Global warming is altering the world wine map." She is a citizen of the State of California and resides in the County of Los Angeles.

Brown is a participant in the Tribune ESOP and a beneficiary of the ESOT, which implements and forms part of the Tribune ESOP.

34.     Plaintiff **HENRY WEINSTEIN** worked as a journalist for the Los Angeles *Times* from 1978 until 2008.  Weinstein was employed by the Tribune Company in the County of Los Angeles, California, from the time of its acquisition of the Times Mirror Company in 2000 until 2008. One of the paper's most respected reporters, Weinstein earned a J.D. from U.C. Berkeley's Boalt Hall School of Law and covered politics, local government, and legal affairs for the Los Angeles *Times* over his celebrated 30 year career.  Weinstein was the 2006 recipient of the prestigious John Chancellor Award for Excellence.  Weinstein is a citizen of the State of California and resides in the County of Los Angeles.

Weinstein was a participant in the Tribune ESOP until March 28, 2008, and is a beneficiary of the ESOT, which implements and forms part of the Tribune ESOP. Weinstein was a participant in the Tribune and Times Mirror Pension Plans from 1978 until the plans were frozen as a result of Zell's acquisition.

35.     Plaintiff **WALTER ROCHE, JR.** worked as a journalist for the Baltimore *Sun* from 1996 until 2004 and later for the Los Angeles *Times* from 2004 until 2008.  Roche was employed by the Tribune Company from the time of

its acquisition of the Times Mirror Company in 2000 until 2008. Roche resides in Lafayette Hill, Pennsylvania. Roche was a participant in the Tribune ESOP and is a beneficiary of the ESOT, which implements and forms part of the Tribune ESOP.

36. Plaintiff **MYRON LEVIN** worked as a journalist for the Los Angeles *Times* from 1984 until 2008. Mr. Levin was employed by the Tribune Company in the County of Los Angeles, California, from the time of its acquisition of the Times Mirror Company in 2000 until 2008. Levin has won a number of journalism honors and awards, including a prestigious Alicia Patterson Foundation fellowship. Levin and a Times colleague won the National Press Club's 2008 consumer journalism award. Levin is a citizen of the State of California and resides in the County of Los Angeles. Levin was a participant in the Tribune ESOP until March 28, 2008, and is a beneficiary of the ESOT, which implements and forms part of the Tribune ESOP. Levin was a participant in the Tribune and Times Mirror Pension Plans from 1984 until the plans were frozen as a result of Zell's acquisition.

37. Plaintiff **JACK NELSON** worked as a journalist for the Los Angeles *Times* from 1965 until 2002, and was employed by the Tribune Company from the time of its acquisition of the Times Mirror Company in 2000 until 2002. Mr. Nelson worked first for the Los Angeles *Times* as its Southern Bureau Chief and became Washington, D.C. Bureau Chief in 1975. Over his celebrated career, Mr. Nelson did ground-breaking civil rights reporting and broke major stories during the Watergate scandal. He won the 1960 Pulitzer Prize for local deadline reporting, the Drew Pearson award for investigative reporting in 1974 and the John F. Kennedy Lifetime Achievement award in 1999. The author or co-author of five books, Nelson has taught at Northwestern University and the University of Southern California. Nelson was a participant in the Tribune and Times Mirror Pension Plans from 1965 until the plans were frozen as a result of Zell's

**CLASS ACTION COMPLAINT**

38.     **DAN NEIL, CORIE BROWN, HENRY WEINSTEIN, WALTER ROCHE, JR., MYRON LEVIN** and **JACK NELSON** are referred to collectively herein as "Plaintiffs."

**B.**     **Defendants**

39.     Defendant **TRIBUNE COMPANY** (the "Tribune Company" or "Company") is a media company with operations throughout the United States, including the County of Los Angeles. The Company is incorporated in Delaware. Through its ownership of the Los Angeles *Times*, the Company conducted substantial business within the Central District of California at all times relevant to this action. The Company engages in newspaper publishing, television and radio broadcasting, and entertainment operations. The Company operates in two segments: Publishing; and Broadcasting and Entertainment.

40.     At the time of the ESOP Acquisition (as hereinafter defined), the Publishing segment published the following daily newspapers:

- The Los Angeles *Times*
- The Chicago *Tribune*
- *Newsday* (Long Island, NY)
- South Florida *Sun-Sentinel*
- *The Sun* (Baltimore)
- Orlando *Sentinel*
- The Greenwich *Time*
- Hartford *Courant*
- *Daily Press* (Newport News, VA)
- *The Morning Call* (Allentown, PA)

41.     The Publishing segment also manages the web sites of the Tribune Company's daily newspapers and television stations, as well as other publishing-related operations.

/ / /

---

**CLASS ACTION COMPLAINT**

14

42.     Defendant **GREATBANC TRUST COMPANY** ("GreatBanc" or "Trustee") is the trustee of the Tribune ESOP.  GreatBanc is a Delaware corporation headquartered in Illinois.  On information and belief, GreatBanc is a subsidiary of U.S. Fiduciary Services, Inc., a financial services holding company.

43.     Defendant **TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN** is an employee stock ownership plan governed by ERISA.  Plaintiffs name the Tribune ESOP as a nominal defendant in this action because the Tribune ESOP is a necessary party, without which full and complete relief cannot be afforded to Plaintiffs and the class.

44.     Defendant **TRIBUNE COMPANY EMPLOYEE BENEFITS COMMITTEE** ("Plan Administrator" or "Committee") is the administrator of the Tribune ESOP.

45.     Defendant **SAMUEL ZELL** was elected to Tribune Company's Board of Directors in or about May 2007 and remains a member of the Tribune Board.  Zell maintains a residence in Malibu, California.  Zell became Chairman of the Board of Directors of the Tribune Company, as well as President and CEO in December 2007 in the purchase of the Company.  Zell is both a member of the Company's Board and is an officer of the Company.  Zell is also chairman and president of Equity Group Investments, L.L.C. ("EGI"), a private investment firm based in Chicago.  Zell is also chairman of Equity International, a privately-held investor in real estate businesses outside of the United States, and Equity Lifestyle Properties, Inc., an equity real estate investment trust primarily engaged in the ownership and operation of trailer parks.

46.     Defendant **EGI-TRB, L.L.C.** ("EGI-TRB" or "Zell Entity") is a Delaware limited liability company located in Illinois.  Zell was the founder or promoter of the Zell Entity.  On information and belief, the Zell Entity is wholly owned by Sam Investment Trust, an Illinois trust established for the benefit of Zell and his family.  The Tribune Company's SEC filings indicate that the Zell Entity

---

was formed *for the purpose of entering into and consummating the leveraged ESOP transactions discussed herein.* The Tribune Company's SEC filings indicate that the Zell Entity has three executive officers but no board of directors or similar board of managers. Sam Zell is the president of the Zell Entity. Defendant William Pate is a Vice-President of the Zell Entity and a chief investment officer at EGI, another Zell controlled company. Philip G. Tinkler is a Vice-President of the Zell Entity and the Chief Financial Officer and Chief Operating Officer of the Zell-controlled EGI.

47. Defendant **JEFFREY S. BERG** is a Director on the Board of Directors of the Tribune Company. On information and belief, Defendant Berg resides in Pacific Palisades, California.

48. Defendant **BRIAN L. GREENSPUN** is a Director on the Board of the Tribune Company. On information and belief, Defendant Greenspun resides in Henderson, Nevada and is the owner of the Las Vegas *Sun.*

49. Defendant **BETSY D. HOLDEN** was a Director of the Tribune Company during the relevant time period and is currently a Director on the Board. On information and belief, Defendant Holden resides in Winnekta, Illinois.

50. Defendant **WILLIAM A. OSBORN** has been a Director on the Tribune Company's Board of Directors since 2001. Defendant Osborn resides in Winnekta, Illinois. Defendant Osborn is also chairman and a director of Northern Trust Corporation and its principal subsidiary, The Northern Trust Company (collectively, "Northern Trust"). Defendant Osborn joined Northern Trust in 1970 and was named President and Chief Operating Officer of Northern Trust in 1993. Defendant Osborn became Chairman and CEO of Northern Trust in 1995. Defendant Osborn stepped down as president of Northern Trust in 2006 and as CEO of Northern Trust on January 1, 2008. Northern Trust was retained by the Company as trustee of each of the Company's 401(k) savings plans, receiving millions of dollars in fees.

---

**CLASS ACTION COMPLAINT**

51.     Defendant **WILLIAM PATE** is a Director on the Board of the Tribune Company.  On information and belief, Defendant Pate resides in Chicago, Illinois.  Defendant Pate is also chief investment officer for EGI, the privately held investment firm controlled by Zell.  Defendant Pate has served in various capacities for EGI since 1994, and in his present position since 2000.

52.     Defendant **MARY AGNES WILDEROTTER** is a Director on the Board of the Tribune Company and is CEO of Frontier Communications, formerly Citizens Communications.  On information and belief, Defendant Wilderotter resides in Stamford, Connecticut.

53.     Defendant **FRANK WOOD** is a Director of the Company.  Defendant Wood resides in Cincinnati, Ohio.

54.     Defendants **ZELL, BERG, GREENSPUN, HOLDEN, OSBORN, PATE, WILDEROTTER,** and **WOOD** are referred to collectively as the "New Tribune Board."

55.     Defendant **DENNIS J. FITZSIMONS** was at the Tribune Company from 1982 to 2007.  He served as President (since 2001), CEO (since 2003), and Chairman of the Board (since 2004) of the Tribune Company.  Defendant FitzSimons stepped down from his positions with the Tribune on or about December 20, 2007.  On information and belief, Defendant FitzSimons resides in Winnetka, Illinois.

56.     Defendants **HOLDEN, OSBORN**, and **FITZSIMONS** are referred to collectively as the "Old Tribune Board."[5]

/ / /

/ / /

/ / /

/ / /

_____

[5]      The following individuals were also members of the old Tribune Board during part of 2007 prior to the Zell acquisition:  Enrique Hernandez, Jr.; Robert S. Morrison; Miles D. White; Jeffrey Chandler; Roger Goodan; and William Stinehart, Jr.

**CLASS ACTION COMPLAINT**

17

## C.    Agency/Joint Venture

57.    At all times herein mentioned, Defendants, and each of them, were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency.  Each defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-defendant, and/or retained the benefits of said wrongful acts.

## D.    Aiding and Abetting

58.    Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs and the class, as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each Defendant acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongdoings alleged herein.

## E.    Conspiracy

59.    Defendants reached an agreement to perform the acts complained of herein; all were direct, necessary, and substantial participants in the conspiracy, common enterprise, and common course of conduct complained of herein; and each was aware of its overall contribution to and furtherance of the conspiracy, common enterprise, and common course of conduct.  Defendants' acts of conspiracy include, *inter alia*, all of the acts that each of them is alleged to have committed in furtherance of the wrongful scheme complained of herein, except those relating to the reaching of agreements or understandings sufficient to characterize their conduct as conspiratorial.

/ / /

/ / /

---

**CLASS ACTION COMPLAINT**

## IV.    CLASS ACTION ALLEGATIONS

60.    Plaintiffs seek certification, under Fed. R. Civ. P. 23 (a) and (b), of a class as identified below.

61.    Plaintiffs were participants and beneficiaries of the Tribune ESOP, which is the sole shareholder of the Tribune Company, on or about the time of the transactions at issue.  Plaintiffs are currently participants and/or beneficiaries of the Tribune ESOP.

62.    Plaintiffs did not make a demand on the New Tribune Board, Tribune Company or the Tribune ESOP for the desired actions requested herein because such a demand would have been futile.  Indeed, these Defendants are incapable of making an impartial decision in response to such a demand because, *inter alia*, the Tribune Board **controls** the Tribune Company and the Tribune ESOP.

63.    Plaintiffs bring this action on behalf of themselves and a class consisting of:

> **All individuals who are or, at any time on or after the date two years before the date of filing of this Complaint (the "class period"), were employed by the Tribune Company and had rights under the Tribune ESOP.  Excluded from the class are Defendants and their affiliates; the officers and directors of any Defendant or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.**

64.    The members of the class are so numerous that joinder of all members is impracticable.  While the exact numbers of members in the class are unknown to Plaintiffs at this time, such information can be ascertained from records maintained by Defendants and their agents.  The Tribune Company currently has over 19,000 employees.  Plaintiffs estimate that the class encompasses thousands of the Tribune Company's current and former employees.

65.    Common questions of law and fact exist as to all members of the class and predominate over any questions affecting solely individual members of the class.  The questions of law and fact common to the class include, *inter alia*, the following questions:

a. whether Defendants breached their duty of prudence under ERISA;

b. whether Defendants breached their duties of loyalty and disclosure under ERISA;

c. whether Defendants breached their duty to monitor under ERISA;

d. whether Defendants breached their duty to avoid conflicts of interest under ERISA;

e. whether Defendants are subject to co-fiduciary liability under ERISA;

f. whether Defendants engaged in prohibited transactions in violation of ERISA;

g. whether Defendants breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiffs and other class members in connection with the relevant transactions;

h. whether individual Defendants engaged in self-dealing in connections with the relevant transactions;

i. whether the individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiffs, the class, and the Company in connection with the relevant transactions;

j. whether the individual Defendants unjustly enriched themselves and other insiders or affiliates;

k. whether Defendants have breached or aided and abetted in the breach of any other fiduciary duties to Plaintiffs, the Class, the Tribune ESOP, and the Tribune Company in connection with the relevant transactions, including the duties of good faith,

---

**CLASS ACTION COMPLAINT**

20

1            diligence, candor and fair dealing;

2        l.   whether Defendants, in bad faith and for improper motives,

3             impeded or erected barriers to discourage other offers for the

4             Company or its assets; and

5        m.   The appropriate measure of restitution and/or damages.

6        66.   There are no substantial individual questions among the class claims,

7    other than the amount of relief that each class member is entitled to receive, and

8    Plaintiffs are not aware of any conflicts between themselves and class members.

9        67.   Plaintiffs' claims are typical of the claims of the members of the class,

10   as Plaintiffs and all other members of the class were harmed by Defendants'

11   wrongful conduct. Plaintiffs are aggrieved by the breaches of fiduciary duties they

12   and all other class members have suffered at Defendants' hands, and are intent on

13   seeing such wrongs remedied. Plaintiffs therefore are committed to fairly,

14   adequately, and vigorously representing and protecting the interests of the members

15   of the class, and have retained counsel competent and experienced in class action

16   litigation of this nature for this purpose. Neither Plaintiffs nor their counsel have

17   any interests that might cause them to refrain from vigorously pursuing the claims

18   in this class action. Thus, Plaintiffs are adequate representatives of the class.

19       68.   A class action is superior to other available methods for the fair and

20   efficient adjudication of this controversy because joinder of all members is

21   impracticable. In addition, prosecution of separate actions by individual class

22   members would create an inherent risk of inconsistent and varying adjudications,

23   which could in turn establish conflicting standards of conduct for Defendants.

24   Furthermore, due to the great disparity in market power between the parties and the

25   fact that many class members continue to depend on Defendants for their

26   livelihood, a class action may be the only way, as a practical matter, that the cases

27   will be prosecuted and class members' rights under the applicable laws vindicated.

28   Also, Defendants have acted or refused to act on grounds that apply generally to

**CLASS ACTION COMPLAINT**

1 the class, so that final injunctive relief or corresponding declaratory relief is
2 appropriate respecting the class as a whole. Finally, Plaintiffs know of no serious
3 difficulty likely to be encountered in the management of this action that would
4 preclude its maintenance as a class action.

5     69.    On information and belief, the names and addresses of the class
6 members are available from Defendants, and adequate notice can be provided to
7 members of the class to the extent required by Federal Rules of Civil Procedure,
8 Rule 23.

9 **V.    PLAINTIFFS ASSERT THE FEDERAL WHISTLE BLOWER PROTECTION LAWS**

10     70.    In filing this action, Plaintiff Neil is a current employee of the Tribune
11 Company and is fearful that his job and employment benefits, as well as the jobs
12 and employment benefits of the class, are in serious jeopardy. Plaintiffs are
13 demonstrating great integrity by participating in this litigation against powerful
14 forces who hold their very livelihood in their hands. Indeed, on information and
15 belief, Plaintiffs and the class have been exposed to implicit and explicit threats
16 and innuendo that their jobs could be at stake or they could be subject to retaliation
17 for filing this lawsuit to challenge Defendants' outrageous conduct.

18     71.    As a result, Plaintiffs and the class hereby invoke the protections of
19 the ERISA whistleblower statute.

20     72.    Specifically, Section 510 (29 U.S.C. § 1140) of ERISA protects
21 participants in and beneficiaries of the Tribune ESOP from retaliation for
22 exercising their rights. Section 510 makes it "unlawful for any person to discharge,
23 fine, suspend, expel, discipline, or discriminate against a participant or beneficiary"
24 in an employee benefits plan covered by ERISA – in other words, retaliate against
25 the participant or beneficiary – for the purpose of "interfering with the attainment
26 of any right to which such participant may become entitled under" the plan or
27 ERISA. Section 510's protection specifically includes retaliation against a person
28 for providing information or testimony, or being about to give testimony, in any

"inquiry or proceeding" relating to ERISA. As such, any attempt by Defendants, or any of them, to retaliate against Plaintiffs and the class, or any of them, for participating in this lawsuit will result in an additional Section 510 claim in which Plaintiffs and the class will seek all remedies afforded by law, including, but not necessarily limited to, back pay, reinstatement, attorneys' fees and costs.

## VI.    FACTUAL BACKGROUND

### A.    The Tribune Was a Collection of Assets Worth Billions of Dollars

73.    In April 2007, the Tribune Company's estimated market value was around **$8.2 billion.** The Company's assets included the Los Angeles *Times*, the Chicago *Tribune*, the Baltimore *Sun*, *Newsday*, and six other dailies.

In addition, the Company owned over 50 web sites; 25 television stations; a 31% stake of the Food Network; the Chicago Cubs baseball team; and significant holdings in **real estate** across the country. In this regard, the Company owns or leases transmitter sites, parking lots and other land aggregating approximately 1,048 acres in 87 separate locations. The Company owns or leases and aggregate of approximately 3,011,451 square feet of office and production space in 291 locations. The Company also owns Wrigley Field, the stadium used by the Chicago Cubs.[6]

### B.    The Deal:  Taking the Tribune Company Private

#### 1.    Background and Chronology of the Tribune ESOP Acquisition

74.    On June 10, 1847, the Tribune Company, published its first edition in Chicago. In 1983, the Tribune Company became a public company with an initial offering of 7.7 million shares valued at $206 million. At the time, it was one of the largest IPOs ever made.

/ / /

/ / /

---

[6]    In July 2008, reports indicated that the Tribune Company received an offer to buy the Chicago Cubs and Wrigley Field for $1.3 billion.

**CLASS ACTION COMPLAINT**

23

75.    On <u>June 12, 2000</u>, the Tribune Company and the (Los Angeles) Times
Mirror Company merged.  This merger added seven daily newspapers to the
Tribune Company's fold, including the Los Angeles *Times* and *Newsday* in New
York.

76.    On <u>December 23, 2002</u>, the assets of the Tribune Company
Employees' Pension Plan (a frozen plan as of 1998) were merged into the Times
Mirror Pension Plan.  On <u>December 31, 2003</u>, an ESOP previously created under
the Times Mirror Ownership merged into the Times Mirror Savings Plan.  On
<u>December 31, 2005</u>, the Times Mirror Savings Plan was frozen with respect to
continued benefit accruals for all participants other than those employed at
*Newsday* (for whom the plan was frozen as of <u>March 31, 2006</u>).

77.    On <u>May 30, 2006</u>, the then-Board of Directors of the Tribune
Company announced a Share Repurchase Plan, which was completed in <u>July 2006</u>.

78.    On <u>April 2, 2007</u>, after ostensibly accepting and considering bids to
purchase the Tribune Company for several months, the Company announced its
intention to accept a proposed acquisition for $34 per share offered by Zell.  The
Company's press release that day had the headline "Tribune to Go Private for $34
Per Share; Employee Stock Ownership Plan (ESOP) Created; Sam Zell to Invest,
Join Board; Chicago Cubs and Comcast SportsNet Interest to be Sold," and stated,
in relevant part as follows:

"With the completion of its strategic review process, Tribune Company
today announced a transaction which will result in the company going private and
Tribune shareholders receiving $34 per share.  Sam Zell is supporting the
transaction with a $315 million investment.  Shareholders will receive their
consideration in a two-stage transaction."

"Upon completion of the transaction, the company will be privately held,
with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's
then-outstanding common stock and Zell holding a subordinated note and a warrant

entitling him to acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.

"The first stage of the transaction was a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell... The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

"The board of directors of Tribune, on the recommendation of a special committee comprised entirely of independent directors, has approved the agreements and will recommend Tribune shareholder approval."

79. The announcement stated that agreements reached between the Tribune Company, the Tribune ESOP, and Zell included the following transactions:

- The Tribune ESOP immediately purchased $250 million of newly issued Tribune common stock for $28 per share.

- Zell invested $250 million in the Company and joined the Tribune Board. Of this initial investment, $50 million purchased 1.5 million newly-issued shares of Tribune common stock for $34 per share and $200 million purchased a note exchangeable for common stock at $34 per share exchange price.

- The Company launched a tender offer to repurchase 126 million shares of its common stock for $34 per share, returning approximately $4.3 billion of capital to shareholders. The tender offer was subject to the completion of financing arrangements, receipt of a solvency opinion and other

**CLASS ACTION COMPLAINT**

1    customary conditions.

2    •    Following the tender offer, the Company and the Tribune ESOP
3         merged and all remaining Tribune stock was converted to cash
4         at $34 per share.  The merger was subject to Tribune
5         shareholder approval, FCC and other regulatory approvals,
6         receipt of financing and a solvency opinion, and other
7         conditions reflected in the definitive agreements.

8    •    Upon completion of the merger, Zell's initial $250 million
9         investment was redeemed and Zell made a new investment
10        through the purchase of a subordinated note for $225 million
11        with an 11-year maturity and a warrant for $90 million with a
12        15-year maturity.  The warrant can be exercised by Zell at any
13        time to acquire 40 percent of the Company's common stock for
14        an aggregate exercise price initially of $500 million.

15        80.    On April 4, 2007, David Hiller, acting on behalf of the Company as
16   the Los Angeles *Times* CEO and publisher, represented that: "It is very important
17   that people understand that the existing pension plans and current 401(k)'s are fully
18   protected.  The new plans will start in 2008."  Later that day, Defendant
19   FitzSimons, then-president and CEO of the Tribune Company, wrote: "[E]xisting
20   retirement and pension benefits are secure.  If you earned benefits from pension
21   plans that ended in recent years, those benefits are safe.  At the end of 2006,
22   Tribune's pension assets of over $1.7 billion and the plans were over-funded by
23   more than $200 million."

24        81.    On April 13, 2007, according to several sources, a letter was sent from
25   FitzSimons to the Wall Street Journal, indicating that the ESOP Trustee obtained a
26   fairness opinion on both the price of the shares purchased by the Tribune ESOP
27   and the relative price Zell "will have to pay to obtain his 40% stake in the
28   company."

**CLASS ACTION COMPLAINT**

82.     On <u>April 14, 2007</u>, a package was distributed to Tribune employees to introduce a new cash balance plan. Included in the package was an assurance that frozen Tribune and Times Mirror Pension Plans would remain secure.

83.     In a previous SEC filing on <u>April 5, 2007</u>, the Company disclosed that <u>Zell would effectively have power to veto major transactions, even though he was only a minority shareholder</u>. Under the terms, transactions with a value of more than $250 million, among others, would required the approval of the Tribune Board, which will include two directors of Zell's choice. These transactions, along with any changes to the by-laws of the Company, would require approval of a majority of the Tribune Board's independent directors as well as that of one of Zell's appointees. On <u>May 9, 2007</u>, Zell was appointed as a member of the Company's Board of Directors.

84.     On <u>May 17, 2007</u>, the Company entered new credit agreements totaling more than $10 billion.

85.     On <u>December 20, 2007</u>, using only $315 million of his own money, Zell closed the $8.2 billion deal taking the Company private through an S corporation ESOP. An S Corporation is a "pass-through tax entity" taxed under Chapter 1, Subchapter S of the Internal Revenue Code. Profits of an S corporation are passed through to individual tax returns, and the profits are therefore reported and taxed by their shareholders. This structure purportedly allowed the Company to avoid most corporate taxes, freeing up cash flow to pay down debt (which surged by billions as a result of the ESOP Acquisition). The Company thus became the largest 100% ESOP-owned S corporation and the fifth largest majority employee-owned company in the United States.

86.     In connection with the closing of the ESOP Acquisition, Zell held a press conference at which he referred to the transaction as the "deal from Hell."

/ / /

/ / /

## 2. **Summary of the ESOP Acquisition**

87.     The ESOP acquisition ("ESOP Acquisition") took place in two stages. In the first stage, the Company sold some assets while still a C corporation. Also in the first stage:

- Zell made a $250 million investment in the Company;
- The Tribune ESOP borrowed $250 million from the Company, and purchased 9 million company shares at $28 per share; and
- The Company borrowed $7 billion and redeemed shares at $34 per share.

88.     In the second stage, the Company was converted from a C corporation to an S corporation. The Company then borrowed an additional $3 billion, and it acquired all outstanding shares not held by the Tribune ESOP, leaving the Company as a 100% privately owned S corporation. The Company also redeemed Zell's initial $250 million investment. Shortly thereafter, Zell made a $315 million investment in the form of a $225 million subordinated note and the purchase of a warrant for $90 million. The warrant can be exercised anytime within 15 years of issuance and gives Zell the right to acquire 40% of the Company from the Tribune ESOP. The exercise price of the warrant starts at $500 million and increases by $10 million a year until it reaches $590 million, where it remains until it expires.

89.     At the time the Tribune ESOP acquired the 9 million Tribune shares, cash flow was down 12% through Q3, 2007 and management had decided to eliminate the profit sharing contribution.

90.     The ESOP Acquisition was characterized by Goldman Sachs as follows: "With an estimated annual interest expense (before adjustments for asset sales) of $1 billion and 2008E EBITDA of $1.147 billion, the transaction leaves little room for error, particularly given the extremely challenging industry backdrop."

/ / /

---

**CLASS ACTION COMPLAINT**

### 3. **Details of the Highly Leveraged ESOP Acquisition**

91. On <u>April 1, 2007</u>, the Tribune Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, Tesop Corporation, a Delaware corporation wholly owned by the ESOP (the "Merger Sub"), and a Zell entity providing for the Merger Sub to be merged with and into the Tribune Company, and following such merger, the Tribune Company to continue as the surviving corporation wholly owned by the Tribune ESOP (the "Merger").

92. GreatBanc Trust Company ("GreatBanc") entered into the Merger Agreement not in its individual or corporate capacity, but solely as a trustee of the ESOT, a separate trust which forms a part of the Tribune ESOP. According to GreatBanc's press release, the bank's role in the ESOP Acquisition is to act as a "watchdog" for the participants in the Tribune ESOP, and that its sole purpose as ESOP Trustee is to serve the best interests of participants in the Tribune ESOP.

93. The "Zell Entity" refers to EGI-TRB, the Zell-affiliated company that made the $315 million investment in the Tribune ESOP in exchange for the note and warrant to purchase 40% of the Tribune Company in the future.

94. On <u>April 1, 2007</u>, the Tribune ESOP purchased 8,928,571 shares of the Tribune Company's common stock from the Tribune Company at a price of $28 per share. The Tribune ESOP paid for this purchase with a promissory note of the Tribune ESOP in favor of the Tribune Company in the principal amount of $250 million, to be repaid by the Tribune ESOP over the 30-year life of the loan through its use of annual contributions from the Tribune Company to the Tribune ESOP and/or distributions paid on the shares of the Company's common stock held by the Tribune ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the Tribune ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of the Company after the Merger.

---

**CLASS ACTION COMPLAINT**

95. On <u>April 23, 2007</u>, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for: (a) 1,470,588 shares of the Company's common stock at a price of $34 per share; and (b) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below). Pursuant to the Zell Entity Purchase Agreement, on <u>May 9, 2007</u>, Zell was appointed as a member of the Tribune Board.

96. On <u>April 25, 2007</u>, the Tribune Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34 per share in cash (the "Share Repurchase"). The tender offer expired on <u>May 24, 2007</u>, and 126 million shares of the Company's common stock were repurchased and subsequently retired on <u>June 4, 2007</u> utilizing proceeds from the Credit Agreement.

97. On <u>December 20, 2007</u>, the Tribune Company completed the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the Tribune ESOP, or the Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and the Company became wholly owned by the Tribune ESOP.

98. In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements,

**CLASS ACTION COMPLAINT**

30

of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company a $225 million subordinated promissory note and a 15-year warrant. The warrant entitled the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represented approximately 40% of the economic equity interest in the Company following the Merger. The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain of Zell's accessories.

99.    In commenting on the valuation paid by the Tribune ESOP, Goldman Sachs stated: "Based on our 2008 estimate of EBITDA, and assuming the company's other assets (Chicago Cubs, Food Network interest, CareerBuilder stake, etc.) are worth approximately $2.2 billion, Tribune's $34 go-private price represents a multiple of about 9.0x EBITDA. We view this as a very rich valuation in the context of the cyclical and securlar changes facing the industry."

### 4.    New Credit Agreements

100.    On May 17, 2007, the Company entered into a **$8.028 billion** senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consisted of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility (the Tranche X Facility"); (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"); (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility"); and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the

---

**CLASS ACTION COMPLAINT**

1 facilities under the Credit Agreement equaled **$10.133 billion in new debt**. On
2 June 4, 2007, proceeds from the Tranche X facility and the Tranche B Facility were
3 used by the Company to consummate the Share Repurchase and to refinance the
4 Company's former five-year credit agreement and former bridge credit agreement.

5    101.   On June 29, 2007, the Company repaid $100 million of the $1.5
6 billion of borrowings under the Tranche X Facility. The remaining principal
7 balance of the Tranche X Facility must be repaid in an aggregate amount of $650
8 million on December 4, 2008, and the remaining outstanding amount of the
9 Tranche X Facility, if any, must be repaid on June 4, 2009.

10    102.   On December 20, 2007, the Company entered into an agreement to
11 obtain an **additional $3.705 billion** in debt which was used by the Company to
12 consummate the Merger.

13    **C.   Zell Controls the Zell Entity, the Tribune ESOP and the Tribune**
14        **Company**

15    103.   At all relevant times, Zell was and is the President of the Zell Entity
16 and its controlling executive officer.

17    104.   There exists, and at all times herein mentioned, there existed, a unity
18 of interest between Zell and the Zell Entity, such that any individuality and
19 separateness between Zell and the Zell Entity has ceased, and the Zell Entity is the
20 alter ego of Zell. Indeed, the Zell Entity has no board of directors. However, Zell
21 is the President and one of only three executive officers. The other two executive
22 officers work for Zell at EGI. Furthermore, the Tribune Company's SEC filings
23 expressly stated that for Zell and the Zell Entity, the purpose of the leveraged
24 Tribune ESOP transactions was to allow the Zell Entity to benefit. On information
25 and belief, Zell controls the Zell Entity.

26    105.   Adherence to the fiction of the separate existence of the Zell Entity as
27 an entity distinct from Zell would permit an abuse of corporate privilege and would
28 promote injustice. Indeed, the Zell Entity is, and at all times mentioned herein, was

---

**CLASS ACTION COMPLAINT**

1  a mere shell, instrumentality, and conduit through which Zell carried on his
2  business in the corporate name, while exercising complete control and dominance
3  of such business to such extent that any individuality or separateness of the Zell
4  Entity and Zell does not, and at all times herein mentioned, did not exist.

5      106.   Furthermore, Zell controls the Tribune Board and, thereby, the
6  Tribune Company. Indeed, Zell effectively has veto power over major transactions
7  because such transactions require approval of a majority of the Tribune Board's
8  independent directors and Zell's appointed Zell Entity director. Specifically, the
9  Company cannot engage in any of the following actions without Zell's approval:

10          (a)    amend, alter or repeal any provision of the Certificate of
11                 Incorporation or By-laws of the Company;
12          (b)    create, or authorize the creation of, or issue or obligate itself to
13                 issue shares of, any additional class or series of capital stock
14                 other than shares issued and sold to the Tribune ESOP at fair
15                 market value solely for purposes of maintaining its 51% equity
16                 ownership of the Company, on a fully diluted basis;
17          (c)    liquidate, dissolve or wind-up the business and affairs of the
18                 Company, or consent to any of the foregoing;
19          (d)    purchase or redeem (or permit any subsidiary to purchase or
20                 redeem) or pay or declare any dividend or make any distribution
21                 on, any shares of capital stock of the Company other than (i)
22                 repurchases of stock from former employees, officers, directors,
23                 consultants or other persons who performed services for the
24                 Company or any subsidiary in connection with the cessation of
25                 such employment or service, (ii) dividends or distributions
26                 necessary to enable the Tribune ESOP to make all payments due
27                 under the terms of the ESOP Loan Agreement as they come due
28                 and (iii) repurchases of stock from the Tribune ESOP as

**CLASS ACTION COMPLAINT**

required by the terms of the Tribune ESOP plan document;

(e) engage in transactions with affiliates other than in their capacity as a stockholder, director, officer or employee of the Company, including any transaction, contract, agreement or arrangement between the Tribune ESOP and the Company, or any amendment or waiver thereof, other than the Investor Rights Agreement, the Merger Agreement, the ESOP Purchase Agreement, the ESOP Loan Agreement and the ESOP Pledge Agreement, and the transactions contemplated thereby;

(f) make, or permit any subsidiary to make, any loan or advance to, any subsidiary or other corporation, partnership or other entity unless it is wholly owned by the Company;

(g) make, or permit any subsidiary to make, any loan or advance to any person, including, without limitation, any employee or director of the Company or any subsidiary, except: (i) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock option plan approved by the Tribune Board, (ii) notes that may be issued by the Company to participants of the Tribune ESOP under the terms of the Tribune ESOP, and (iii) financing provided to the Tribune ESOP;

(h) guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(i) incur any aggregate indebtedness in excess of $250 million that is not already included in the Company's annual budget approved by the Board, other than trade credit incurred in the

---

**CLASS ACTION COMPLAINT**

34

1       ordinary course of business;

2       (j)    acquire any assets or securities of any person in a transaction

3              resulting in payments by the Company in an aggregate amount

4              in excess of $250 million;

5       (k)    sell, assign, license, pledge or encumber any assets of the

6              Company for an amount in excess of $250 million;

7       (l)    enter into any corporate strategic relationship involving the

8              payment, contribution, or assignment by the Company or to the

9              Company of money or assets greater than $250 million;

10      (m)    change the fiscal year of the Company; or

11      (n)    elect not to qualify, or continue to qualify as an S corporation.

12      107.    Moreover, as described in further detail below, Zell, through the New

13 Tribune Board in its fiduciary capacity, controls the Tribune ESOP, which is the

14 sole shareholder of the Tribune Company.  Among other things, Zell has the power

15 to appoint and remove other Tribune ESOP fiduciaries such as the ESOP Trustee

16 and ESOP Plan Administrator.  Also, in essence, Zell may amend the Tribune

17 ESOP at any time and any action authorized or required to be taken by the

18 Company under the Tribune ESOP must be authorized by Zell.  The level of Zell's

19 control is simply astonishing by any measure.

20      108.    By reason of his management positions, membership or

21 representations on the Zell Entity and Tribune's Board of Directors, or stock

22 ownership options, Zell controls the Zell Entity, the New Tribune Board, the

23 Tribune Company and the Tribune ESOP.  Since the ESOP Acquisition closed in

24 December, 2007, Zell had power, influence and control, and exercised it.  A result

25 has been the violations of law complained of herein.

26 ///

27 ///

28 ///

**D.    Zell Conspired With Insiders and Aided and Abetted the Breach of Fiduciary Duties**

109.    The ESOP Acquisition favored the Old Tribune Board, the New Tribune Board, and management of the Tribune Company at the expense of Plaintiffs and the class.  In agreeing to and consummating the ESOP Acquisition, the Old Tribune Board failed to consider in good faith a competing offer made jointly by billionaire investors Eli Broad and Ronald Burkle for the Company.  The Old Tribune Board rejected these two bidders twice: first, on July 31, 2006, when the old tribune Board unequivocally rebuffed offers from Broad, Burkle and entertainment mogul David Geffen to purchase the Los Angeles *Times* from the Company at a substantial premium.  The Old Tribune Board again ignored Broad and Burkle's $34 per share offer in March 2007, purportedly because it was not structured as an ESOP.  Despite being shut out of the bidding process, Broad and Burkle submitted a revised proposal that included an ESOP structure, but the Old Tribune Board - in order to keep its promise to Zell - cut short the so-called bidding process.  Ultimately, the Old Tribune Board announced its agreement with Zell even though his bid was not superior to the other in-hand offers to purchase the Company.  In essence, the ESOP Acquisition was the product of a hopelessly flawed process that was designed to ensure the sale of Tribune Company to Zell's designee and Zell's designee only on terms preferential to Zell and detrimental to Plaintiffs and the class.

110.    In December 28, 2007, the Company's SEC filing indicated that Zell and the Company created a $25 million pool for a management equity incentive plan to provide incentives for Tribune executives to complete the going-private transaction and retain them over a transition period.  Notably, FitzSimons received about $3 million from this pool and a total of approximately $17.7 million in severance and other payouts.

/ / /

---

**CLASS ACTION COMPLAINT**

1    111.   Based on industry analyst reports, it is clear that the Tribune ESOP

2  vastly overpaid at $28 per share.  As stated by Lehman Brothers in its November 2,

3  2007 report on the publishing industry: "Should the Tribune privatization deal

4  break and not occur, we believe that fair value on the stock, if it were to remain an

5  ongoing public entity, would be significantly less than the current stock price [$34

6  per share].  Given the added $7 billion in debt to repurchase 126 million shares in

7  the tender offer, we think fair value on the stock would be $7-$8 per share on our

8  detailed sum-of-the-parts analysis...."  Among the issues cited by Lehman Brothers

9  in its November 2007 Publishing report are: "declining readership and circulation,

10  declining advertising market share, a weak newspaper advertising revenue outlook

11  (estimated down 8.0% in 2007 and down 5% in 2008), a total decoupling of

12  newspaper advertising growth from nominal GDP growth, very tight cost

13  containment already over the past seven years, and margins that are currently at

14  pre-1990's levels on average due to secular issues."

15    112.   Defendants, and each of them, had fiduciary obligations to, among

16  other things:

17        a.   act independently so that the interests of the Tribune ESOP, the

18             Tribune Company, Plaintiffs and the class were protected;

19        b.   adequately ensure that no conflicts of interest existed between

20             Defendants' own interests and their fiduciary obligations or, if

21             such conflicts existed, to ensure that all conflicts were resolved

22             in the best interests of the Tribune ESOP, the Tribune Company,

23             Plaintiffs and the class; and

24        c.   disclose all material information to Plaintiffs and the Tribune

25             ESOP, including information on the Company's true value.

26    113.   In accordance with their duties of loyalty and good faith, the Old

27  Tribune Board was obligated to refrain from:

28  / / /

---

**CLASS ACTION COMPLAINT**

1        a.    participating in any transactions where the directors' or officers'
2              loyalties are divided;

3        b.    participating in any transaction where the directors or officers
4              receive or are entitled to receive a personal financial benefit not
5              equally shared by the public shareholders of the Company;
6              and/or

7        c.    unjustly enriching themselves at the expense or detriment of the
8              Tribune Company, Plaintiffs, the class, and the Tribune ESOP.

9    114.   Defendants, separately and together, in connection with the ESOP
10 Acquisition, violated the fiduciary duties owed to the Tribune Company, the
11 Tribune ESOP, Plaintiffs and the class, including their duties of loyalty, good faith,
12 candor, due care and independence, insofar as they stood on both sides of the
13 transaction and engaged in self-dealing and obtained for themselves personal
14 benefits, including personal financial benefits, not shared equally by Plaintiffs and
15 the class.

16    **E.**    **Tribune Troubles:  Layoffs and Buy-Outs of Tribune Employees**

17    115.   On <u>February 12, 2008</u>, Zell announced to employees that the Company
18 would eliminate all profit-sharing contributions to the pension plan.  The
19 announcement also indicated that the Cash Balance Plan "is funded by Tribune's
20 significantly over-funded pension assets."  Nonetheless, the announcement stated
21 that the frozen pension plan benefits remained "secure."

22    116.   Upon information and belief, the Tribune Company and the New
23 Tribune Board have terminated a number of long-term employees who were
24 Tribune ESOP participants or have taken action to force their early resignations or
25 retirement.  Upon information and belief, these actions were taken to, among other
26 things, increase the value of Zell's warrant to purchase 40% of the billion dollar
27 company within 15 years.

28 / / /

---

117.   Since the ESOP Acquisition, staff cuts were made with departing employees receiving two weeks' pay per year of service, up to a maximum of one years' salary. According to reports published by the New Tribune Board, the cash for the buyouts came from the "over-funded" pension plan. In February 2008, Tribune publishers, including David Hiller of the Los Angeles *Times*, sent memos indicating that if there was to be another buy-out offer to employees to leave the Tribune Company in the future, it would not be as favorable. As such, Tribune employees were induced to take that buy-out offer and leave the Tribune Company. On information and belief, the intent of these buy-outs was to reduce the Tribune company's work force by 2%.

118.   On February 13, 2008, Zell suggested in a memo that the moves reflected the reality of the Tribune Company's significant debt levels.

119.   On February 14, 2008, a Los Angeles *Times* article stated that "Tribune officials had determined that the defined-benefit plan had about $300 million more than it needed to meet future obligations to retirees. Rather than leave that cash 'just sitting there,' Hiller said, Zell was using it to fund the buyouts and – in a program announced Tuesday – to make a one-time, cash contribution of 2% of employees' salaries to a new cash-balance plan."

120.   On February 19, 2008, the Tribune Employee Severance Program stated that employees' pension plan benefits will remain secure and unchanged.

121.   In May 2008, the Company announced its quarterly earnings for the first quarter of 2008. Newspaper sales declined 11%. All print advertising categories showed some acceleration of their decline in the first quarter compared to the fourth quarter of 2007. Newspaper EBITDA[7] fell 37%.

122.   In June 2008, the Company announced that Los Angeles *Times* building and the Chicago Tribune Tower were up for sale.

---

[7]Earnings Before Interest, Taxes, Depreciation and Amortization

1    123.  On July 2, 2008, the Tribune Company announced another round of
2  mass layoffs, including 250 from the Los Angeles *Times*.  On July 13, 2008, David
3  Hiller resigned as publisher of the Los Angeles *Times* and Ann Marie Lipinski
4  resigned as editor of the Chicago *Tribune*.

5    124.  On July 14, 2008, the Associated Press reported that the Los Angeles
6  *Times* planned to cut 250 positions.  It also stated that: "Last December, Tribune
7  bought out its public shareholders in an $8.2 billion deal orchestrated by real estate
8  mogul Sam Zell.  Now, he and the company are struggling to service that debt."

9    **F.    Conflicts of Interest**

10    125.  The following are just a few of the numerous conflicts of interest:

11        **1.    The Los Angeles *Times* Magazine**

12    126.  On June 10, 2008, Los Angeles *Times* publisher Russell "Russ"
13  Stanton announced in memo to Los Angeles *Times* staffers that "the [Tribune]
14  company is rethinking the future of the Los Angeles Times Magazine" and "has
15  been looking at possible ways to continue to publish a magazine, but outside of the
16  director of the editorial department."  In the June 10 memo, Stanton assured his
17  staff of the Tribune Company's commitment to "make clear that the magazine is
18  being produced outside of [the Los Angeles *Times*'] own newsroom.  We want to
19  make sure that the public - our readers and the subjects of the stories included - are
20  not confused about who is producing the content of the magazine."  By August
21  2008, control of the Los Angeles *Times* Magazine had been shifted from the
22  editorial department to business operations, making the significance of Stanton's
23  assurance impossible to understate.  As reported in the New York *Times*' coverage
24  of Stanton's announcement, "The arrangement would flout the tradition at most
25  newspapers, which keep business operations, like advertising and circulation,
26  completely separate from the editorial department, which controls decisions about
27  the contents of news and feature pages."  The report also cited fears that the Los
28  Angeles *Times* Magazine "would become less a work of journalism than a

---

**CLASS ACTION COMPLAINT**

40

1  lightweight vehicle for currying favor with advertisers."

2      127.   Despite Stanton's promises, the action has breached a critical,
3  industry-wide ethical wall between newspapers' business and editorial departments
4  (the *New York Times Magazine* is controlled by that paper's editorial department,
5  for example), Tribune management is intentionally presenting a product controlled
6  by Zell and his newly hired magazine "publisher" (who is on the advertizing staff),
7  as the work of the regular news staff.

8      128.   For example, although the "new" magazine was widely reported in
9  July 2008 to be named simply "LA" instead of its historical title (*The Los Angeles
10 Times Magazine*) in order to make the change in content control easily apparent to
11 readers, on information and belief, the Tribune Company now plans to use the
12 historical name when it reintroduces the Magazine.  Moreover, on information and
13 belief, new magazine staffers currently introduce themselves as Los Angeles
14 *Times*' editorial writers.  In perhaps the most obvious violations of the professional
15 standards and policies against conflicts of interest, on information and belief
16 editorial staff will be forced to provide content for the advertizing department-led
17 publication, and funds to hire magazine freelancers will come from the editorial
18 department's budget.  Adding insult to injury, while posting billion dollar losses
19 and continuing the layoffs of experienced, talented, dedicated editorial staff, the
20 Tribune Company is redecorating and renovating the old (editorial department)
21 magazine offices to accommodate roughly twice as many staffers as worked for the
22 old magazine, who will, on information and belief, earn salaries far higher than did
23 the old Magazine's staff.

24          **2.    The Tribune Tower**

25      129.   On June 12, 2008, *Chicago Business* reported that "Tribune Co. boss
26 Sam Zell has leased the 23rd floor of the Tribune Tower, the company's former
27 executive suite, to a new investment firm headed by his sister, Leah Zell Wagner...
28 The 23rd floor was the former office of Tribune CEO Dennis FitzSimons, who

---

**CLASS ACTION COMPLAINT**

41

1  announced his resignation in December, a day before real estate mogul Sam Zell
2  took over the media giant and took the company private." According to the
3  Tribune Company Related Person Transactions Policy, which took effect <u>December</u>
4  <u>20, 2007,</u> "In considering whether to approve or ratify any Related Person
5  Transaction, the Audit Committee or the disinterested members of the Board of
6  Directors, as the case may be... shall consider... whether the transaction may
7  involve a conflict of interest..." (See **Exhibit F** attached hereto and incorporated
8  herein by this reference).

9      130.  On information and belief, the New Tribune Board failed to follow its
10  own conflict of interest policy.  Employees - technically "owners" of the Tribune
11  Company - have been denied information about Zell's two-year lease of office
12  space to his sister.  On information and belief, the transaction, that according to
13  property values reported in Grubb-Ellis' First Quarter 2008 report is worth
14  approximately $500,000, was not done at fair market value.  Because employees
15  technically own the Company, it is they who have been shortchanged by a deal
16  done to benefit Zell's sibling.

17      **G.**    **Overview of ERISA and ESOPs**

18      131.  Congress enacted ERISA in 1974 to assure the equitable character of
19  employee benefit plans and their financial soundness.  ERISA seeks to accomplish
20  this goal by requiring such plans to name fiduciaries and by giving them strict and
21  detailed duties and obligations.  Under ERISA, a person or entity is a fiduciary
22  with respect to a plan to the extent: (a) he or she exercises any discretionary
23  authority or discretionary control respecting management of such plan or exercises
24  any authority or control respecting management or disposition of its assets, or (b)
25  he or she has any discretionary authority or discretionary responsibility in the
26  administration of such plan.

27  / / /

28  / / /

132. Borrowing from trust law, ERISA imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets. The ERISA fiduciary: (a) is subject to a strict standard of care, 29 U.S.C. §1104(a)(1); (b) is liable for known breaches of co-fiduciaries, §1105; and (c) may not engage in prohibited transactions, §1106.

133. ERISA contains specific provisions governing ESOPs. An ESOP is an ERISA plan which invests primarily in "qualifying employer securities," typically stock of the employer creating the plan, §1107(d)(6)(A). An ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan. Notwithstanding this, ESOPs are covered by ERISA's stringent requirements and, except for a few select provisions, ESOP fiduciaries must act in accordance with the duties of loyalty and care. ESOP fiduciaries wear two hats: they administer the ESOP investments consistent with both the provisions of a specific employee benefit plan and ERISA.

134. Thus, an ESOP does not relieve a fiduciary from the general fiduciary responsibilities of Section 1104 which, among other things, require a fiduciary to discharge his duties respecting the plan: (a) "solely in the interest of the plan participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries," and (b) with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." These requirements generally are referred to as the duties of loyalty and care, or as the "solely in the interest" and "prudence" requirements. In addition, fiduciaries are required to "diversif[fy] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

/ / /

/ / /

**CLASS ACTION COMPLAINT**

1    135.   An ESOP must be operated for the exclusive benefit of employees and
2  their beneficiaries.  Further, as plan fiduciaries, the ESOP trustees have liability
3  when they recommend transactions, structure deals, and provide investment advice
4  to the extent that they exercise effective control over the ESOP's assets.  In
5  addition, to the extent the trustees are corporate insiders, they cannot use their
6  positions of trust and confidence to involve the ESOP in transactions in which they
7  have a personal interest.

8    136.   Further, a corporate director's power to appoint trustees of the ESOP
9  makes him or her a fiduciary to the extent he or she exercises discretion or control.
10  The director's duty to monitor the actions of appointed trustees imposes a duty to
11  prevent wrongful conduct.

12    137.   In addition to the obligation to act in the best interests of the trust,
13  when a fiduciary has dual loyalties, the prudent person standard requires that he or
14  she make a careful and impartial investigation of all investment decisions.  Thus,
15  an ESOP fiduciary must serve with the utmost care and fairness.

16    138.   Finally, ERISA provides a statutory basis for co-fiduciary liability, or
17  liability for breach of fiduciary responsibility of another fiduciary with respect to
18  the same plan under certain circumstances, including when: (a) the co-fiduciary had
19  actual knowledge of the other fiduciary's breach and the co-fiduciary knowingly
20  participated in the breach or undertook to conceal it; or (b) the co-fiduciary's
21  failure to comply with his or her own duties under ERISA enabled the fiduciary to
22  commit the breach; or (c) the co-fiduciary has actual knowledge of the other
23  fiduciary's breach and the co-fiduciary failed to make reasonable efforts to remedy
24  the other fiduciary's breach.

25    139.   Section 1109(a) provides that an ERISA fiduciary who breaches any
26  duty is liable to the plan: (a) for any losses to the plan resulting from each such
27  breach (in other words, from a financial loss to the plan); (b) for any profits made
28  through use of assets of the plan by the fiduciary (in other words, for any profit

---

**CLASS ACTION COMPLAINT**

44

wrongfully made); and (c) for such other equitable or remedial relief as the court may deem appropriate. A court may enjoin fiduciaries and those who aid and abet their efforts from serving directly or indirectly as fiduciaries of any ESOP or ESOT, or any other employee benefit plan covered by ERISA and from engaging in any acts that would violate fiduciary duties imposed by ERISA.

## H.   Overview of Retirement Plans Before and After the ESOP Acquisition

### 1.   The Tribune Retirement Plans Before the ESOP Acquisition

140.   The Tribune Company and the Times Mirror had pension plans. The Tribune plan ended <u>December 31, 2007</u>. Each employee received two contributions from the Company – a 4% contribution each pay period based on salary and an annual profit sharing contribution based on financial performance of the Company. Company contributions to the 401(k) Savings and Profit Sharing plan continued through the merger closing.

### 2.   The Tribune Retirement Plans After the ESOP Acquisition

141.   Prior to the ESOP Acquisition, the Tribune Company had approximately $3.6 billion in debt. After the ESOP Acquisition, the Tribune Company was approximately $13 billion in debt.

142.   Beginning in 2008, eligible Tribune employees had a different retirement plan made up of the Cash Balance Plan, the existing 401(k) plans, and the Tribune ESOP.

143.   The Cash Balance Plan was newly created and funded entirely by the Company. It provides a 3% annual allocation to each eligible employee's Cash Balance Plan account. Interest is credited quarterly to employee accounts based on the 10-year U.S. Treasury Note. The assets for the Cash Balance Plan are held at Northern Trust. The Company saves money because the Cash Balance Plan can be funded from what it claims are excess assets in the pension plan. The surplus funding for the Tribune's pension assets ($400 million) was used in 2008 to fund

---

**CLASS ACTION COMPLAINT**

1 the 3% benefit allocation.  The vesting rules are the same as the Tribune ESOP.

2      144.  As to the existing 401(k) plans, eligible employees could continue to

3 contribute to their 401(k) accounts up to IRS maximums.

4      145.  The Tribune ESOP was created at the time of the ESOP Acquisition.

5 It was funded solely through company contributions and invested solely in shares

6 of stock in the Tribune Company.  Annually, an allocation is made among

7 employee accounts in the ESOP Trust.  The Company initially targeted an annual

8 allocation of 5% of eligible employees' salaries.

9     **I.**    **The Tribune ESOP Fiduciaries**

10      146.  The Tribune ESOP was established on April 1, 2007 with an effective

11 date of January 1, 2007.  The Tribune ESOT was established pursuant to an

12 agreement between the Tribune Company and GreatBanc on April 1, 2007.

13 Pursuant to the ESOT, GreatBanc accepted appointment as the Trustee of the

14 Tribune ESOP effective February 7, 2007.  Amounts contributed under the Plan are

15 held and invested, until distributed, by the ESOP Trustee appointed by the Tribune

16 Company acting by and through the New Tribune Board.  The ESOP Trustee acts

17 in accordance with the terms of the Tribune ESOP, which is administered by a

18 committee appointed by the New Tribune Board.

19     **1.**    **The ESOP Trustee**

20      147.  Pursuant to the Tribune ESOP and the Tribune ESOT, GreatBanc may

21 manage, administer and invest all contributions made by the several employers

22 under the Tribune ESOP as one trust fund.  The Tribune ESOP provides that

23 GreatBanc shall discharge its duties solely in the interests of the participants and

24 beneficiaries of the Tribune ESOP and:

25       a.    for the exclusive purpose of:

26          i.    providing benefits to participants and beneficiaries, and

27          ii.    defraying reasonable expenses of administering the

28               Tribune ESOP;

---

**CLASS ACTION COMPLAINT**

b.   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matter would use in the conduct of an enterprise of a like character and with like aims; and

c.   in a manner that does not constitute a non-exempt prohibited transaction under ERISA.

148.   Like ESOPs generally, the Tribune ESOP was intended to invest primarily in Company stock. Accordingly, GreatBanc may, but is not required to, hold 100% of the trust assets in shares in Company stock. In this regard, the Tribune ESOP provides that GreatBanc shall have complete discretion with regard to all purchases and sales of Company stock by the Trust, without regard to any instruction from the Plan Administrator. Accordingly, GreatBanc is authorized to purchase or sell Tribune stock from or to the Company or from or to any other person, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by GreatBanc based on an independent appraisal when the Company stock is not publically traded. Additional general duties of GreatBanc include:

a.   to vote or exercise other rights with respect to any Tribune stock at its discretion;

b.   to employ and to reasonably rely upon information and advice furnished by agents, attorneys, appraisers, accountants or other persons of its choice for such purposes as the ESOP Trustee considers necessary, for the proper administration of the Trust;

c.   to borrow such sum or sums from time to time as the ESOP Trustee considers necessary or desirable and in the best interest of the Trust fund; and

/ / /

**CLASS ACTION COMPLAINT**

47

      d.     to perform any and all other acts which are necessary or appropriate for the proper management, investment and distribution of the Trust fund.

149. GreatBanc is only entitled to reasonable compensation for services, as agreed to between the Tribune Board and GreatBanc.

150. The Tribune ESOP may remove GreatBanc as trustee by giving thirty days' advance notice to GreatBanc, subject to providing GreatBanc with satisfactory written evidence of the appointment of a successor trustee and of the successor trustee's acceptance of the trusteeship.

## 2.    The Plan Administrator

151. Defendant Tribune Company Employee Benefits Committee is appointed by the New Tribune Board to administer the Tribune ESOP. The Committee consists of one or more individuals (who may but need not be employees of the Tribune Company) to conduct administrative functions of the Tribune ESOP. The Plan Administrator shall have all the powers necessary and appropriate to discharge its duties under the Tribune ESOP, which powers shall be exercised in the sole and absolute discretion of the Plan Administrator, including but not limited to, in pertinent part, the following:

      a.     to construe and interpret the provisions of the Tribune ESOP and to make factual determinations thereunder, including the power to determine the rights or eligibility under the Tribune ESOP of employees, participants, or any other persons, and the amounts of their benefits under the Tribune ESOP;

      b.     to adopt such rules or procedure and regulations as in its opinion may be necessary for the proper and efficient administration of the Tribune ESOP;

      c.     to enforce the Tribune ESOP in accordance with the terms of the Tribune ESOP and the trust and the rules and regulations the

---

**CLASS ACTION COMPLAINT**

48

1    Plan Administrator has adopted;

2    d.    to employ agents, attorneys, accountants, actuaries or other

3    persons (who also may be employed by the Tribune Company)

4    and to allocate or delegate to them such powers, rights and

5    duties as the Plan Administrator may consider necessary or

6    advisable to carry out administration of the Tribune ESOP;

7    e.    to appoint an investment manager to manage (with power to

8    acquire and dispose of) the assets of the Tribune ESOP, which

9    investment manager may or may not be a subsidiary of the

10    Company, and to delegate to any such investment manager all of

11    the powers, authorities and discretions granted to the Plan

12    Administrator under the Tribune ESOP, and to remove any

13    investment manager as necessary; and

14    f.    to authorize GreatBanc to act without the direction of the Plan

15    Administrator with regard to any matter concerning the

16    purchase, sale or voting of Company stock, including the

17    financing and other matters incidental to such purchase or sale,

18    upon written consent of GreatBanc to accept responsibility.

19    **3.    The New Tribune Board and the Company**

20    152.    As indicated above, any action authorized or required to be taken by

21    the Company or an employer under the Tribune ESOP shall be by resolution of the

22    Tribune Board, by resolution of a duly authorized committee of the Tribune Board,

23    or by a person or persons authorized by resolution of the Tribune Board or such

24    committee.  In this regard, on information and belief, certain of the Company's

25    officers were also fiduciaries of the Tribune ESOP under ERISA.

26    153.    Critically, the Tribune Company reserved the right to amend the

27    Tribune ESOP at any time pursuant to action of the Tribune Board.

28    ///

**CLASS ACTION COMPLAINT**

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM

### (VIOLATION OF DUTY OF PRUDENCE - ERISA)

154.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

155.   Plaintiffs assert this claim against the Fiduciary Defendants.

156.   ERISA provides that a fiduciary with respect to a qualified employment plan shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.  Fiduciaries are required to discharge these duties with the care, skill, prudence, and diligence that a prudent man acting in a like capacity and familiar with such matters would use for the conduct of an enterprise of like character with like aims.  29 U.S.C. § 1104.

157.   At all relevant times set forth herein, the Company, the Old Tribune Board, the New Tribune Board, the Trustee, and the Plan Administrator (the "Fiduciary Defendants"), exercised discretionary authority or control with respect to the management, administration and/or disposition of the Tribune ESOP or its assets.

158.   At all relevant times set forth herein, the Fiduciary Defendants were fiduciaries as defined by ERISA and were required to act with the highest degree of skill, prudence, diligence, loyalty, honesty and due care to the Tribune ESOP participants and beneficiaries with respect to any decisions or acts affecting the ESOP.  By engaging in the acts and transactions set forth herein, the Fiduciary Defendants have engaged in breaches of fiduciary duty and prohibited transactions in violation of ERISA.  29 U.S.C. § 1104; 29 U.S.C. § 1106.

159.   The Fiduciary Defendants are liable for failing to sue themselves by way of a derivative action on behalf of the Tribune ESOP to remedy their breaches of duty.  An ESOP fiduciary who also serves as an officer or director of the

---

**CLASS ACTION COMPLAINT**

sponsoring employer can be charged with knowledge of any improper actions that he took as an officer or director, and his failure to act prudently on the basis of that knowledge violates the fiduciary duties he owes under ERISA.

160.    Moreover, an ESOP trustee has a duty to bring a derivative action if he is aware that officers and directors of the sponsoring company have breached their fiduciary duty to shareholders. That this would require the ESOP trustee to bring suit against himself does not relieve him of this duty under ERISA. In breaching their duties and dealing with the ESOP assets for their own interests as set forth herein, Defendants abused and put at risk assets of the Tribune ESOP belonging to the entire ERISA plan.

161.    In the alternative, as relates to the Old Tribune Board and the New Tribune Board, and only to the extent the certain members of the Old Tribune Board and the New Tribune Board may be determined to be nonfiduciaries with respect to the Tribune ESOP, said New Tribune Board members are liable as parties in interest under ERISA for knowingly participating in a prohibited transaction or transactions involving the Tribune ESOP and for knowingly participating in other ERISA violations knowingly undertaken by the Tribune ESOP fiduciaries as set forth herein. 29 U.S.C. § 1002(14)(B).

162.    By engaging in the breaches of fiduciary duties set forth herein, the Fiduciary Defendants at all relevant times acted as conflicted fiduciaries. Unless the New Tribune Board, the ESOP Trustee, and the Plan Administrator are removed from their fiduciary positions, the New Tribune Board, the ESOP Trustee, and the Plan Administrator will continue to engage in wrongful acts, including but not limited to continued ill-advised transactions, investments and loans; along with concealment of breaches, to the continuing detriment of the Tribune ESOP and its participants and beneficiaries.

163.    This Court should exercise its equitable powers under ERISA to remove the New Tribune Board, the ESOP Trustee, and the Plan Administrator

**CLASS ACTION COMPLAINT**

1 from their fiduciary positions and appoint independent, non-directed fiduciaries
2 with ESOP experience to manage the affairs of the Tribune ESOP.

3     164.   Moreover, the Court should restore all of the losses to the Tribune
4 ESOP stemming from the Fiduciary Defendants' breaches of fiduciary duties and
5 disgorge an ill-gotten profits of the Fiduciary Defendants stemming from those
6 breaches.

7     165.   The Fiduciary Defendants have breached their duty of prudence for,
8 *inter alia*, agreeing to the ESOP Acquisition that resulted in the Tribune ESOP
9 having to borrow $250 million to pay for Company stock that was improperly
10 valued. Accordingly, the sale was at an excessive price and burdened the Tribune
11 ESOP with too much debt, which compromised the value of the acquired stock.
12 Indeed, prior to the ESOP Acquisition, the Tribune Company was $3.6 billion in
13 debt. After the ESOP Acquisition, it was $13 billion in debt.

14     166.   Furthermore, despite the Tribune Company's troubles after the ESOP
15 Acquisition was completed in December 2007, the Company, the New Tribune
16 Board, the Trustee, and the Plan Administrator have continued to hold or invest in
17 Tribune stock. As such, these Defendants have engaged in a continuing breach of
18 their duty of prudence and have abused their discretion by, *inter alia*, investing and
19 continuing to hold and invest in the debt ridden Tribune Company's stock.

20     WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

21                    **SECOND CLAIM**

22      **(VIOLATION OF DUTY OF LOYALTY/DISCLOSURE - ERISA)**

23     167.   Plaintiffs hereby incorporate by reference all of the allegations set
24 forth above as though fully set forth hereafter.

25     168.   Plaintiffs bring this claim against the Fiduciary Defendants.

26     169.   The duty of loyalty owed by ERISA fiduciaries is broad and includes
27 the duty to disclose material information.

28 / / /

---

**CLASS ACTION COMPLAINT**

1      170.  The Fiduciary Defendants had a duty of disclosure to Plaintiffs and the

2 class with respect information in public filings, press releases, and other written

3 and oral communications.

4      171.  The Fiduciary Defendants have made or were responsible for material

5 misrepresentations and omissions in connection with public filings, press releases,

6 and other written and oral communications both publicly, and directed at

7 participants in the Tribune ESOP.

8      172.  For example, prior to the ESOP Acquisition, representatives of the

9 Tribune Company, including but not limited to the Old Tribune Board and

10 Company officers, repeatedly indicated to Plaintiffs and the class that their pension

11 benefits would be "safe." Indeed, in <u>April 2007</u>, David Hiller and Dennis

12 FitzSimons assured Los Angeles *Times* employees that their retirement benefits

13 were fully protected and will not be affected by the Tribune ESOP. On <u>April 14,</u>

14 <u>2007</u>, a package was distributed to employees to introduce a new cash balance

15 plan. Included in the package was an assurance that frozen Tribune and Times

16 Mirror Pension Plans would remain secure.

17      173.  In reality, on <u>February 12, 2008</u>, Zell announced to employees that the

18 Company would eliminate profit-sharing contribution to pension. Moreover, since

19 the ESOP Acquisition, staff cuts were made with departing employees receiving

20 two weeks' pay per year of service. The cash for the buyouts came from the

21 supposedly over-funded pension plan.

22      174.  Thus, after the Tribune Company, including but not limited to both the

23 Old Tribune Board and the New Tribune Board, repeatedly represented to

24 employees that their pensions and by implication, their livelihood, would be safe

25 following the ESOP Acquisition, the Company and the New Tribune Board lead by

26 Zell, engaged in mass lay-offs using funds from the very pensions they said they

27 would protect.

28 / / /

**CLASS ACTION COMPLAINT**

175.   In another misrepresentation, on <u>April 2, 2007</u>, the Company announced that after the ESOP Acquisition, the Company will be led by a board of directors with an independent majority.  FitzSimons, as president and chief executive officer of the Tribune Company, will remain a member of the Board, along with at least five independent directors and an additional director affiliated with Zell.  However, the Tribune Company's SEC filing around that time indicated that Zell was able to appoint two members to the Tribune Board, which effectively gave him veto power on major decisions.  Furthermore, FitzSimons stepped down from his positions with the Tribune Company in <u>December 2007</u>.

176.   Finally, after repeated representations that the ESOP Acquisition was in the best interests of the Company and its future owner-employees, the Company is struggling to service its massive $13 billion debt.

177.   Accordingly, the Old Tribune Board, the New Tribune Board, the ESOP Trustee, and the Plan Administrator created an inaccurate impression on the future prospects of the Tribune ESOP and the Tribune Company; provided misleading information about soundness of the ESOP Acquisition and the Tribune Company's stock; and failed to disclose inaccurate or incomplete evaluation practices.  Consequently, the Fiduciary Defendants have breached their duties of loyalty and disclosure.

WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

## THIRD CLAIM

## (VIOLATION OF DUTY TO AVOID CONFLICTS OF INTEREST - ERISA)

178.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

179.   Plaintiffs bring this claim against the Fiduciary Defendants.

180.   The composition of the New Tribune Board by definition shows conflicts of interest where Zell, not the Tribune ESOP, has effective veto power on

---

**CLASS ACTION COMPLAINT**

54

1 all major decisions. This situation is the result of the decision to consummate an
2 acquisition agreement that allowed Zell to appoint two additional board members.
3 Furthermore, William Osborn has been a member of the Tribune Board since 2001.
4 Osborn is also the chairman and a director of Northern Trust, which is the Trustee
5 for the pension. William Pate is a Director on the Tribune Board and is referred to
6 as Zell's "right-hand" man. Not surprisingly, since 2000, Pate has been the chief
7 investment officer for Equity Group Investments, LLC, a privately held investment
8 firm also controlled by Zell.

9     181.   On information and belief, Plaintiffs allege that the Fiduciary
10 Defendants have breached their duty to avoid conflicts of interest by engaging in
11 self dealing transactions adverse to the interests of the Tribune ESOP. 29 U.S.C. §
12 1104; 29 U.S.C. § 1106.

13     WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

14                           **FOURTH CLAIM**

15              **(VIOLATION OF DUTY TO MONITOR - ERISA)**

16     182.   Plaintiffs hereby incorporate by reference all of the allegations set
17 forth above as though fully set forth hereafter.

18     183.   Plaintiffs assert this claim against the Company and the New Tribune
19 Board.

20     184.   GreatBanc was appointed as the ESOP Trustee by the Company
21 through the New Tribune Board. Likewise, the Plan Administrator was appointed
22 by the Company through the New Tribune Board to administer the Tribune ESOP.

23     185.   GreatBanc and the Plan Administrator were specifically tasked with
24 acting in the best interests of the participants and beneficiaries of the Tribune
25 ESOP. However, they simply affirmed an insider deal that allowed the Tribune
26 ESOP to borrow $250 million to invest in a debt ridden company while Board
27 members such as FitzSimons walked away with some $17.7 million leaving what
28 was supposed to be an "independent" Board, merely a tool for Zell. Accordingly,

---

**CLASS ACTION COMPLAINT**

1 the Company and the New Tribune Board, individually and collectively, breached
2 their duty to monitor by improperly appointing the ESOP Trustee and the Plan
3 Administrator.

4     186. Moreover, the ongoing responsibilities of an appointing fiduciary
5 under ERISA requires that at reasonable intervals the performance of trustees and
6 other fiduciaries should be reviewed by the appointing fiduciary in such a manner
7 as may be reasonably expected to ensure that their performance has been in
8 compliance with the terms of the plan and statutory standards, and satisfies the
9 needs of the Plan.

10     187. The duty to monitor also includes a duty to take action upon discovery
11 that appointed fiduciaries are not performing properly.

12     188. The Company and the New Tribune Board also breached their
13 fiduciary duty by failing to properly monitor or remove the ESOP Trustee and the
14 Plan Administrator for, among other things, continuing to hold or invest in the
15 stock of the debt ridden and struggling Tribune Company.

16     WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

17 ### **FIFTH CLAIM**

18 ### **(CO-FIDUCIARY LIABILITY - ERISA)**

19     189. Plaintiffs hereby incorporate by reference all of the allegations set
20 forth above as though fully set forth hereafter.

21     190. Plaintiffs assert this claim against the Fiduciary Defendants.

22     191. On information and belief, the Fiduciary Defendants knowingly
23 participated in or concealed fiduciary breaches of each other and possibly other
24 fiduciaries. 29 U.S.C. § 1105(a).

25     192. On information and belief, each Fiduciary Defendant's own failure to
26 comply with his, her or its fiduciary responsibilities enabled breaches of other
27 fiduciaries. 29 U.S.C. § 1105(a).

28 / / /

---

**CLASS ACTION COMPLAINT**

56

1    193.   Accordingly, the Fiduciary Defendants, and each of them, are also
2  liable as co-fiduciaries under ERISA with respect to the violations described herein
3  because they knowingly participated in their co-fiduciaries' breaches and/or
4  knowingly undertook to conceal those breaches, enabled their co-fiduciaries to
5  commit the breaches and failed to make reasonable efforts to remedy the breaches.
6  29 U.S.C. § 1105(a).

7    WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

8  ## SIXTH CLAIM

9  ## (PROHIBITED TRANSACTIONS - ERISA)

10    194.   Plaintiffs hereby incorporate by reference all of the allegations set
11  forth above as though fully set forth hereafter.

12    195.   Plaintiffs assert this claim against all Defendants.

13    196.   29 U.S.C. § 1106(a) of ERISA requires that a plan fiduciary "shall not
14  cause the plan to engage in a transaction, he knows or should know that such
15  transaction constitutes a direct or indirect sale or exchange, or leasing of any
16  property between the plan and a party in interest," or a "transfer to, or use by of for
17  the benefit of, a party in interest, of any assets of the plan."

18    197.   29 U.S.C. § 1106(b) of ERISA mandates that a plan fiduciary shall not
19  "act in any transaction involving the plan on behalf of a party (or represent a party)
20  whose interests are adverse to the interests of the plan or the interests of the
21  participants," or "deal with the assets of the plan in his own interest or for his own
22  account," or "receive any consideration for his own personal account from any
23  party dealing with such plan in connection with a transaction involving the assets
24  of the plan."

25    198.   29 U.S.C. § 1108(e) provides a conditional exemption from the
26  prohibited transaction rules for the sale of employer securities to or from a plan if
27  the sale is made for adequate consideration.  Nonetheless, ERISA's legislative
28  history and existing case law make clear that a fiduciary must conduct a prudent

---

**CLASS ACTION COMPLAINT**

57

1  investigation to determine the proper price for the sale of an employer security.

2      199.  Defendants engaged in prohibited transactions in violation of 29

3  U.S.C. §§ 1106(a)-(b) by failing to ensure that the Tribune ESOP did not pay more

4  than adequate consideration in buying Tribune stock. Rather, the Tribune ESOP

5  paid more than adequate consideration in buying Tribune stock. In this regard, the

6  Tribune stock price was not properly valued by the Fiduciary Defendants because

7  they did not conduct a prudent investigation into the proper price of Tribune stock

8  before the ESOP Acquisition. Furthermore, the Tribune stock price prior to the

9  ESOP Acquisition did not properly account for the Tribune Company's existing and

10  anticipated future debt.

11      WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

12                      **SEVENTH CLAIM**

13          **(STATE LAW BREACH OF FIDUCIARY DUTIES)**

14      200.  Plaintiffs hereby incorporate by reference all of the allegations set

15  forth above as though fully set forth hereafter.

16      201.  Plaintiffs bring this claim for state law breach of fiduciary duties

17  against the Old Tribune Board and the New Tribune Board on behalf of the

18  Company and the Tribune ESOP. The Company and the Tribune ESOP are

19  nominal defendants as to this claim.

20      202.  Plaintiffs did not make a demand on the New Tribune Board, the

21  Company or the Tribune ESOP for the relief requested herein because such a

22  demand would have been futile. Indeed, these Defendants are incapable of making

23  an impartial decision in response to such a demand because, *inter alia*, the New

24  Tribune Board controls the Company and the Tribune ESOP.

25      203.  The members of the Old Tribune Board and the New Tribune Board,

26  and each of them, violated the fiduciary duties of due care, loyalty, candor, good

27  faith and independence owed to the Company, the Tribune ESOP, Plaintiffs and the

28  class and have acted to put their personal interests ahead of those to which they

---

**CLASS ACTION COMPLAINT**

1  have fiduciary duties.

2      204.  The members of the Old Tribune Board and the New Tribune Board
3  are not entitled to protection from the business judgment rule for breach of their
4  duties.  Their actions here do not involve mere mistakes in business judgment,
5  made in good faith and in the best interests of the corporation, and free from any
6  conflict of interest.  To the contrary, on information and belief, the members of the
7  Old Tribune Board and the New Tribune Board acted in their own interest or
8  lacked independence relative to their decisions.  Moreover, neither the Old Tribune
9  Board nor the New Tribune Board acted in good faith.  Both the Old Tribune Board
10 and the New Tribune Board acted in a manner that cannot be attributed to a rational
11 business purpose.  Finally, in reaching the decisions complained of herein, both the
12 Old Tribune Board and the New Tribune Board were grossly negligent by, *inter*
13 *alia*, failure to consider all material facts reasonably available.

14     205.  The Old Tribune Board and the New Tribune Board, acting both
15 individually and collectively, violated his, her, and its fiduciary duties by entering
16 into transactions without regard to the fairness of the transaction to the Company,
17 Tribune ESOP, Plaintiffs or the class.

18     206.  The Old Tribune Board and the New Tribune Board, acting both
19 individually and collectively, failed to exercise the care required, and breached
20 their respective duties of loyalty, good faith, candor and independence because,
21 among other reasons, the Old Tribune Board and the New Tribune Board:

22         a.    failed to take steps to maximize the value of the Company and
23             took steps to avoid competitive bidding, to cap the price of the
24             Company's stock and to give certain Defendants an unfair
25             advantage by, *inter alia*, failing to solicit other potential
26             acquirers or alternative transactions;

27         b.    failed to properly value the Company;

28

---

**CLASS ACTION COMPLAINT**

    c. ignored or did not protect against numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger; and

    d. failed to disclose material information.

207. Because the New Tribune Board so dominates and controls the business and corporate affairs of the Company, and its members are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and Plaintiffs which made it unfair for the Old Tribune Board to pursue transactions wherein they reap disproportionate benefits.

208. Indeed, the Merger and related transactions and decisions by the Old Tribune Board and the New Tribune Board have left the Company $13 billion in debt, which it is struggling to service. In a proxy statement filed with the SEC in or about July 2007, the Old Tribune Board and Zell indicated that the Merger Agreement was in the best interests of the Company. The proxy statement also indicated that the Old Tribune Board and Zell allegedly took into consideration a variety of risks and other potentially negative factors concerning the Merger. Astonishingly, the risks listed did not include a discussion of the $13 billion post-transaction debt or how the Company would service that debt. Perhaps the Old Tribune Board was blinded by the prospect of Zell's self-imposed $25 million bonus pool for completing the Merger.

209. Furthermore, since the Merger, the New Tribune Board has continued to make grossly negligent decisions. Such mismanagement is evidenced by the Company's claims that the pension fund was overfunded by $400 million. Rather than adding value to the Company, each member of the New Tribune Board has stripped it of valuable resources by, *inter alia*, continuing to incur substantial and unreasonable debt and forcing the resignations of long time employees with a wealth of institutional knowledge and talent.

---

**CLASS ACTION COMPLAINT**

210. By reason of the foregoing acts, practices and course of conduct, the Old Tribune Board and the New Tribune Board, acting both individually and collectively, have failed to exercise ordinary care and diligence in the exercise of their respective fiduciary obligations.

211. As a result of the actions of these Defendants, and each of them, the Company, Tribune ESOP, Plaintiffs and the class have been damaged and irreparably harmed and will continue to be irreparably harmed as this debt-ridden Company may be on the verge of destruction.

212. Unless enjoined by the Court, each member of the New Tribune Board will continue to breach their respective fiduciary duties and may continue to consummate transactions that are disastrous to the Company, the Tribune ESOP, Plaintiffs and the class.

213. The Old Tribune Board and the New Tribune Board, acting both individually and collectively, engaged in self dealing; did not act in good faith; and breached their respective fiduciary duties.

214. Plaintiffs and the class have no adequate remedy at law. Only through the exercise of the Court's equitable powers can the Company, the Tribune ESOP, Plaintiffs and the class be fully protected from the immediate and irreparable injury which the actions of these Defendants, and each of them, have inflicted and threaten to continue to inflict.

215. On information and belief, Plaintiffs allege that the Old Tribune Board and the New Tribune Board, acting both individually and collectively, engaged in fraudulent or dishonest conduct or grossly abused their authority or discretion. Consequently, and to prevent future derelictions of duties, removal of each member of the New Tribune Board is in the best interest of the Company.

WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

/ / /

/ / /

## EIGHTH CLAIM

## (AIDING AND ABETTING STATE LAW BREACHES OF FIDUCIARY DUTIES)

216.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

217.    Plaintiffs bring this claim against Defendants FitzSimons and Zell on behalf of the Company and the Tribune ESOP.  The Company and the Tribune ESOP are nominal defendants as to this claim.

218.    Defendants FitzSimons and Zell aided and abetted the other Defendants in breaching their fiduciary duties owed to the Tribune ESOP, the Tribune Company, Plaintiffs and the members of the class.

219.    The Old Tribune Board and the New Tribune Board owed to the Tribune ESOP, the Tribune Company, Plaintiffs and the members of the class certain fiduciary duties as fully set out herein.

220.    By committing the acts alleged herein, the Old Tribune Board and the New Tribune Board breached their fiduciary duties owed to the Tribune ESOP, the Tribune Company, Plaintiffs and the members of the class.

221.    Defendants FitzSimons and Zell colluded in or aided and abetted the Old Tribune Board and the New Tribune Board's breaches of fiduciary duties, and were active and knowing participants in the Old Tribune Board and the New Tribune Board's breaches of fiduciary duties owed to the Tribune ESOP, the Tribune Company, Plaintiffs and the members of the class.

222.    The Tribune ESOP, the Tribune Company, Plaintiffs and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

WHEREFORE, Plaintiffs and the class pray for relief as set forth below.

/ / /

/ / /

---

**CLASS ACTION COMPLAINT**

62

## VIII. PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all other members of the class, requests judgment and relief as follows:

1.      Certification of this action as a class action on behalf of the proposed class and designation of Plaintiffs as the representatives of the class and of their counsel as class counsel;

2.      A judgment and decree that the acts of Defendants, and each of them, violate ERISA and state law for breach of fiduciary duties;

3.      A judgment and decree that during relevant time period Samuel Zell controlled the Zell Entity, the Tribune ESOP and the Tribune Company.

4.      An award of restitution for all losses to the Tribune ESOP stemming from the wrongful acts of Defendants, and each of them, and disgorgement of the full value of all sums and enrichment that Defendants, and each of them, wrongfully have obtained, and continue to obtain, at the expense of the Tribune ESOP, Plaintiffs and the class, according to proof;

5.      Injunctive relief against Defendants, and each of them, to prevent future wrongful conduct, including but not necessarily limited to:

   a.     removal of the New Tribune Board, the ESOP Trustee, and the Plan Administrator, and each of them, from their fiduciary positions; and

   b.     removal of Zell, Berg, Greenspun, Holden, Osborn, Pate, Wilderotter and Wood, and each of them, from the Board of Directors of the Tribune Company.

6.      An accounting for the profits and benefits derived by the Old Tribune Board, the New Tribune Board, the ESOP Trustee, and the Plan Administrator, and each of them;

7.   An accounting for the supposedly overfunded Tribune pension plan;

8.   An award of compensatory damages, according to proof;

9.   An award of punitive damages, according to proof;

10.  Prejudgment interest at the maximum legal rate;

11.  Costs of the proceedings herein;

12.  Reasonable attorneys' fees; and

13.  All such other and further relief as the Court deems just and proper.

Dated: September **15**, 2008       **COTCHETT, PITRE & McCARTHY**

By: _____

JOSEPH W. COTCHETT
Attorneys for Plaintiffs and the Class

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial on all issues so triable.

Dated: September **15**, 2008       **COTCHETT, PITRE & McCARTHY**

By: _____

JOSEPH W. COTCHETT
Attorneys for Plaintiffs and the Class

**CLASS ACTION COMPLAINT**

64

# EXHIBIT A

# TRIBUNE

| Information for Employee Owners | N E W S |

**TRIBUNE ESOP** — EMPLOYEE STOCK OWNERSHIP PLAN

## SPECIAL ESOP EDITION

# *Time to Fly!*

### CONTENTS

Message from Sam Zell

What's an ESOP?

In GreatBanc We Trust

Your 3-part Retirement Program

How This Thing Works

Paying Down Debt (we gotta lot)

Riveting Q&A

*Real pigs are seldom seen aloft. But the porcelain porker shown here, symbolic of the Tribune ESOP, has good flight potential if the company steps up performance. And as employee owners, we each share responsibility for making that happen. Inside, read all about the new plan and what it means for you.*

EXHIBIT A – 65

# Call Me Sam



Dear Partners,

When we closed the going-private transaction in December, our total debt increased to nearly $13 billion. I put $315 million behind that debt, which was underwritten based on Tribune's historical performance – a level of performance, incidentally, that I believe we can surpass. The employees – you – then acquired 100 percent of the company. I acquired an option to buy 40 percent of the company for $500 to $600 million within the next 15 years.

Let me clarify the most common misperception I've heard on the ESOP: **Employees do not contribute any money toward the plan. What would have been discretionary company contributions to 401(k) accounts going forward are what's financing the ESOP.**

Over the next 10 years, if we perform to the level of our expectations, we will have paid down a significant amount of debt. Our projections assume cash flows in line with 2007 and expectations that newspaper revenues will decline and that broadcast and interactive revenues will increase.

In the end, you and I, together, will own a collection of assets worth billions of dollars, the majority of which will be allocated to employees.

You will still have a 401(k) account that you may elect to fund and the Cash Balance Plan. You will not have invested one nickel into the ESOP.

In all my years of doing deals, this is one of the best risk/reward ratios I've ever seen. There is extraordinary upside if we succeed in stabilizing the print side of our business.

I've said repeatedly that no matter what happens in this transaction, my lifestyle won't change. Yours, on the other hand, could change dramatically if we get this right.

Don't be mistaken; I'm invested in our success. I don't like to lose. And, based on the quality of people I've met so far, I'm betting you don't either.

So, we will change our focus. We will change our reporting patterns. We will change our culture from ground up. We will take intelligent risks, and we will drive Tribune Company to its rightful dominant position in the industry.

Sam

## What's an ESOP?

An Employee Stock Ownership Plan, or ESOP, is fundamentally a retirement benefit, similar to a profit sharing or 401(k) plan. It aligns the interests of the company and its employees—if the company does well, so do those who work for it.

Gains in revenue, productivity and earnings benefit the company, increasing the value of its stock held by the ESOP. That, in turn, increases the value of all employee ESOP accounts.

With an ESOP, employees have a "beneficial ownership" in the company, entitling them to receive the fair market value of the company's stock when they receive distributions from the plan.

ESOP assets are held in a trust outside the company and consist of company stock. Within the ESOP Trust, individual accounts are maintained for participating employees.

## Who's Calling the Shots?

Actually you are. As employee owners, we all share responsibility for improving Tribune's performance and ensuring the company's long-term success. But the question posed above also speaks to the important issue of "governance." That's a fancy word for the formal structure under which the company conducts its business and how, as owners, your personal stake in Tribune is protected.

In a typical public company, shareholders own the stock and vote for the board of directors and on other actions. That's no longer the case at Tribune, where the ESOP now owns 100% of company stock and is the sole shareholder.

GreatBanc Trust Company, the ESOP Trustee, represents the financial interests of employees who are beneficiaries of the plan. It will vote all Tribune shares owned by the ESOP on matters submitted to a shareholder vote, such as the annual election of directors and ratification of the company's auditor. GreatBanc also will obtain a third party valuation of Tribune's stock each year.

GreatBanc was selected by Tribune's board of directors last spring based on its experience as one of the largest providers of ESOP trust services in the country. It acts as the ESOP Trustee for many major corporations, including Hartmarx, Provident Bank, Rite Aid, Sherwin-Williams and Wells Fargo & Company. Tribune employees can count on GreatBanc to represent their best interests.

GreatBanc does not have a seat on Tribune's board of directors, which is consistent with the role of trustees at other ESOP-owned companies. However, the board of directors is elected by, and responsible to, the ESOP.

Directors establish corporate policy and select senior management of the company. Tribune's board has eight members:

**Sam Zell**, Tribune chairman and CEO

**Jeff Berg**, chairman and CEO of International Creative Management

**Brian Greenspun**, chairman and CEO of The Greenspun Corporation and president/editor of the *Las Vegas Sun*

**Betsy Holden**, senior advisor to McKinsey & Company

**Bill Osborn**, chairman of Northern Trust Corporation

**Bill Pate**, chief investment officer of Equity Group Investments

**Maggie Wilderotter**, chairman and CEO of Citizens Communications

**Frank Wood**, CEO of Secret Communications, a venture capital company

Further information about each board member is available at www.tribune.com.

To learn more about Tribune's ESOP Trustee, visit www.greatbanctrust.com.

EXHIBIT A – 66

# THE **ESOP** *and more*

The ESOP is an exciting new retirement benefit, and one with potential for significant long-term rewards. You should know, however, that Tribune Company's retirement program contains two other elements, one of which is brand new.



On Jan. 1, 2008, eligible Tribune employees began participating in a three-part retirement benefits program composed of the ESOP, a new Cash Balance Plan and the existing 401(k) plan.

The Cash Balance Plan, like the ESOP, is funded entirely by the company. It provides an annual allocation of 3 percent of eligible pay to each participating employee's Cash Balance Plan account. This creates a "floor" retirement benefit that you can count on. There is no investment risk, meaning your account balance can only go up.

The first scheduled Cash Balance Plan allocation will be in early 2009 for the 2008 plan year, and interest will be credited quarterly to employee accounts. Similar to a 401(k), employees may take their vested benefit with them when leaving the company before retirement.

The third element in the Tribune retirement program is your existing 401(k) plan. While the company no longer contributes to employee 401(k) accounts, you may continue to fund your 401(k) independently up to the IRS maximum, which in 2008 is set at $15,500, plus catch-up contributions of $5,000 for those age 50 or older. As before, 401(k) participants can direct their investments as they choose.

If you have a frozen pension plan benefit, that benefit is secure and remains unchanged. Your pension benefit is held in a trust separate from the company, and you'll receive it when you retire. At the end of 2007, Tribune's pension assets were more than $1.8 billion and the plans were overfunded by approximately $400 million.

## New Retirement Program



This chart shows potential retirement program growth, after five and 10 years. Data is presented under three company performance scenarios based on cash flow (CF) increasing 2%, staying flat and declining 2%. Cash flow impacts only ESOP balances, not Cash Balance Plan and 401(k) accounts.

Assumptions: $50,000 salary; target 5% annual ESOP allocation; 3% annual Cash Balance Plan allocation with growth at 10-year Treasury rate; 3% employee 401(k) contribution with 6% annual return.

*Projections of Tribune's retirement program in this summary are for illustration purposes only and are not a guarantee of future performance. When considering your entire retirement investment portfolio, take into account your other assets, income and investments (i.e., home equity, IRAs, savings accounts, etc.).*

*The ESOP holds stock. In healthy companies, stock becomes more valuable over time. There are no guarantees with stock and certain factors will have a significant effect on what you receive from the ESOP: 1) New allocations to the account from company contributions, 2) Change in stock value due to paying down debt and 3) Change in stock value due to company performance.*

*The amounts calculated are balances based not only on the stated assumptions about the sample participant but also on a number of unpredictable variables including economic, market and other conditions. A change to any of these assumptions will change the value of retirement program account balances. Additionally, the amount of the ESOP allocation will vary from year to year.*

# Glossary

**Beneficial Ownership** – The right to receive proceeds or benefits from owning a company's stock. Tribune employees who participate in the ESOP are beneficial owners.

**ESOP Trustee** – For Tribune, this is the role played by GreatBanc Trust Company. The Trustee is charged with acting in the best financial interests of all ESOP participants.

**Fair Market Value** – The value of Tribune stock as determined by an independent appraiser.

**Leveraged ESOP** – An ESOP is permitted to borrow money to purchase the stock of the sponsoring company — a feature that sets it apart from other employee benefit plans. An ESOP that borrows money, as with Tribune, is called a "leveraged ESOP."

**Operating Cash Flow** – Revenue minus expenses. It can be used to pay down debt and is one indication of a company's financial strength.

**S Corp** – For tax purposes, there are generally two types of companies, C corporations and S corporations. C corporations pay federal taxes on their income directly to the IRS. S corporations pass their income along to their shareholders, who then are responsible for paying the appropriate taxes. Tribune expects to become an S corporation in 2008. As an "S Corp," Tribune's income will effectively flow through to the ESOP, its only shareholder. However, since the ESOP is a tax-exempt retirement plan, it is not subject to income taxes. The S Corp structure therefore frees up cash that can be used to pay down debt.



EXHIBIT A – 67

# HOW THE NEW ESOP WORKS

Tribune's ESOP purchased newly-issued shares of company stock financed by a loan from Tribune. All of these shares are initially held in the ESOP Trust. Each year, the company makes a contribution to the ESOP and the ESOP, in turn, will repay the loan. As the ESOP loan is repaid, shares of stock are released and allocated to individual employee accounts held in the ESOP Trust. Tribune is initially targeting an allocation of 5 percent of eligible pay to be made in early 2009.



## Creating Value by Paying Down Debt

Tribune assumed a significant amount of debt, or "leverage," in the transaction to take the company private. Paying down that debt is the key to building equity value in the company. As debt is reduced, the value of employee ESOP accounts will increase. The concept is very similar to a home mortgage—as you pay it down, equity value in your home grows.

Debt is paid down with cash flow. To increase cash flow, it's important for Tribune to increase revenues and contain expenses. The significant cash-producing nature of our publishing and broadcasting businesses, combined with the company's "S Corp" tax status, will contribute to Tribune's ability to make interest payments and pay down debt. The company's total debt is approximately $13 billion.

Tribune designed its ESOP with a great deal of thought about the future. If we manage our businesses well, the company will have sufficient cash flow to grow operations while paying down debt and repurchasing ESOP shares from employees after they retire.

## Valuing Your Account

ESOP participants will receive an annual statement in the first quarter each year, starting in 2009. The statement will reflect the company's annual stock allocation, the value of those shares and the total value of your account.

The value of Tribune shares will be determined annually by an outside appraisal firm selected by GreatBanc Trust Company, the ESOP Trustee. The appraiser identifies the "fair market value" of the stock—a complex process since Tribune stock is no longer publicly traded. GreatBanc's selected appraiser, Duff & Phelps, will review financial documents, conduct site visits and interviews, and study industry and economic analyses.

The stated value of your ESOP account will change based on the annual stock valuation results. Just as they would if Tribune were still a public company, share values can be expected to increase if overall financial performance improves.

The other factor affecting your account's value will be the number of shares you own. Employees can expect a stock allocation early each year for the preceding plan year, with the size of the allocation based primarily on company performance.

EXHIBIT A – 68



**TRIBUNE ESOP**

## When will I receive Tribune stock through the ESOP?

## How much will I get?

## Who is eligible?

## Do I need to sign up?

## How does the ESOP affect my pension?

## How will my ESOP account balance change over time?

## How will I know what my account is worth?

## What are the vesting rules?

## Will I be able to diversify my ESOP account?

## When can I take money out of my ESOP account?

## What about taxes?

**www.tribuneathome.com.**

## ESOP FACTS

- There are more than 9,000 ESOPs in the U.S. with at least 10 million employee participants
- About 3,500 ESOP companies are majority-owned by their ESOP; 2,000 are 100% ESOP-owned
- Most ESOP companies have additional retirement plans
- At least 75% of ESOP companies have leveraged ESOPs
- Tribune and Times Mirror had successful ESOPs that ended in 2003 and 1994, respectively

*Sources: ESOP Association; Tribune Company*



**TRIBUNE NEWS**

*Benefits for union-represented employees are subject to collective bargaining and the benefits summarized in this material may not currently apply. Local Human Resources or Tribune Benefits Service Center representatives can answer any questions about benefits for union-represented employees.*

*The purpose of this material is to provide highlights of Tribune's new retirement program. Eligibility and benefit payment determinations will be governed by the plan documents. In the event of a discrepancy between the information provided in this material and the plan documents, the plan documents will govern. Tribune Company reserves the right to change, amend or terminate the benefit plans at any time for any reason. Your eligibility for benefits does not guarantee continued employment at Tribune Company or any of its entities.*

EXHIBIT A – 69

# **EXHIBIT B**

**1.    What is a Cash Balance Plan?**

A Cash Balance Plan is a type of "hybrid" pension plan (defined benefit plan) that combines the strengths of traditional pension plans with those of savings plans. It is often referred to as an account-based retirement plan. It offers the safety and security of a pension while adopting the ease and simplicity of a 401(k) account.

**2.    How does the Cash Balance Plan work?**

The Cash Balance Plan portion of eligible employees' retirement plan will be funded entirely by the company and participants are not subject to investment risk as the funds are held in a separate trust. Each employee's account can only increase—it cannot decrease due to changes in the economy or stock and bond markets. Your account will grow in two ways:

- *Company allocations*—The company will make an annual contribution equal to 3 percent of an employee's eligible compensation to their Cash Balance Plan account. The first allocation will be made early in 2009 for the 2008 plan year.

- *Interest credits*—In addition, your account balance will be credited with quarterly interest based on the yield (in November of the previous year) of the 10-year U.S. Treasury Note, beginning in 2009. The yield has averaged 4.8 percent annually over the past 10 years.

**3.    What are the advantages of a Cash Balance Plan?**

The plan offers several advantages:

- The benefit will be paid entirely by the company and will not be subject to investment risk.

- Eligible employees' accounts can only increase—they cannot decrease due to changes in the economy or stock and bond markets.

- Eligible employees may take their vested benefit with them when leaving the company before retirement.

**4.    Several companies went through litigation over this type of plan in the last several years. Why would we implement such a plan?**

In 2006, legislation was adopted clarifying that Cash Balance Plans are not age discriminatory as the litigation suggested. Hundreds of companies including Xerox, FedEx, Kodak, Motorola and Travelers offer their employees the benefits of a Cash Balance Plan.

**5.    Will the frozen pension plans be converted to an account balance?**

No. The Tribune and Times Mirror Pension Plans were both frozen in years past. These benefits are secure and are not in anyway involved with our current transaction. These benefits will not convert to an opening account balance and are not impacted. Each eligible employee will start with a new opening account balance.

**6.    Is my Cash Balance Plan account the same as my new ESOP account?**

1

No. Eligible employees will have separate accounts for the ESOP and the Cash Balance Plan. The company will make separate allocations to each account.

**7.    Where does my Cash Balance Plan account reside?**

Cash Balance Plan assets for eligible employees will be held at Northern Trust, one of the world's leading financial institutions. The assets will be held in a trust.

**8.    Where does the company obtain the funds to make the 3 percent annual Cash Balance Plan allocation?**

At the end of 2006, Tribune's pension assets totaled more than $1.7 billion and the plans were overfunded by more than $200 million. This surplus funding will be used for the 3 percent benefit allocation. Keep in mind that if you have a frozen pension plan benefit, that benefit is secure and remains unchanged. Your pension benefit is held in a trust separate from the company and is not impacted by this transaction. You will receive your benefit when you retire.

**9.    What are the vesting rules for the Cash Balance Plan?**

The vesting rules are the same as under the new ESOP. Participants will vest in 20 percent increments each year beginning on the second anniversary of employment with Tribune. You will be fully vested after six years of service and current employees will receive credit for past service. Therefore, if you have six or more years of service with Tribune, you will be 100 percent vested in your Cash Balance Plan account as of January 1, 2008.

**10.    Do I have to pay taxes on my Cash Balance Plan benefit?**

Your benefits are taxed when you take a distribution from the plan based on whether you elect a monthly annuity benefit or a lump sum benefit. If you have questions about taxes, contact the Tribune Benefits Service Center. You also may wish to contact a tax advisor.

**11.    What are the payment options under the Cash Balance Plan?**

The Cash Balance Plan benefit will be portable once it has vested—you'll be able to take it with you if you leave Tribune regardless of your age. Your options include:

- *Lump sum payment*—receive payment of your benefit as cash (there may be tax consequences in some cases) or roll the lump sum into another qualified plan or an IRA.

- *Ongoing payments*—receive monthly payments or elect another ongoing payment option.

- *Defer payment*—leave your account balance (if greater than $5,000) in the plan and receive payment later. You may defer payment until you reach age 65.

**12.    Is the company saving money with this new plan?**

Yes. The company saves cash because the Cash Balance Plan can be funded from excess assets in the pension plan.

2

**13.    When will the company communicate more information about the new retirement plan?**

Your current retirement benefits will remain in place for the remainder of 2007. The new retirement plan for eligible employees (Cash Balance Plan, ESOP and 401(k) Plan) is effective January 1, 2008, with the first allocations from the Cash Balance Plan and ESOP made to employees' accounts in the first quarter of 2009.

Comprehensive communication regarding the ESOP and the other components of the new package of retirement benefits will begin in the fall of 2007.

**14.    I'm considering retiring — should I retire now?**

Retirement is a very personal decision. You should discuss your options with your family. Also, you should consider seeking the advice of a financial advisor.

**15.    Can I still participate in the Employee Stock Purchase Plan (ESPP)?**

The ESPP will make its last purchase of company stock on April 18. After this time, you may not purchase company stock at a discount.

- If you were paid on March 30, that will be the date of your last ESPP payroll deduction.

- If you were paid on April 6, that will be the day of your last ESPP payroll deduction.

3

# EXHIBIT C

LE MAN BROTHERS

EQUITY RESEARCH

November 02, 2007

**Publishing**

Industry Overview

**Newspaper Valuation and Stock Scorecard**

North America
Internet & Media
Publishing

Craig A. Huber
1.212.526.5546
chuber@lehman.com
LBI, New York

**Sector View:**

New:   3-Negative
Old:    3-Negative

### Investment Conclusion

☐ **Maintain 3-Negative newspaper sector view and would continue to underweight the newspaper stocks** due to expensive valuations, our belief that Street estimates remain too high, declining readership and circulation, declining advertising market share, a weak newspaper advertising revenue outlook (estimated down 8.0% in 2007 and down 5.0% in 2008), a total decoupling of newspaper advertising growth from nominal GDP growth, very tight cost containment already over the past seven years, and margins that are currently at pre-1990's levels on average due to secular issues. **Given increasing secular pressures, we think the newspaper group will trade down to 5-5.5x EBITDA over time (or 15% or so FCF yields)** vs. the 12-year valuation range of 7-10.5x forward EBITDA for the large cap more pure-play newspaper stocks and down to 6x EBITDA for the small caps.

### Summary

☐ **Newspaper stocks are down 18.5% on average YTD (or down 31.3% excluding Dow Jones and Tribune) vs. up 6.4% for the S&P 500.** This compares with the YTD performance of television stocks up 21.8%; cable/satellite stocks up 8.7%; entertainment stocks down 1.9%; printing stocks down 2.9%; publishing/financial information stocks down 9.3%; advertising agency stocks down 10.9%; Spanish-language broadcasting stocks down 14.6%; magazine stocks down 17.2%; yellow pages stocks down 17.5%; and radio stocks down 31.5%.

☐ **Newspapers are trading on average at an unattractive 7.9x 2008E EBITDA (excluding Dow Jones and Tribune)** vs. 10-year historical range of 6.0-10.5x forward EBITDA for the more pure-play newspaper companies.

☐ For comparison, **radio** trading at 8.5x 2008E EBITDA (vs. 10-year historical range of 9-25x), **entertainment** trading at 8.5x (vs. historical range of 7-18x), **ad agencies** trading at 8.1x (vs. historical range of 8-20x), and **cable** trading at 6.6x (vs. historical range of 7-13x).

☐ **On a free cash flow basis, newspapers are trading at 13.3x 2008E (excluding Dow Jones and Tribune)** on average with the large/mid cap. newspapers trading in a current range of 7-26x. Comparatively, **radio** stocks trading at 9.2x 2008E FCF on average (6-16x range), **entertainment** trading at 14.9x (10-20x range), **ad agencies** trading at 17.9x (15-21x range), and **cable** trading at 22.3x (16-28x range).

☐ See attached Cross Media Comparative Valuation table for details.

**Lehman Brothers Newspaper Stock Scorecard:** In order to put a quantitative framework around how we look at nine newspaper stocks from most attractive to least, we have developed the Lehman Brothers Newspaper Stock Scorecard. We have chosen **11 metrics that we view as important** when attempting to determine which stocks are most attractive at any given time. Each metric is given a score of 1 to 9, with 1 assigned to the best performer and 9 for the worst performer. Each of the 11 metrics is equally weighted for each company and summed up into an overall score. The 11 metrics we assign scores to are: 1) Blended 2007-08E price-to earnings multiple, 2) blended 2007-08E enterprise-value-to-EBITDA multiple, 3) blended 2007-08E free cash flow multiple, 4) potential upside/downside to our 12-month price target, 5) 2006-08E compound annual growth rate (CAGR) for EPS, 6) 2006-08E CAGR for EBITDA, 7) 2006-08E CAGR for FCF, 8) percentage difference between our 2008 EPS estimate and First Call consensus, 9) 2007-08E return on invested capital, 10) 2007-08E return on equity, and 11) lastly, our own subjective measure of potential catalysts.

**Gannett** (3-Underweight) is in the first position followed by **Washington Post** (1-Overweight), **Journal Communications** (2-Equal weight), **New York Times** (3-Underweight), **Dow Jones** (2-Equal weight), **Scripps** (3-Underweight), **McClatchy** (3-Underweight), **Tribune** (3-Underweight), and **Journal Register** (3-Underweight).

**Lehman Brothers does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.**

Customers of Lehman Brothers in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.lehmanlive.com or can call 1-800-2LEHMAN to request a copy of this research.

Investors should consider this report as only a single factor in making their investment decision.

PLEASE SEE ANALYST(S) CERTIFICATION(S) ON PAGE 7 AND IMPORTANT DISCLOSURES BEGINNING ON PAGE 8

EXHIBIT C – 73

# LEHMAN BROTHERS
### EQUITY RESEARCH

Lehman Brothers
November 1, 2007

Craig A. Huber  (212) 526-5546

## Comparative Valuation - Newspaper Companies
### Sector Rating - Negative

| | Dow Jones | Gannett | McClatchy | New York Times | Scripps, E.W. | Tribune | Washington Post | Small-Cap Newspapers Journal Comms. | Journal Register |
|---|---|---|---|---|---|---|---|---|---|
| Stock Symbol | DJ | GCI | MNI | NYT | SSP | TRB | WPO | JRN | JRC |
| Rating | 2-Equal weight | 3-Underweight | 3-Underweight | 3-Underweight | 3-Underweight | 3-Underweight | 1-Overweight | 2-Equal weight | 3-Underweight |
| Recent Stock Price | 59.61 | 41.45 | 16.58 | 18.97 | 44.13 | 29.45 | 817.89 | 8.49 | 2.26 |
| 52-week High | 61.76 | 63.50 | 44.04 | 26.90 | 53.39 | 33.85 | 885.23 | 14.00 | 8.60 |
| 52-week Low | 33.67 | 40.70 | 16.28 | 18.05 | 37.89 | 22.78 | 712.73 | 8.47 | 2.17 |
| Stock Price Return - YTD | 56.9% | -31.4% | -61.7% | -22.1% | -11.8% | -4.3% | 9.7% | -32.7% | -69.8% |
| % Off 52-Week High | -3.5% | -34.7% | -62.4% | -29.5% | -17.3% | -13.0% | -7.6% | -39.4% | -73.7% |
| 12-Month Price Target / Implied Return | | | | | | | | | |
| Dividend per Share | 1.00 | 1.60 | 0.72 | 0.92 | 0.56 | 0.72 | 8.20 | 0.30 | 0.08 |
| Dividend Yield (%) | 1.7% | 3.9% | 4.3% | 4.8% | 1.3% | 2.4% | 1.0% | 3.5% | 3.5% |
| Dividend Payout Ratio (vs. 2007E FCF) | 67.1% | 33.3% | 29.0% | 53.3% | 26.1% | 40.8% | 37.6% | 63.1% | 17.3% |
| **Earnings per Share (excl. extra week in 4Q06)** | | | | | | | | | |
| 2005 | 0.85 | 4.78 | 2.51 | 1.49 | 2.05 | 2.07 | 31.49 | 0.57 | 1.00 |
| 2006(A) | 0.97 | 4.69 | 2.67 | 1.31 | 2.34 | 1.98 | 34.67 | 0.70 | 0.73 |
| 2007(E) | 1.40 | 4.31 | 1.48 | 1.02 | 2.03 | 1.45 | 29.25 | 0.58 | 0.45 |
| 2008(E) | 1.47 | 4.40 | 1.30 | 1.06 | 2.10 | 1.05 | 33.75 | 0.68 | 0.35 |
| % Change 2006 vs. 2004 | -14.1% | -0.4% | 2.9% | -17.2% | 17.1% | -5.9% | -9.0% | -16.2% | -9.9% |
| % Change 2006(A) vs. 2005 | 14.1% | -1.9% | 6.3% | -11.8% | 14.1% | -5.2% | 10.7% | 22.2% | -27.4% |
| % Change 2007(E) vs. 2006(E) | 44.3% | -8.1% | -44.5% | -22.4% | -13.2% | -26.1% | -16.1% | -16.7% | -38.0% |
| % Change 2008(E) vs. 2007(E) | 5.0% | 2.1% | -12.2% | 2.9% | 3.4% | -27.6% | 15.4% | 17.2% | -22.2% |
| **Price / Earnings** | | | | | | | | | |
| 2006(A) | | | | | | | | | |
| 2007(E) | | | | | | | | | |
| 2008(E) | | | | | | | | | |
| P/E Relative - 2006(A) | 3.32 | 0.48 | 0.34 | 0.78 | 1.02 | 0.81 | 1.27 | 0.66 | 0.17 |
| P/E Relative - 2007(E) | 2.51 | 0.57 | 0.66 | 1.10 | 1.28 | 1.20 | 1.65 | 0.86 | 0.30 |
| P/E Relative - 2008(E) | 2.67 | 0.62 | 0.84 | 1.19 | 1.38 | 1.85 | 1.59 | 0.82 | 0.42 |
| **Enterprise Value / EBITDA** | | | | | | | | | |
| 2006(A) | | | | | | | | | |
| 2007(E) | | | | | | | | | |
| 2008(E) | | | | | | | | | |
| **Free Cash Flow per Share (excl. extra week in 4Q06)** | | | | | | | | | |
| 2006(A) | 1.19 | 4.99 | 3.18 | 1.97 | 2.42 | 1.98 | 27.41 | 0.78 | 0.66 |
| 2007(E) | 1.49 | 4.80 | 2.48 | 1.72 | 2.14 | 1.77 | 21.81 | 0.48 | 0.46 |
| 2008(E) | 1.62 | 4.81 | 2.24 | 1.64 | 2.24 | 1.46 | 31.95 | 0.57 | 0.43 |
| **Price / Free Cash Flow** | | | | | | | | | |
| 2006(A) | | | | | | | | | |
| 2007(E) | | | | | | | | | |
| 2008(E) | | | | | | | | | |
| **Enterprise Value / Unlevered FCF 2007(E)** | | | | | | | | | |
| **Financial Data ($ mil; excl. extra week in 4Q06)** | | | | | | | | | |
| Revenue - 2006(A) | 2,062 P | 7,905 P | 2,462 P | 3,228 | 2,508 P | 5,386 P | 3,905 | 620 P | 498 P |
| EBITDA - 2006(A) | 268 P | 2,238 P | 624 P | 484 | 857 P | 1,299 P | 744 | 128 P | 109 P |
| EBITDA Margin (%) | 13.0% | 28.3% | 25.3% | 15.0% | 34.2% | 24.2% | 19.1% | 20.6% | 22.0% |
| Revenue - 2007(E) | 2,080 P | 7,517 P | 2,263 | 3,192 | 2,485 | 5,029 | 4,159 | 578 | 464 |
| EBITDA - 2007(E) | 315 P | 2,028 P | 575 | 473 | 773 | 1,090 | 688 | 104 | 92 |
| EBITDA Margin (%) | 15.1% | 27.0% | 25.4% | 14.8% | 31.1% | 21.7% | 16.5% | 17.9% | 19.7% |
| **Market Capitalization ($ mil)** | | | | | | | | | |
| Shares Outstanding (mil) | 85.9 | 234.2 | 82.1 | 143.9 | 163.4 | 118.4 | 9.5 | 67.1 | 39.1 |
| Equity Market Capitalization | 5,118 | 9,710 | 1,361 | 2,730 | 7,213 | 3,487 | 7,771 | 569 | 88 |
| Total Debt | 392 | 4,558 | 2,291 P | 959 | 624 | 9,924 | 417 | 98 P | 651 |
| Cash | 28 | 177 | 25 | 58 | 21 | 608 | 279 | 6 | 4 |
| Minority Interests | 0 | 22 | 0 | 0 | 851 | 0 | 0 | 0 | 0 |
| Investments | 75 | 800 | 474 P | 250 | 221 | 2,000 | 420 | 0 | 0 |
| Enterprise Value | 5,407 | 13,312 | 3,153 | 3,381 | 8,446 | 10,803 | 7,489 | 661 | 735 |
| Debt-to-Capital | 39.8% | 34.1% | 45.8% | 52.2% | 18.8% | 67.7% | 11.1% | 18.4% | 73.5% |
| **Net Debt/EBITDA (2007E)** | | | | | | | | | |
| EPS CAGR (2006-08E) | 23.1% | -3.1% | -30.2% | -10.6% | -5.3% | -26.8% | -1.5% | -1.2% | -30.6% |
| EBITDA CAGR (2006-08E) | 9.3% | -5.5% | -10.8% | -2.4% | -3.6% | -12.9% | 0.9% | -6.8% | -11.9% |
| FCF/share CAGR (2006-08E) | 16.9% | -1.8% | -16.1% | -8.9% | -3.7% | -13.5% | 8.0% | -14.8% | -19.5% |

*E = Lehman Brothers estimates    A= Actual    P = Pro forma*

*Note: Revenue and EBITDA multiples are pro forma, as needed, for full year for acquisitions/divestitures. EPS and free cash flow estimates are from transaction closing date forward.*

*Free cash flow = Net Income + D&A - Capital Expenditures; capital expenditures, though, for New York Times, Journal Communications, and Journal Register exclude large one-time projects.*

*Figures for Gannett, McClatchy, New York Times, Tribune, Journal Communications, and Journal Register exclude extra week in 4Q06.*

*Includes stock option expensing beginning 1Q06. New York Times includes stock option expensing beginning 2005 (full-year).*

*Source: Lehman Brothers*

EXHIBIT C – 74

LE**!** **1**AN BROTHERS

EQUITY RESEARCH

Cross Media Comparative Valuation
November 1, 2007

Craig A. Huber (212) 526-5546

| | EBITDA Multiple | | | Free Cash Flow Multiple | |
|---|---|---|---|---|---|
| | 10-Year Range* | 2007(E) | 2008(E) | 2007(E) | 2008(E) |
| **Newspapers** | | | | | |
| Dow Jones | | 17.2 | 16.9 | 40.0 | 36.8 |
| Gannett | | 8.6 | 8.8 | 8.8 | 8.6 |
| McClatchy | | 5.5 | 6.4 | 6.7 | 7.4 |
| New York Times | | 7.1 | 7.3 | 11.0 | 11.6 |
| Scripps, E.W. | | 10.9 | 10.6 | 20.6 | 19.7 |
| Tribune | | 9.9 | 11.0 | 16.6 | 19.9 |
| Washington Post | | 10.9 | 9.9 | 37.5 | 25.6 |
| Journal Comm. | | 6.4 | 5.9 | 17.9 | 15.0 |
| Journal Register | | 8.0 | 8.7 | 4.9 | 5.3 |
| Average (excl. DJ/RRB) | 6-10+ | 7.9 | 7.9 | 15.3 | 13.3 |
| | | | | | |
| **Advertising Agencies** | | | | | |
| Interpublic | | 10.5 | 7.0 | 51.0 | 20.6 |
| Omnicom | | 10.2 | 9.3 | 16.9 | 15.2 |
| Average | 8-21 | 10.4 | 8.1 | 34.0 | 17.9 |
| | | | | | |
| **Publishing / Financial Info.** | | | | | |
| McGraw-Hill | | 8.6 | 8.6 | 15.6 | 14.4 |
| Moody's | | 9.0 | 8.1 | 16.0 | 14.0 |
| Average | 8-17 | 8.8 | 8.3 | 15.8 | 14.2 |
| | | | | | |
| **Radio** | | | | | |
| CBS | | 6.3 | 5.7 | 8.3 | 7.2 |
| Citadel | | 8.6 | 8.2 | 9.2 | 6.8 |
| Clear Channel | | 11.2 | 10.9 | 15.9 | 15.6 |
| Cox Radio | | 8.8 | 8.4 | 11.1 | 11.3 |
| Cumulus | | 11.0 | 11.0 | 9.0 | 9.8 |
| Emmis | | 11.9 | 12.6 | 5.4 | 10.5 |
| Entercom | | 8.3 | 7.5 | 6.9 | 6.5 |
| Radio One | | 8.3 | 8.1 | – | – |
| Westwood One | | 7.0 | 6.6 | 6.8 | 6.1 |
| Average | 8-25 | 9.0 | 8.5 | 9.1 | 9.2 |
| | | | | | |
| **Spanish Language Broadcasting** | | | | | |
| Entravision | | 13.0 | 11.5 | 22.5 | 18.8 |
| Spanish Broadcasting | | 10.9 | 10.0 | – | – |
| Average | 12-30 | 12.0 | 10.7 | 22.5 | 18.8 |
| | | | | | |
| **Outdoor** | | | | | |
| Clear Channel Outdoor | | 11.9 | 10.7 | 29.0 | 25.9 |
| Lamar | | 13.6 | 12.2 | 21.6 | 18.5 |
| JC Decaux | | 8.3 | 6.1 | 25.7 | 15.4 |
| Average | 10-17 | 10.6 | 9.7 | 25.4 | 19.9 |
| | | | | | |
| **Entertainment** | | | | | |
| Disney | | 9.6 | 8.7 | 21.5 | 19.5 |
| News Corp. | | 9.8 | 8.0 | 11.5 | 10.3 |
| Time Warner | | 8.4 | 7.5 | 24.2 | 13.7 |
| Viacom | | 10.6 | 9.7 | 17.8 | 15.9 |
| Average | 8-18 | 9.6 | 8.5 | 18.7 | 14.9 |
| | | | | | |
| **Cable** | | | | | |
| Comcast | | 6.5 | 5.7 | 42.0 | 16.1 |
| Liberty Global | | 9.7 | 7.7 | 27.8 | 28.2 |
| Time Warner Cable | | 7.1 | 6.3 | 34.0 | 22.7 |
| Average | 7-13 | 7.8 | 6.6 | 34.6 | 22.3 |

*E = Lehman Brothers Estimates        * = 10-year historical range using the current year EBITDA*

*** = Range is for the more pure-play newspaper companies*

*Note:  EBITDA Multiple = Enterprise Value / EBITDA; Free Cash Flow Multiple = Price / Free Cash Flow*

*EBITDA multiples are pro forma, as needed, for full year for acquisitions/divestitures.*

*Source:  Lehman Brothers (Newspapers / Advertising Agencies / McGraw-Hill - Craig Huber;*

*Radio / Spanish Language / Outdoor / Entertainment - Anthony DiClemente; Entertainment / Cable - Vijay Jayant)*

EXHIBIT C – 75

# LEHMAN BROTHERS
## EQUITY RESEARCH

Lehman Brothers

Craig A. Huber  (212) 526-5546

**Stock Price Performance**
**Publishing and Various Media Stocks**

| Industry / Company | Recent Stock Price ($) | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Newspapers** | | | | | | | | | | | | | | | | | | |
| Dow Jones | 59.61 | -25.4% | 11.0% | 7.0% | 35.8% | -11.1% | 32.1% | -12.8% | 62.2% | -8.6% | 43.9% | -15.4% | -1.5% | -19.2% | 18.0% | -11.7% | -15.2% | 7.1% |
| Gannett | 41.45 | -14.2% | 29.8% | 14.5% | 15.7% | -4.9% | 18.1% | 24.5% | 67.7% | 5.8% | 27.9% | -21.9% | 8.1% | 8.1% | 25.7% | -7.2% | -24.7% | -0.2% |
| McClatchy | 16.58 | -13.9% | -1.1% | 12.1% | 25.9% | -7.7% | 8.2% | 55.2% | -1.6% | 31.8% | 23.5% | -0.3% | 11.3% | 21.5% | 22.2% | 5.1% | -16.8% | -26.7% |
| New York Times | 16.97 | -20.1% | 17.6% | 13.8% | 1.7% | -13.8% | 37.0% | 30.0% | 76.3% | 5.1% | 43.3% | -17.3% | 9.2% | 6.9% | 5.8% | -13.4% | -33.8% | -7.8% |
| Scripps, E.W. | 44.13 | -27.6% | 45.2% | 4.2% | 13.0% | 11.7% | 32.1% | 45.9% | 40.3% | 3.8% | -8.8% | 41.9% | 5.9% | 17.5% | 23.2% | 3.4% | 0.3% | 4.0% |
| Tribune | 29.45 | -23.8% | 16.9% | 19.7% | 27.9% | -7.2% | 13.7% | 31.1% | 80.0% | 7.1% | 66.3% | -22.4% | -10.4% | 22.7% | 14.8% | -17.5% | -26.8% | 1.7% |
| Washington Post | 817.99 | -28.5% | 0.2% | 20.4% | 12.9% | -3.1% | 18.2% | 20.7% | 47.0% | 19.9% | -2.8% | 12.1% | -13.2% | 40.5% | 8.1% | 25.2% | -21.5% | -2.5% |
| Journal Communications | 8.49 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -1.1% | -21.5% | -9.6% |
| Journal Register | 2.28 | – | – | – | – | – | – | – | – | -28.8% | 2.9% | 4.0% | 31.0% | -15.5% | 16.4% | -6.8% | -22.2% | -51.2% |
| **Advertising Agencies** | | | | | | | | | | | | | | | | | | |
| Interpublic | 9.84 | 9.8% | 66.8% | 23.8% | -6.7% | 2.0% | 37.3% | 11.1% | 59.2% | 51.6% | 45.9% | -25.5% | -29.8% | -51.5% | 10.8% | -14.1% | -26.0% | 28.8% |
| Omnicom | 49.67 | -6.1% | 43.2% | 33.8% | 15.4% | 14.8% | 47.1% | 24.9% | 87.8% | 38.4% | 73.8% | -16.4% | 8.8% | -26.9% | 30.8% | -2.3% | 2.1% | 22.8% |
| WPP | 6.47 | -90.4% | -22.6% | -2.1% | 122.4% | 24.2% | 51.1% | 55.9% | 6.9% | 36.8% | 189.5% | -10.8% | -12.4% | -37.1% | 18.9% | 5.8% | 11.4% | 9.8% |
| **Magazines** | | | | | | | | | | | | | | | | | | |
| Martha Stewart Living | 13.13 | – | – | – | – | – | – | – | – | – | – | -18.4% | -18.0% | -40.0% | -0.2% | 194.8% | -39.9% | 25.6% |
| Meredith | 60.26 | -30.6% | 17.8% | 2.0% | 51.0% | 18.4% | 82.0% | 27.2% | 36.8% | 6.9% | 11.0% | -21.9% | 11.8% | 16.3% | 19.8% | 12.1% | -2.3% | 7.7% |
| Primedia | 8.28 | – | – | – | – | – | – | -11.3% | 17.4% | -5.9% | 38.9% | -27.7% | -63.9% | -52.6% | 37.4% | 34.3% | -57.0% | 5.0% |
| **Publishing / Financial Info.** | | | | | | | | | | | | | | | | | | |
| FactSet | 56.28 | – | – | – | – | – | – | – | 46.4% | 100.8% | 84.2% | -6.5% | -5.3% | -18.6% | 30.0% | 53.8% | 6.3% | 37.2% |
| McGraw-Hill | 47.38 | -3.2% | 13.4% | 11.0% | 14.2% | 2.3% | 34.4% | 8.0% | 54.4% | 40.4% | 22.9% | -3.2% | 5.7% | 0.7% | 17.8% | 32.8% | 14.4% | 31.7% |
| Moody's | 42.00 | -3.9% | 42.8% | 4.8% | 11.0% | -6.7% | 23.4% | 0.3% | 34.7% | 14.3% | -4.3% | 18.0% | 56.0% | 4.0% | 47.2% | 44.1% | 42.0% | 12.4% |
| Thomson | 46.10 | – | – | – | – | – | – | – | – | – | – | – | – | 40.3% | -0.4% | 0.3% | 0.9% | 19.8% |
| **Printing** | | | | | | | | | | | | | | | | | | |
| Consolidated Graphics | 56.44 | – | – | – | – | – | 131.1% | 115.4% | 68.5% | 44.9% | -77.9% | -20.1% | 81.3% | 15.8% | 41.9% | 45.3% | 3.1% | 24.6% |
| Donnelley, R.R. | 40.13 | -20.8% | 28.8% | 33.4% | -3.2% | -3.3% | 38.1% | -18.8% | 21.4% | 20.0% | -41.8% | 13.2% | 13.7% | -23.8% | 44.6% | 21.0% | -0.1% | 3.9% |
| Quebecor World | 9.18 | – | – | – | – | – | – | 4.9% | -0.5% | 27.8% | 3.8% | 14.8% | -8.7% | 0.9% | -5.1% | 7.3% | -35.9% | -14.9% |
| **Alternative Media** | | | | | | | | | | | | | | | | | | |
| Monster Worldwide | 38.90 | – | – | – | – | – | – | – | 80.4% | 82.6% | 238.1% | -22.5% | -22.0% | -73.8% | 107.2% | 53.2% | 21.3% | 14.3% |
| **Yellow Pages** | | | | | | | | | | | | | | | | | | |
| R.H. Donnelly | 51.75 | – | – | – | – | – | – | – | – | – | 29.8% | 28.8% | 19.5% | 0.9% | 35.9% | 48.2% | 4.4% | 1.6% |
| **Television** | | | | | | | | | | | | | | | | | | |
| Belo | 17.94 | -14.8% | 0.2% | 35.1% | 27.8% | 7.9% | 24.2% | 1.5% | 82.7% | -28.2% | -3.1% | -14.7% | 19.1% | 15.4% | 34.9% | -6.0% | -17.0% | -14.2% |
| Hearst-Argyle | 22.26 | – | – | – | – | – | – | 40.0% | 21.4% | 10.9% | -19.3% | -23.2% | 5.5% | 11.8% | 14.6% | -3.6% | -8.6% | 8.9% |
| Nexstar Broadcasting | 9.05 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -32.7% | -45.7% | -7.2% |
| Sinclair | 11.30 | – | – | – | – | – | 50.7% | 79.3% | -18.1% | -37.6% | -17.8% | -5.7% | 22.9% | 29.8% | -38.0% | 3.3% | 14.1% |
| **Radio** | | | | | | | | | | | | | | | | | | |
| CBS | 28.26 | – | 36.6% | 22.7% | 7.2% | -9.2% | 18.3% | -26.4% | 18.8% | 78.6% | 83.3% | -22.6% | -5.8% | -7.7% | 9.2% | -17.4% | -8.7% | -52.2% |
| Citadel | 4.29 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -27.7% | -15.8% | -25.0% |
| Clear Channel | 37.54 | 11.2% | 31.4% | 80.3% | 182.2% | 37.9% | 73.9% | 83.7% | 119.9% | 37.2% | 63.8% | -45.7% | 5.1% | -28.8% | 28.2% | -27.8% | 8.2% | 13.0% |
| Cox Radio | 11.80 | – | – | – | – | – | – | – | 130.0% | 5.0% | 126.1% | -32.1% | 12.8% | -10.9% | 10.8% | -34.7% | -14.6% | 15.8% |
| Cumulus | 10.10 | – | – | – | – | – | – | – | – | – | 205.3% | -62.9% | 346.3% | -8.3% | 48.3% | -31.6% | -17.7% | -18.3% |
| Emmis | 5.05 | – | – | – | – | – | 129.6% | 5.8% | 39.3% | -4.3% | 187.4% | -54.0% | -17.8% | -11.9% | 29.8% | -29.1% | 3.8% | -54.8% |
| Entercom | 17.62 | – | – | – | – | – | – | – | – | – | – | -48.9% | 45.2% | -6.2% | 12.9% | -32.2% | -17.3% | -8.0% |
| Radio One | 3.40 | – | – | – | – | – | – | – | – | – | – | – | 63.7% | -19.9% | 33.7% | -16.5% | -35.9% | -34.9% |
| Westwood One | 2.46 | -60.0% | -12.5% | 8.1% | 415.4% | 18.4% | 44.9% | 17.7% | 123.3% | -17.8% | 149.2% | -49.2% | 55.6% | 24.3% | -8.4% | -21.3% | -38.5% | -56.7% |
| **Spanish Language Broadcasting** | | | | | | | | | | | | | | | | | | |
| Entravision | 8.83 | – | – | – | – | – | – | – | – | – | – | – | -36.0% | -16.8% | 11.2% | -24.8% | -14.7% | 15.4% |
| Spanish Broadcasting | 2.51 | – | – | – | – | – | – | – | – | – | – | -87.6% | 97.8% | -27.2% | 48.9% | 0.1% | -51.6% | -19.8% |
| Televisa | 23.70 | – | – | – | – | -54.3% | -28.9% | 13.9% | 51.0% | -38.2% | 176.0% | -34.2% | -3.9% | -35.3% | 44.2% | 59.8% | 38.6% | 34.2% |
| **Outdoor** | | | | | | | | | | | | | | | | | | |
| Channel Outdoor | 25.20 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 39.2% |
| Lamar | 52.54 | – | – | – | – | – | – | – | 63.9% | 40.6% | 62.6% | -36.3% | 9.7% | -20.5% | 10.9% | 14.8% | 7.8% | 41.3% |
| JC Decaux | 35.38 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 89.3% | -28.3% | 34.4% |
| **Entertainment** | | | | | | | | | | | | | | | | | | |
| Disney | 33.80 | -8.9% | 13.5% | 51.1% | -0.3% | 8.7% | 29.0% | 19.1% | 42.9% | -8.5% | -1.7% | -0.4% | -27.7% | -20.3% | 44.4% | 20.2% | -12.8% | 43.0% |
| DreamWorks Animation | 32.88 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -34.5% | 20.1% |
| News Corp. | 21.34 | – | – | – | – | – | – | 40.2% | -7.5% | 14.2% | 25.1% | 36.2% | -13.8% | -8.5% | -13.8% | 34.4% | 24.2% | -18.1% | 38.1% |
| Time Warner | 18.00 | – | – | – | 100.1% | 91.5% | 167.8% | -11.3% | 172.2% | 585.6% | 85.8% | -54.1% | -7.6% | -59.2% | 37.3% | 8.1% | -9.8% | 24.9% |
| Viacom | 40.41 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -0.3% |
| **Cable / Satellite** | | | | | | | | | | | | | | | | | | |
| Cablevision | 28.85 | -58.2% | 125.8% | 0.0% | 93.9% | -25.8% | 7.4% | -43.5% | 212.7% | 109.4% | 50.6% | 12.5% | -34.2% | -64.7% | 39.7% | 6.5% | -5.7% | 21.3% |
| Comcast | 20.60 | -20.8% | 28.8% | 16.7% | 88.7% | -36.6% | 15.7% | 0.5% | 81.7% | 80.6% | 72.1% | -13.7% | -12.9% | -34.9% | 39.1% | 1.9% | -22.1% | 63.3% |
| DirecTV | 26.14 | -29.3% | -12.9% | 80.5% | 55.0% | -8.9% | 44.1% | 16.4% | 22.7% | 7.4% | 141.9% | -28.1% | -32.8% | 30.7% | 54.7% | 1.1% | -13.7% | 78.8% |
| EchoStar | 48.61 | – | – | – | – | – | – | -8.3% | -23.9% | 188.8% | 708.2% | -53.3% | 20.7% | -19.0% | 52.7% | 0.6% | -18.3% | 38.9% |
| Liberty Global | 39.75 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | -5.7% | 29.0% |

Note: Stock price returns do not include dividends. Uses arithmetic averages.
Source: FactSet

EXHIBIT C – 76

# LEHMAN BROTHERS
**EQUITY RESEARCH**

Lehman Brothers Newspaper Stock Scorecard  (1 = Best Performer; 9 = Worst Performer)

**Lehman Brothers**
Craig A. Huber  (212) 526-5546

| Overall Score | | | Blended 2007-08(E) Multiple | | | Potential Upside to 12-mn Price Target | 2006-08(E) CAGR | | | 2008(E) % Diff LB EPS vs. First Call | Average 2007-08(E) | | Catalyst | Score/Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | P/E | EBITDA | FCF | | EPS | EBITDA | FCF | | ROIC | ROE | | |
| 1 | Gannett | 3-Underweight | 2 | 3 | 3 | 5 | 4 | 5 | 3 | 2 | 3 | 4 | 3 | |
| 2 | Washington Post | 1-Overweight | 8 | 6 | 8 | 4 | 3 | 2 | 2 | 1 | 2 | 5 | 1 | |
| 3 | Journal Comm. | 2-Equal weight | 4 | 2 | 5 | 2 | 2 | 6 | 7 | 4 | 5 | 6 | 2 | |
| 4 | New York Times | 3-Underweight | 5 | 4 | 4 | 9 | 6 | 3 | 5 | 3 | 7 | 2 | 6 | |
| 5 | Dow Jones | 2-Equal weight | 9 | 9 | 9 | 3 | 1 | 1 | 4 | 7 | 4 | 7 | 5 | |
| 6 | Scripps, E.W. | 3-Underweight | 6 | 8 | 7 | 6 | 5 | 4 | 4 | 6 | 1 | 3 | 7 | |
| 7 | McClatchy | 3-Underweight | 3 | 1 | 2 | 7 | 8 | 7 | 8 | 5 | 8 | 9 | 4 | |
| 8 | Tribune | 3-Underweight | 7 | 7 | 6 | 1 | 7 | 9 | 6 | 9 | 6 | 1 | 9 | |
| 9 | Journal Register | 3-Underweight | 1 | 5 | 1 | 8 | 9 | 8 | 9 | 8 | 9 | 8 | 8 | |
| | | | | | | | Company Statistics | | | | | | | |
| | **Large/Mid-Cap Newspapers** | | | | | | | | | | | | | |
| | Dow Jones | | 41.6 | 17.0 | 38.4 | 0.7% | 23.1% | 9.3% | 16.9% | -17.1% | 6.3% | 8.1% | | |
| | Gannett | | 9.5 | 6.7 | 8.6 | -5.9% | -3.1% | -5.6% | -1.8% | -4.8% | 8.1% | 10.0% | | |
| | McClatchy | | 12.0 | 5.9 | 7.0 | -9.5% | -30.2% | -10.8% | -16.1% | -11.6% | 4.3% | 3.4% | | |
| | New York Times | | 18.3 | 7.2 | 11.3 | -15.7% | -10.6% | -2.4% | -8.9% | -10.1% | 4.5% | 12.7% | | |
| | Scripps, E.W. | | 21.4 | 10.8 | 20.1 | -9.4% | -5.3% | -3.6% | -3.7% | -14.0% | 13.6% | 11.6% | | |
| | Tribune | | 24.2 | 10.4 | 18.5 | 15.4% | -26.8% | -12.9% | -13.5% | -27.9% | 4.7% | 13.2% | | |
| | Washington Post | | 25.1 | 10.4 | 31.6 | -5.3% | -1.6% | 0.9% | 8.0% | 0.0% | 8.9% | 9.0% | | |
| | **Small-Cap Newspapers** | | | | | | | | | | | | | |
| | Journal Comm. | | 13.6 | 6.2 | 16.4 | 8.0% | -1.2% | -6.8% | -14.8% | -10.5% | 5.0% | 8.9% | | |
| | Journal Register | | 5.7 | 8.3 | 5.1 | -11.5% | -30.6% | -11.9% | -19.5% | -25.8% | 3.4% | 5.6% | | |

*E = Lehman Brothers estimates*
*Note: Criteria are equal weighted in the total score.*
*Source: Lehman Brothers*

5

EXHIBIT C – 77

## Price Target Methodologies

Our **price target** for shares of **Dow Jones** is $60, which is equal to the announced takeout price from News Corp.

Our **12-month price target** on shares of **Gannett** is $39, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $32 (using a WACC of 10.1%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 7.9, or an implied terminal EBITDA multiple of 4.7). 2) A target multiple of 7.0x estimated 2008 EBITDA, or $43 per share (which works out to 9.8x estimated 2008 EPS and 8.9x FCF). 3) Our sum-of-the-parts analysis places fair value at $42 based on applying an estimated 2008 EBITDA multiple of 6.5x for the newspaper division and a multiple of 9.0x for the TV station group (using blended 2007/08 EBITDA to take into account political/Olympics advertising), adjusting down the overall valuation by $441 million for corporate expenses, and taking into account net debt of $4.38 billion, an estimated $800 million in investments, and shares outstanding of 234.2 million.

Our **12-month price target** on shares of **McClatchy** is $15, which is derived as the average of the following two methodologies: 1) Our 10-year DCF analysis places fair value at $12.50 (using a WACC of 10.0%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 8.0x, or an implied terminal EBITDA multiple of 4.5x); and 2) a multiple target of 6.5x estimated 2008 EBITDA equates to $17 per share (which is 13.1x estimated 2008 EPS and 7.6x FCF).

Our **12-month price target** on shares of **New York Times** is $16, which is derived as the average of the following three methodologies: 1) Our 10-year DCF analysis places fair value at $12 (using a WACC of 10.5%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 7.7 or an implied terminal EBITDA multiple of 4.1). 2) A target multiple of 7.0x estimated 2008 EBITDA equates to $18 per share (which works out to 17.1x estimated 2008 EPS and 11.0x FCF). 3) Our sum-of-the-parts analysis places fair value at $19, based on applying an estimated 2008 EBITDA multiple of 7.0x for the newspapers, a multiple of 10.0x for About.com, adjusting down the overall valuation by $352 million for corporate expenses, and taking into account pro forma net debt of $901 million, an estimated $250 million in investments, and 143.9 million shares outstanding.

Our **12-month price target** on shares of **Scripps** is $40, which is based on a sum of the parts analysis using 2008 EBITDA multiples (7.0x for the newspapers, 8.5x for the TV stations using blended 2007/08 EBITDA to take into account political/Olympics advertising, 10.0x for Home & Garden TV, 10.5x for Food Network, 7.5x for the interactive division, and 6.0x for licensing and other); a value of $75 million for Do It Yourself, $157.5 million for Fine Living, $75 million for Great American Country Network; docking $595.7 million in value for corporate expenses at a multiple of 8.8x; and taking into account net debt of $603.0 million and shares outstanding of 163.4 million.

Our **12-month price target** on shares of **Tribune** is $34 based on the price per share shareholders will receive in a transaction taking Tribune private announced on April 2, 2007. The transaction is taking place in two parts with 126 million shares tendered on May 24, 2007, at $34 per share and the remaining shareholders receiving $34 per share in 4Q07 (target time frame). Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share based on our detailed sum-of-the-parts analysis: Using estimated 2008 EBITDA multiples of 7.0x for newspapers, 9.0x for the TV stations using blended 2007/08 EBITDA to take into account political advertising, 9.0x for radio/entertainment excluding the Chicago Cubs, docking $394 million in value for corporate expenses at a multiple of 7.8x, taking into account debt of $8.6 billion, PHONES debt of $1.3 billion, cash of $262 million, $286 million from Matthew Bender tax settlement case, $640 million in estimated after-tax proceeds for the Chicago Cubs which is being divested, $60 million in estimated after-tax proceeds for sale of three small newspapers, valuing the investment portfolio at $2.0 billion, and 118.4 million shares outstanding. Another way of looking at what Tribune's stock would be worth if the privatization deal were to break and not occur would be to value the shares at an assumed 15% 2008E free cash flow yield which equates to $10 per share.

Our **12-month price target** on shares of **Washington Post** is $775, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $787 per share (using a WACC of 10.0%, a long-term FCF growth rate of 3.5%, and a terminal FCF multiple of 15.6x, or an implied terminal EBITDA multiple of 7.4x). 2) A target multiple of 9.25x estimated 2008 EBITDA equates to $765 per share (which works out to 22.7x estimated 2008 EPS and 23.9x FCF). 3) Our sum-of-the-parts valuation places fair value at $784 per share based on 2008 EBITDA multiples—7.0x for the newspaper division, 9.0x for broadcasting (using blended 2007/08 EBITDA to take into account political/Olympics advertising), 7.5x for magazines, 8.0x for cable, and 12.5x for the education division. Docking the overall valuation by $375.9 million for corporate expenses, and taking into account net debt of $138.1 million, $420.0 million for the equity investment portfolio, and 9.50 million shares outstanding, gives us fair value.

Our **12-month price target** on shares of **Journal Communications** is $9, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $7 (using a WACC of 10.1%, a long-term FCF growth rate of 2.0%, and a terminal FCF multiple of 12.3x, or an implied terminal EBITDA multiple of 5.1x); 2) A target multiple of 7.25x estimated 2008 EBITDA equates to $11 per share (which results in 16.2x estimated 2008 EPS and 19.4x FCF); and 3) Our sum-of-the-parts analysis places fair value at $11 based on the following 2008 EBITDA multiples by segment—7.0x for the newspapers, 8.5x for the TV stations, 8.5x for the radio stations, (for both TV and radio stations, we use blended 2007/08 EBITDA to take into account political/Olympics advertising) and 4.5x for the printing services operation. We also assign a value of $10 million to the company's "other" segment. Also taking into account net debt outstanding of $91.9 million and shares outstanding of 67.1 million, this works out to a blended 2008 estimated EBITDA multiple of 7.9x.

Our **12-month price target** on shares of **Journal Register** is $2, which is derived as the average of the following two methodologies: 1) Given the very high amount of debt at the company already, our 10-year discounted cash flow analysis puts fair value at $0 (using a WACC of 10.0%, a long-term free cash flow growth rate of 1.5%, and a terminal free cash flow multiple of 11.8x, or an implied terminal EBITDA

EXHIBIT C – 78

multiple of 5.1x); and 2) a target multiple of 9.5x estimated 2008 EBITDA equates to $4 per share (which results in 11.4x 2008 estimated EPS and 9.3x FCF).

## Investment Risks

**Risks that may impede the achievement of our price targets** for the nine newspapers we cover, in our view, include the following possibilities. 1) The U.S. economy slows in the next 12–18 months. 2) National and/or local advertisers make a secular shift out of newspapers and move their advertising budgets to the TV networks/stations, cable networks, Internet, the trade press, business/weekly magazines, and/or cut them altogether. 3) Secular deterioration occurs at a faster rate in newspaper classified advertising (help wanted, in particular) and through a continued migration to third-party online sites. 4) Newsprint prices rise faster than we expect. 5) A company begins to expand its cost base in anticipation of better economic times that do not occur in the coming years. 6) A company undertakes a large, expensive acquisition and/or the integration of an acquisition does not proceed smoothly. 7) The proposed loosening of media ownership rules and regulations fail or are tightened. 8) Circulation figures decrease more quickly than we anticipate. 9) Recent larger-than-normal newspaper circulation volume drops, leading to lack of advertising pricing power and/or ad volume decreases.

Risks specific to each company that may impede the achievement of our price targets, in our view, which are not aforementioned, include the following:

**Dow Jones:** 1) Wall Street employment levels deteriorate, pressuring Dow Jones Newswires; 2) tombstone advertising suffers from a lack of public offerings and/or investment banks choose not to place tombstone advertising in *The Wall Street Journal*; 3) a stock market downturn leads to fewer advertisements; 4) other advertisers look for alternative publications in which to place their ads; and 5) News Corp.'s takeout deal with Dow Jones does not end up happening.

**Gannett:** 1) TV stations suffer from a slowdown in advertising; and 2) the large U.K. newspaper operation continues to be negatively affected by the advertising slowdown in that market and/or currency hurts the overall performance in U.S. dollars.

**New York Times:** 1) Local economic trends in New York and/or Boston deteriorate more than the national average.

**Scripps:** 1) TV stations suffer from a slowdown in advertising; and 2) investors' revenue and ratings expectations for Scripps Networks do not materialize.

**Tribune:** 1) TV stations suffer from a slowdown in advertising, 2) ratings of the new CW network (launched in fall 2006) do not increase as much as expected; and 3) risk the deal to take Tribune private does not materialize.

**Washington Post:** 1) TV stations and/or magazines suffer from an advertising slowdown; 2) the number of cable subscribers declines sharply; and 3) revenue growth at the education division slows significantly and/or regulation changes affect the business.

**Journal Communications:** 1) TV stations suffer from a slowdown in advertising; 2) continued margin expansion in all segments, particularly newspapers and broadcasting, does not materialize as expected; 3) the company loses some or all of its business from a major client; and 4) there is continued pricing pressure in the commercial printing businesses.

**Journal Register:** 1) Interest expense on the high amounts of debt eventually overwhelm the company's cash flow.

*Stocks in this report are priced as of the close of business, November 1, 2007.*

## Analyst Certification:

I, Craig A. Huber, hereby certify (1) that the views expressed in this research Industry Note accurately reflect my personal views about any or all of the subject securities or issuers referred to in this Industry Note and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this Industry Note.

EXHIBIT C – 79

# LEHMAN BROTHERS

**EQUITY RESEARCH**

## FOR CURRENT IMPORTANT DISCLOSURES REGARDING COMPANIES THAT ARE THE SUBJECT OF THIS RESEARCH REPORT, PLEASE SEND A WRITTEN REQUEST TO:
### LEHMAN BROTHERS CONTROL ROOM
### 745 SEVENTH AVENUE, 19TH FLOOR, NEW YORK, NY 10019
### OR
### REFER TO THE FIRM'S DISCLOSURE WEBSITE AT www.lehman.com/disclosures

**Important Disclosures Continued:**
The analysts responsible for preparing this report have received compensation based upon various factors including the firm's total revenues, a portion of which is generated by investment banking activities

| Company Name | Ticker | Price (31-Oct-2007) | Stock / Sector Rating |
|---|---|---|---|
| Dow Jones | DJ | US$ 59.61 | 2-Equal weight / 3-Negative |
| Gannett Inc. | GCI | US$ 41.45 | 3-Underweight / 3-Negative |
| Journal Communications | JRN | US$ 8.49 | 2-Equal weight / 3-Negative |
| Journal Register | JRC | US$ 2.26 | 3-Underweight / 3-Negative |
| McClatchy Company | MNI | US$ 16.58 | 3-Underweight / 3-Negative |
| New York Times | NYT | US$ 18.97 | 3-Underweight / 3-Negative |
| Scripps, E.W. | SSP | US$ 44.13 | 3-Underweight / 3-Negative |
| Tribune Co. | TRB | US$ 29.45 | 3-Underweight / 3-Negative |
| Washington Post | WPO | US$ 817.99 | 1-Overweight / 3-Negative |

**Guide to Lehman Brothers Equity Research Rating System:**
Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector (the "sector coverage universe"). Below is the list of companies that constitute the sector coverage universe:

Dow Jones (DJ)
Journal Communications (JRN)
McClatchy Company (MNI)
Moody's Corp. (MCO)
RR Donnelley & Sons (RRD)
Tribune Co. (TRB)

Gannett Inc. (GCI)
Journal Register (JRC)
McGraw-Hill (MHP)
New York Times (NYT)
Scripps, E.W. (SSP)
Washington Post (WPO)

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

**Stock Rating**
**1-Overweight** - The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**2-Equal weight** - The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12- month investment horizon.
**3-Underweight** - The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**RS-Rating Suspended** - The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company.

**Sector View**
**1-Positive** - sector coverage universe fundamentals/valuations are improving.
**2-Neutral** - sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating.
**3-Negative** - sector coverage universe fundamentals/valuations are deteriorating.

**Distribution of Ratings:**
Lehman Brothers Equity Research has 2106 companies under coverage.
39% have been assigned a 1-Overweight rating which, for purposes of mandatory regulatory disclosures, is classified as Buy rating, 30% of companies with this rating are investment banking clients of the Firm.

LEHMAN BROTHERS

EQUITY RESEARCH

45% have been assigned a 2-Equal weight rating which, for purposes of mandatory regulatory disclosures, is classified as Hold rating, 37% of companies with this rating are investment banking clients of the Firm.

12% have been assigned a 3-Underweight rating which, for purposes of mandatory regulatory disclosures, is classified as Sell rating, 24% of companies with this rating are investment banking clients of the Firm.

**Lehman Brothers Inc. and Its Foreign Affiliates Involved in the Production of Equity Research**

| New York | London | Tokyo |
|---|---|---|
| Lehman Brothers Inc. (LBI, New York) | Lehman Brothers International (Europe) Ltd. | Lehman Brothers Japan Inc. (LBJ, Tokyo) |
| 745 Seventh Avenue | (LBIE, London) | Roppongi Hills Mori Tower, 31st Floor |
| New York , New York 10019 | 25 Bank Street | 6-10-1 Roppongi, Minato-ku, Tokyo 106-6131, |
| Member, NYSE and NASD | London, E14 5LE, United Kingdom | Japan |
| | Regulated by FSA | Regulated by FSA |
| **Taipei** | **Seoul** | **Hong Kong** |
| Lehman Brothers Inc., Taiwan Branch | Lehman Brothers International (Europe) Seoul | Lehman Brothers Asia Limited - Hong Kong |
| (LBI, Taiwan) | Branch (LBIE, Seoul) | (LBAL, Hong Kong) |
| Cathay Financial Center 12F | Hanwha Building, 12th Floor | Two International Finance Centre |
| 7 Sungren Road - Shin-Yi District | 110, Sokong-dong Chung-Ku | 8 Finance Street, 26th Floor |
| Taipei, Taiwan | Seoul 100-755, Korea | Central, Hong Kong |
| | Regulated by FSC | Regulated by SFC |
| **Mumbai** | **Mumbai** | **Sydney** |
| Lehman Brothers Inc., India Branch | Lehman Brothers Securities Private Limited | **Lehman Brothers Australia Securities Pty Ltd.** |
| (LBI, India) | (LBSPL, India) | **LBASPL, Sydney** |
| Winchester, Off High Street, 9th Floor | Ceejay House, 11th Level, Plot F, | **Level 33, 264 George Street** |
| Hiranandani Business Park, | Shivsagar Estate, Dr. Annie Besant Road, | **Sydney NSW 2000, Australia** |
| Powai, Mumbai 400 076, India | Worli, Mumbai 400018 | **Regulated by ASIC** |
| | Regulated by SEBI | |

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), authorized and regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Singapore Pte Ltd. Where this material is distributed by Lehman Brothers Singapore Pte Ltd, please note that it is intended for general circulation only and the recommendations contained herein does not take into account the specific investment objectives, financial situation or particular person. An investor should consult his Lehman Brothers' representative regarding the suitability of the product and take into account his specific investment objectives, financial situation or particular needs before he makes a commitment to purchase the investment product. This material is distributed in Korea by Lehman Brothers International (Europe) Seoul Branch. This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. With the exception of disclosures relating to Lehman Brothers, this research report is based on current public information that Lehman Brothers considers reliable, but we make no representation that it is accurate or complete, and it should not be relied on as such. In the case of any disclosure to the effect that Lehman Brothers Inc. or its affiliates beneficially own 1% or more of any class of common equity securities of the subject company, the computation of beneficial ownership of securities is based upon the methodology used to compute ownership under Section 13(d) of the United States' Securities Exchange Act of 1934. In the case of any disclosure to the effect that Lehman Brothers Inc. and/or its affiliates hold a short position of at least 1% of the outstanding share capital of a particular company, such disclosure relates solely to the ordinary share capital of the company. Accordingly, while such calculation represents Lehman Brothers' holdings net of any long position in the ordinary share capital of the company, such calculation excludes any rights or obligations that Lehman Brothers may otherwise have, or which may accrue in the future, with respect to such ordinary share capital. Similarly such calculation does not include any shares held or owned by Lehman Brothers where such shares are held under a wider agreement or arrangement (be it with a client or a counterparty) concerning the shares of such company (e.g. prime broking and/or stock lending activity). Any such disclosure represents the position of Lehman Brothers as of the last business day of the calendar month preceding the date of this report. This material is provided with the understanding that Lehman Brothers is not acting in a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers representative. The value of and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. © 2007 Lehman Brothers. All rights reserved. Additional information is available on request. Please contact a Lehman Brothers entity in your home jurisdiction.

Lehman Brothers policy for managing conflicts of interest in connection with investment research is available at www.lehman.com/researchconflictspolicy. Ratings, earnings per share forecasts and price targets contained in the Firm's equity research reports covering U.S. companies are available at www.lehman.com/disclosures.

Complete disclosure information on companies covered by Lehman Brothers Equity Research is available at www.lehman.com/disclosures.

EXHIBIT C - 81

# LE, MAN BROTHERS

EQUITY RESEARCH

October 25, 2007

## Accounting & Tax Policy

Market Commentary/Strategy

**Rangel's Tax Proposal**

North America
Investment Strategy & Macro
Accounting & Tax Policy
Robert Willens, CPA
1.212.526.4095
rwillens@lehman.com
LBI, New York

### Sector View:
New:  0-Not Rated
Old:  0-Not Rated

### Investment Conclusion
❑ Representative Rangel's Tax Proposal Contains Some "Interesting" Provisions.

Representative Charles Rangel (D—NY), the Chairman of the House Ways & Means Committee, has introduced a tax bill, called "The Tax Reduction and Reform Act of 2007", the centerpiece of which is the repeal, for taxable years beginning after 2007, of the alternative minimum tax on individuals. However, this repeal is estimated to cost $795.66 billion over ten years and in order to "pay" for this tax reduction, the bill proposes numerous tax increases including treating at least a portion of the "carried interest" earned by investment fund managers as ordinary income rather than capital gain. In addition, the bill would require brokers to report to their customers the cost basis of any "publicly-traded securities" acquired by such customers in accounts maintained with the broker. Covered securities would be stock, debt, commodities, derivatives and other items specified by the Secretary of the Treasury. The provision would apply to stock acquired after January 1, 2009 and to other instruments (that fall within the definition of the term publicly-traded securities) acquired after January 1, 2011.

The bill would reduce the top corporate marginal tax rate from its present level of 35% to 30.5%. In addition, however, it would reduce the inter-corporate dividends received deduction from its present level of 70% to only 60%. Thus, even taking into account the reduction in the marginal corporate tax rate, the "effective tax rate" on inter-corporate dividends would increase some 16%, from 10.5 % to 12.2 %. (In addition, the 80% dividends received deduction, for dividends received from "20 % owned corporations", would be reduced to 70 %—Thus, the effective rate on these dividends would increase from 7 % to 9.15 %). The bill would also repeal the Sec. 199 domestic production activities deduction—a deduction which, when fully phased in, would provide qualifying taxpayers with a 3.15 % tax rate reduction with respect to domestic manufacturing income.

In addition, the bill would repeal the LIFO method of accounting under which corporations, in computing their gross profit, are permitted to "sequence" the most recent costs through the cost of goods sold account. In addition, corporations presently using LIFO would have to "recapture" (i.e., report as income) their "LIFO reserves" (the amount by which the LIFO basis of the inventory is less than the FIFO basis). The income recognized as a result of this recapture would be taken into account over 8 years. The bill would clarify (but not, as feared, "codify") the "economic substance" doctrine. Under this clarification, the doctrine would be satisfied only if (i) the transaction changes, in a "meaningful way", apart from tax consequences, the taxpayer's "economic position" and (ii) the taxpayer has a substantial non-federal income tax purpose for entering into the transaction.

Transactions that are structured as actual asset acquisitions or as deemed asset acquisitions (because the transaction constitutes a "qualified stock purchase" and the purchaser, in connection with such qualified stock purchase, makes an election under Sec. 338, including an election under Sec. 338(h)(10)) are eligible for the benefits of Sec. 197. That section requires that the cost of most acquired intangible assets, including goodwill, be amortized, ratably, over a 15 year period beginning with the month in which the intangible asset is acquired. The Rangel bill would extend the amortization period from 15 years to 20 years. Nearly $21 billion in tax revenues, over the 10 year period, would be raised by this seemingly innocuous provision. In addition, the bill contains provisions that will make it much more difficult for U.S. taxpayers to defer the reporting, for U.S. tax purposes, of the income earned by their foreign subsidiaries. In addition, the bill would amend Sec. 361(a) to re-classify "securities" received in a reorganization as "other property or money". Accordingly, the debt for debt exchanges that have become a staple of many spin-off transactions would no longer be as popular. To avoid tax on the receipt of the securities, the distributing corporation would have to distribute the securities to its shareholders (as opposed to its creditors) and, thus, debt could not be shifted, in a tax-efficient manner, from the distributing corporation to the controlled corporation.

---

**Lehman Brothers does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.**

**Customers of Lehman Brothers in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.lehmanlive.com or can call 1-800-2LEHMAN to request a copy of this research.**

Investors should consider this report as only a single factor in making their investment decision.

**PLEASE SEE ANALYST(S) CERTIFICATION(S) ON PAGE 2 AND IMPORTANT DISCLOSURES BEGINNING ON PAGE 3**

EXHIBIT C – 82

LEHMAN BROTHERS
EQUITY RESEARCH

The "Zell Amendment"

Finally, the bill might actually have an adverse effect on the Tribune buyout. The Tribune buyout envisions the conversion of Tribune, once it satisfies the requirements to be characterized as a "small business corporation", from C corporation to S corporation status. S corporations are not taxed on their taxable income. Instead, the income earned by an S corporation is "passed through" to its shareholders and is taxed directly to such shareholders. Where the shareholder of an S corporation is a "qualified retirement plan" ("an organization described in Sec. 401(a)"), the income earned by the S corporation, and passed through to the plan, is taxed to such plan because Sec. 512(e)(1)(B) provides that such income is taken into account in computing the organization's "unrelated business taxable income". However, there is an exception to this rule, found in Sec. 512(e)(3), for cases where the qualified plan (owning the S corporation's stock) is an ESOP. In that case, the income passed through from the S corporation is not taken into account in calculating the ESOP's unrelated business taxable income. In the Tribune case, Mr. Zell will hold a warrant (to acquire 43 % of Tribune's outstanding stock) and the ESOP will hold 100 % of the S corporation's outstanding stock. Thus, during the period this arrangement exists, no taxes at all will be assessed on the income earned by Tribune. The bill, however, would alter this outcome: It would require "option holders" (like Mr. Zell) to recognize income when the option is exercised or sold in an amount equal to the income "that was shifted to the ESOP" during the period of time that the option was held by the taxpayer. Thus, apparently, when Mr. Zell sold (or exercised) his option (to purchase stock of Tribune) he would be required to report (and pay tax and interest on) 43 % of the taxable income earned by Tribune during the period in which Mr. Zell held the option. Will the specter of this tax hinder the Tribune deal? It certainly cannot be ruled out.

**Analyst Certification:**

I, Robert Willens, CPA, hereby certify (1) that the views expressed in this research Industry Note accurately reflect my personal views about any or all of the subject securities or issuers referred to in this Industry Note and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this Industry Note.

LEF. IAN BROTHERS

EQUITY RESEARCH

**Important Disclosures Continued:**
The analysts responsible for preparing this report have received compensation based upon various factors including the firm's total revenues, a portion of which is generated by investment banking activities

**Guide to Lehman Brothers Equity Research Rating System:**
Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector (the "sector coverage universe"). Not applicable.

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

**Stock Rating**
**1-Overweight** - The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**2-Equal weight** - The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12- month investment horizon.
**3-Underweight** - The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**RS-Rating Suspended** - The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company.

**Sector View**
**1-Positive** - sector coverage universe fundamentals/valuations are improving.
**2-Neutral** - sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating.
**3-Negative** - sector coverage universe fundamentals/valuations are deteriorating.

**Distribution of Ratings:**
Lehman Brothers Equity Research has 2101 companies under coverage.
39% have been assigned a 1-Overweight rating which, for purposes of mandatory regulatory disclosures, is classified as Buy rating, 30% of companies with this rating are investment banking clients of the Firm.
45% have been assigned a 2-Equal weight rating which, for purposes of mandatory regulatory disclosures, is classified as Hold rating, 38% of companies with this rating are investment banking clients of the Firm.
12% have been assigned a 3-Underweight rating which, for purposes of mandatory regulatory disclosures, is classified as Sell rating, 21% of companies with this rating are investment banking clients of the Firm.

**Lehman Brothers Inc. and Its Foreign Affiliates Involved in the Production of Equity Research**

| New York | London | Tokyo |
|---|---|---|
| Lehman Brothers Inc. (LBI, New York) | Lehman Brothers International (Europe) Ltd. | Lehman Brothers Japan Inc. (LBJ, Tokyo) |
| 745 Seventh Avenue | (LBIE, London) | Roppongi Hills Mori Tower, 31st Floor |
| New York , New York 10019 | 25 Bank Street | 6-10-1 Roppongi, Minato-ku, Tokyo 106-6131, |
| Member, NYSE and NASD | London, E14 5LE, United Kingdom | Japan |
| | Regulated by FSA | Regulated by FSA |
| **Taipei** | **Seoul** | **Hong Kong** |
| Lehman Brothers Inc., Taiwan Branch | Lehman Brothers International (Europe) Seoul | Lehman Brothers Asia Limited - Hong Kong · |
| (LBI, Taiwan) | Branch (LBIE, Seoul) | (LBAL, Hong Kong) |
| Cathay Financial Center 12F | Hanwha Building, 12th Floor | Two International Finance Centre |
| 7 Sungren Road - Shin-Yi District | 110, Sokong-dong Chung-Ku | 8 Finance Street, 26th Floor |
| Taipei, Taiwan | Seoul 100-755, Korea | Central, Hong Kong |
| | Regulated by FSC | Regulated by SFC |
| **Mumbai** | **Mumbai** | **Sydney** |
| Lehman Brothers Inc., India Branch | Lehman Brothers Securities Private Limited | Lehman Brothers Australia Securities Pty Ltd. |
| (LBI, India) | (LBSPL, India) | LBASPL, Sydney |
| Winchester, Off High Street, 9th Floor | Ceejay House, 11th Level, Plot F, | Level 33, 264 George Street |
| Hiranandani Business Park, | Shivsagar Estate, Dr. Annie Besant Road, | Sydney NSW 2000, Australia |
| Powai, Mumbai 400 076, India | Worli, Mumbai 400018 | Regulated by ASIC |
| | Regulated by SEBI | |

3

EXHIBIT C – 84

LEHMAN BROTHERS

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), authorized and regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Singapore Pte Ltd. Where this material is distributed by Lehman Brothers Singapore Pte Ltd, please note that it is intended for general circulation only and the recommendations contained herein does not take into account the specific investment objectives, financial situation or particular needs of any particular person. An investor should consult his Lehman Brothers' representative regarding the suitability of the product and take into account his specific investment objectives, financial situation or particular needs before he makes a commitment to purchase the investment product. This material is distributed in Korea by Lehman Brothers International (Europe) Seoul Branch. This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. With the exception of disclosures relating to Lehman Brothers, this research report is based on current public information that Lehman Brothers considers reliable, but we make no representation that it is accurate or complete, and it should not be relied on as such. In the case of any disclosure to the effect that Lehman Brothers Inc. or its affiliates beneficially own 1% or more of any class of common equity securities of the subject company, the computation of beneficial ownership of securities is based upon the methodology used to compute ownership under Section 13(d) of the United States' Securities Exchange Act of 1934. In the case of any disclosure to the effect that Lehman Brothers Inc. and/or its affiliates hold a short position of at least 1% of the outstanding share capital of a particular company, such disclosure relates solely to the ordinary share capital of the company. Accordingly, while such calculation represents Lehman Brothers' holdings net of any long position in the ordinary share capital of the company, such calculation excludes any rights or obligations that Lehman Brothers may otherwise have, or which may accrue in the future, with respect to such ordinary share capital. Similarly such calculation does not include any shares held or owned by Lehman Brothers where such shares are held under a wider agreement or arrangement (be it with a client or a counterparty) concerning the shares of such company (e.g. prime broking and/or stock lending activity). Any such disclosure represents the position of Lehman Brothers as of the last business day of the calendar month preceding the date of this report. This material is provided with the understanding that Lehman Brothers is not acting as a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers representative. The value of and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. © 2007 Lehman Brothers. All rights reserved. Additional information is available on request. Please contact a Lehman Brothers entity in your home jurisdiction.

Lehman Brothers policy for managing conflicts of interest in connection with investment research is available at www.lehman.com/researchconflictspolicy. Ratings, earnings per share forecasts and price targets contained in the Firm's equity research reports covering U.S. companies are available at www.lehman.com/disclosures.

Complete disclosure information on companies covered by Lehman Brothers Equity Research is available at www.lehman.com/disclosures.

EXHIBIT C – 85

# EXHIBIT D

December 20, 2007

**Goldman Sachs**

COMPANY UPDATE
# Tribune Company (TRB)
Neutral

# Good-bye and good luck

## What's changed

Tribune completed its go-private transaction today with the purchase of the company's remaining outstanding shares for $34 per share. The company starts life as a private entity with roughly $13 billion in debt (before proceeds from planned asset sales), or roughly 11x 2008E EBITDA.

## Implications

With estimated annual interest expense (before adjustments for asset sales) of $1 billion and 2008E EBITDA of $1.147 billion, the transaction leaves very little room for error, particularly given the extremely challenging industry backdrop. The company could potentially face a liquidity crunch fairly quickly if the ad revenue trends of 2007 (YTD newspaper ad revenues down 8.5% thru November, TV revenues down 2.4%) persist into 2008 and beyond. Mr. Zell and team clearly have their work cut out for them. We wouldn't be surprised to see additional asset sales beyond the announcements to date (Cubs, Southern CT papers).

## Valuation

Based on our 2008 estimate of EBITDA, and assuming the company's other assets (Chicago Cubs, Food Network interest, CareerBuilder stake, etc.) are worth approximately $2.2 billion, Tribune's $34 go-private price represents a multiple of about 9.0x EBITDA. We view this as a very rich valuation in the context of the cyclical and secular challenges facing the industry.

## Key risks

(1) Highly levered, (2) cyclical pressures, (3) secular shifts in ad market.

## Impact on related securities

We do not believe the Tribune go-private transaction portends further industry consolidation given (1) tight credit market conditions and (2) weak industry fundamentals. Financial pressure on Tribune leading to asset sales could create opportunities for other media firms, including Scripps if liquidity pressures motivate Tribune to sell its Food Network stake.

INVESTMENT LIST MEMBERSHIP
Neutral

Coverage View: Cautious
United States:
Media

Peter P. Appert, CFA
(415) 249-7480 | peter.appert@gs.com Goldman, Sachs & Co.

Peter M. Salkowski
(415) 249-7482 | peter.salkowski@gs.com Goldman, Sachs & Co.

Stephanie Withers, CFA
(415) 249-7470 | stephanie.withers@gs.com Goldman, Sachs & Co.

The Goldman Sachs Group, Inc.



Investment Profile: Tribune Company

| | Low | | | | High | |
|---|---|---|---|---|---|---|
| Growth | | | | | | Growth |
| Returns * | | | | | | Returns * |
| Multiple | | | | | | Multiple |
| Volatility | | | | | | Volatility |
| Percentile | 20th | 40th | 60th | 80th | 100th | |

■ TRB
○ Americas Publishing Peer Group Average
* Returns = Return on Capital   For a complete description of the investment profile measures please refer to the disclosure section of this document.

| Key data | Current |
|---|---|
| Price ($) | 33.98 |
| 6 month price target ($) | 34.00 |
| Market cap ($ mn) | 8,224.9 |
| Dividend yield (%) | 1.5 |
| Net margin (%) | 6.2 |
| Debt/total capital (%) | 87.6 |

| | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Revenue ($ mn) | 5,546.8 | 5,093.1 | 5,052.6 | 5,026.8 |
| EPS ($) | 2.02 | 1.69 | 1.45 | 1.53 |
| P/E (X) | 16.8 | 20.1 | 23.4 | 22.2 |
| EV/EBITDA (X) | 10.0 | 10.2 | 10.7 | 10.6 |
| ROE (%) | 10.1 | 10.6 | 12.1 | 10.0 |

| | 9/07 | 12/07E | 3/08E | 6/08E |
|---|---|---|---|---|
| EPS ($) | 0.37 | 0.67 | 0.02 | 0.44 |

Price performance chart



— Tribune Company (L) — — S&P 500 (R)

| Share price performance (%) | 3 month | 6 month | 12 month |
|---|---|---|---|
| Absolute | 24.2 | 13.4 | 8.4 |
| Rel. to S&P 500 | 29.1 | 17.5 | 5.6 |

Source: Company data, Goldman Sachs Research estimates, FactSet. Price as of 12/20/2007 close.

The Goldman Sachs Group, Inc. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers in the US can receive independent, third-party research on companies covered in this report, at no cost to them, where such research is available, Customers can access this independent research at www.independentresearch.gs.com or call 1-866-727-7000. For Reg AC certification, see the text preceding the disclosures. For other important disclosures go to www.gs.com/research/hedge.html. Analysts employed by non-US affiliates are not required to take the NASD/NYSE analyst exam.

Global Investment Research

**EXHIBIT D –**

December 20, 2007                                                                 Tribune Company (TRB)

# Tribune Company: Summary financials

| Profit model ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Total revenue | 5,546.8 | 5,093.1 | 5,052.6 | 5,026.8 |
| Cost of goods sold | (2,745.8) | (2,555.8) | (2,544.9) | (2,531.3) |
| SG&A | (1,467.7) | (1,366.1) | (1,360.4) | (1,353.1) |
| R&D | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating profit/(expense) | 0.0 | 0.0 | 0.0 | 0.0 |
| ESO expense | (33.8) | (33.4) | (33.4) | (33.4) |
| EBITDA | 1,333.3 | 1,171.4 | 1,147.2 | 1,142.4 |
| Depreciation & amortization | (229.3) | (225.0) | (225.0) | (225.0) |
| EBIT | 1,104.0 | 946.4 | 922.2 | 917.4 |
| Net interest income/(expense) | (259.8) | (556.0) | (710.0) | (692.0) |
| Income/(loss) from associates | 74.9 | 103.0 | 80.0 | 83.2 |
| Others | 0.0 | 0.0 | 0.0 | 0.0 |
| Pretax profits | 919.1 | 493.3 | 292.2 | 308.6 |
| Provision for taxes | (357.5) | (200.2) | (115.4) | (121.9) |
| Minority interest | 0.0 | 0.0 | 0.0 | 0.0 |
| Net income pre-preferred dividends | 561.6 | 293.1 | 176.8 | 186.7 |
| Preferred dividends | (6.3) | 3.0 | 6.0 | 6.0 |
| Net income (pre-exceptionals) | 555.3 | 296.1 | 182.8 | 192.7 |
| Post tax exceptionals | 97.6 | 19.1 | 0.0 | 0.0 |
| Net income (post-exceptionals) | 652.9 | 315.2 | 182.8 | 192.7 |
| | | | | |
| EPS (basic, pre-except) ($) | 2.02 | 1.70 | 1.46 | 1.54 |
| EPS (diluted, pre-except) ($) | 2.02 | 1.68 | 1.45 | 1.53 |
| EPS (basic, post-except) ($) | 2.37 | 1.81 | 1.46 | 1.54 |
| EPS (diluted, post-except) ($) | 2.38 | 1.80 | 1.45 | 1.53 |
| Common dividends paid | (194.6) | (88.7) | (90.7) | (90.7) |
| DPS ($) | 0.73 | 0.49 | 0.68 | 0.68 |
| Dividend payout ratio (%) | 36.2 | 28.9 | 46.3 | 44.0 |

| Balance sheet ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Cash & equivalents | 174.7 | 844.7 | 742.9 | 713.5 |
| Accounts receivable | 785.9 | 577.5 | 559.3 | 547.8 |
| Inventory | 41.0 | 36.0 | 35.6 | 35.4 |
| Other current assets | 395.9 | 264.8 | 264.8 | 264.8 |
| Total current assets | 1,377.4 | 1,723.0 | 1,602.6 | 1,561.5 |
| Net PP&E | 1,685.1 | 1,936.1 | 2,351.1 | 2,586.1 |
| Net intangibles | 18,574.9 | 18,268.7 | 18,248.7 | 18,228.7 |
| Total investments | -- | -- | -- | -- |
| Other long-term assets | 445.5 | 721.2 | 721.2 | 721.2 |
| Total assets | 13,400.8 | 14,069.1 | 14,353.7 | 14,517.7 |
| | | | | |
| Accounts payable | 151.6 | 542.5 | 559.4 | 557.9 |
| Short-term debt | 1,429.0 | 78.5 | 78.5 | 78.5 |
| Other current liabilities | 966.1 | 734.6 | 734.6 | 734.6 |
| Total current liabilities | 2,546.7 | 1,355.5 | 1,372.5 | 1,371.0 |
| Long-term debt | 3,576.2 | 8,863.6 | 8,863.6 | 8,463.6 |
| Other long-term liabilities | 2,958.2 | 2,578.5 | 2,578.5 | 2,578.5 |
| Total long-term liabilities | 6,534.4 | 11,442.1 | 11,242.1 | 11,042.1 |
| Total liabilities | 9,081.2 | 12,797.6 | 12,614.6 | 12,413.1 |
| | | | | |
| Preferred shares | 0.0 | 0.0 | 0.0 | 0.0 |
| Common stock | 1,181.3 | (2,030.3) | (1,654.7) | (1,299.2) |
| Retained earnings | 3,138.3 | 3,301.8 | 3,393.9 | 3,403.8 |
| Other common equity | 0.0 | 0.0 | 0.0 | 0.0 |
| Total common equity | 4,319.6 | 1,271.5 | 1,739.2 | 2,104.6 |
| Minority interest | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | |
| Total liabilities & equity | 13,400.8 | 14,069.1 | 14,353.7 | 14,517.7 |

| Growth & margins (%) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Sales growth | (0.9) | (8.2) | (0.8) | (0.5) |
| EBITDA growth | (7.4) | (12.1) | (2.1) | (0.4) |
| EBIT growth | (7.7) | (14.3) | (2.6) | (0.5) |
| Net income (pre-except) growth | (15.0) | (46.7) | (38.3) | 5.4 |
| EPS growth | (2.8) | (15.5) | (14.2) | 5.4 |
| Gross margin | 50.5 | 49.8 | 49.6 | 49.6 |
| EBITDA margin | 24.0 | 23.0 | 22.7 | 22.7 |
| EBIT margin | 19.9 | 18.6 | 18.3 | 18.3 |

| Cash flow statement ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Net income | 561.6 | 256.9 | 176.8 | 186.7 |
| D&A add-back (incl. ESO) | 229.3 | 225.0 | 225.0 | 225.0 |
| Minority interest add-back | 0.0 | 0.0 | 0.0 | 0.0 |
| Net inc/(dec) working capital | 39.9 | 483.8 | 35.5 | 10.2 |
| Other operating cash flow | 22.2 | 33.4 | 33.4 | 33.4 |
| Cash flow from operations | 787.8 | 999.1 | 470.8 | 455.3 |
| | | | | |
| Capital expenditures | (221.9) | (200.0) | (200.0) | (200.0) |
| Acquisitions | (48.1) | 0.0 | 0.0 | 0.0 |
| Divestitures | (174.1) | 0.0 | 0.0 | 0.0 |
| Others | 470.6 | 0.0 | 0.0 | 0.0 |
| Cash flow from investing | 26.5 | (200.0) | (200.0) | (200.0) |
| | | | | |
| Dividends paid (common & pref) | (200.9) | (85.7) | (84.7) | (84.7) |
| Inc/(dec) in debt | 1,635.4 | 4,035.7 | (200.0) | (200.0) |
| Other financing cash flows | (2,225.1) | (4,167.0) | 0.0 | 0.0 |
| Cash flow from financing | (790.7) | (217.0) | (284.7) | (284.7) |
| Total cash flow | 23.6 | 582.1 | (13.9) | (29.4) |

| Additional financials | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Net debt/equity (%) | 111.8 | 536.8 | 459.9 | 372.0 |
| Interest cover (X) | 4.3 | 1.7 | 1.3 | 1.3 |
| Inventory days | 5.7 | 5.5 | 5.1 | 5.1 |
| Receivable days | 51.5 | 48.1 | 41.1 | 40.2 |
| BVPS ($) | 14.29 | 4.21 | 5.75 | 6.96 |
| | | | | |
| ROA (%) | 4.0 | 2.2 | 1.3 | 1.3 |
| CROCI (%) | 4.0 | 3.8 | 4.0 | 3.9 |
| | | | | |
| Dupont ROE (%) | 12.9 | 23.3 | 10.5 | 9.2 |
| Margin (%) | 10.0 | 5.8 | 3.6 | 3.8 |
| Turnover (X) | 0.4 | 0.4 | 0.4 | 0.3 |
| Leverage (X) | 3.1 | 11.1 | 8.3 | 6.9 |
| | | | | |
| Free cash flow per share ($) | 1.25 | 4.60 | 2.17 | 2.04 |
| Free cash flow yield (%) | 4.1 | 13.5 | 6.4 | 6.0 |

Note: Last actual year may include reported and estimated data.

*Source: Company data, Goldman Sachs Research estimates.*

**Analyst Contributors**

**Peter P. Appert, CFA**
peter.appert@gs.com

**Peter M. Salkowski**
peter.salkowski@gs.com

**Stephanie Withers, CFA**
stephanie.withers@gs.com

EXHIBIT D – 87

2

December 20, 2007                                                                    Tribune Company (TRB)

# Trading history



**Exhibit 1: TRB trading history**



Source: Factset.

# Financial Model

### Exhibit 2: Tribune earnings model - pre buyout
Data in $ millions, except per share amounts

| | 2005A | FY 2006 | | | | 2006A | FY 2007E | | | | 2007E | 2008E | 2009E | 06-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | YEAR | 1QA | 2QA | 3QA | 4QA | YEAR | 1QA | 2QA | 3QA | 4QE | YEAR | YEAR | YEAR | CAGR |
| | | | | | (14 weeks) | | | | | (13 weeks) | | | | |
| **REVENUE** | | | | | | | | | | | | | | |
| Publishing | 4,096.9 | $996.5 | $1,028.3 | $955.5 | $1,111.3 | $4,092.6 | $931.5 | $920.4 | $870.8 | $948.9 | $3,669.6 | $3,578.2 | $3,517.2 | -4.9% |
| Advertising | 3,244.6 | 787.7 | 822.9 | 756.2 | 893.3 | 3,260.1 | 730.8 | 721.1 | 674.5 | 749.5 | 2,872.9 | 2,786.8 | 2,731.0 | -5.7% |
| Circulation | 596.2 | 145.9 | 142.0 | 137.7 | 149.5 | 575.0 | 134.9 | 131.8 | 131.3 | 131.8 | 527.9 | 522.6 | 517.4 | -3.5% |
| Other | 256.1 | 63.0 | 63.4 | 62.6 | 68.5 | 257.5 | 65.8 | 67.5 | 67.0 | 68.5 | 268.8 | 268.8 | 268.8 | 1.4% |
| Broadcasting/Entertainment | 1,498.8 | 302.6 | 403.8 | 392.6 | 355.6 | 1,454.3 | 283.0 | 303.0 | 408.1 | 341.4 | 1,423.5 | 1,474.4 | 1,509.6 | 1.3% |
| Television | 1,250.2 | 284.2 | 320.3 | 277.5 | 325.2 | 1,207.2 | 264.4 | 286.9 | 288.3 | 311.0 | 1,150.7 | 1,190.7 | 1,214.6 | 0.2% |
| Entertainment/Chicago Cubs | 245.5 | 18.3 | 83.3 | 115.0 | 30.4 | 247.0 | 18.6 | 106.0 | 117.8 | 30.4 | 272.8 | 283.7 | 295.0 | 6.1% |
| **Total Revenues** | **5,595.6** | **1,299.1** | **1,431.9** | **1,348.0** | **1,466.9** | **5,546.8** | **1,214.5** | **1,313.4** | **1,276.9** | **1,288.3** | **5,093.1** | **5,052.6** | **5,026.8** | **-3.2%** |
| Growth | -2.3% | -1.3% | -2.1% | -3.8% | 3.7% | -0.9% | -6.5% | -8.3% | -5.3% | -12.2% | -8.2% | -0.8% | -0.5% | |
| Operating Expenses (excl. nonrecurring) | | | | | 3.8% | | | | | | | | | |
| Publishing | 3,285.1 | 810.3 | 819.6 | 815.2 | 875.2 | 3,320.4 | 791.8 | 769.4 | 744.8 | 752.8 | 3,058.8 | 3,003.9 | 2,957.2 | -3.8% |
| Y/Y Change | 0.4% | 0.4% | -0.2% | 0.8% | 3.4% | 1.1% | -2.3% | -6.1% | -8.6% | -14.0% | -7.9% | -1.8% | -1.6% | |
| Broadcasting | 1,062.2 | 233.6 | 291.7 | 284.8 | 249.7 | 1,059.8 | 221.8 | 285.2 | 288.3 | 237.2 | 1,032.3 | 1,070.0 | 1,093.3 | 1.0% |
| Y/Y Change | 1.0% | -4.0% | 0.8% | -2.4% | 5.0% | -0.2% | -5.1% | -2.2% | 1.2% | -5.0% | -2.6% | 3.6% | 2.2% | |
| **Total Operating Expenses** | **4,347.4** | **1,043.9** | **1,111.4** | **1,100.0** | **1,124.9** | **4,380.1** | **1,013.4** | **1,054.6** | **1,033.1** | **990.0** | **4,091.1** | **4,073.8** | **4,050.5** | **-2.6%** |
| Y/Y Change | 0.5% | -0.6% | 0.1% | -0.2% | 3.7% | 0.8% | -2.9% | -5.1% | -6.1% | -12.0% | -6.6% | -0.4% | -0.6% | |
| **OPERATING MARGIN** | | | | | | | | | | | | | | |
| Publishing | 19.8% | 18.7% | 20.3% | 14.8% | 21.2% | 18.9% | 15.0% | 16.4% | 14.5% | 20.5% | 16.5% | 16.0% | 15.9% | |
| Broadcasting | 29.1% | 22.8% | 27.7% | 27.5% | 29.8% | 27.1% | 21.7% | 27.4% | 29.0% | 30.5% | 27.5% | 27.4% | 27.6% | |
| Television | 32.2% | 26.1% | 32.8% | 26.7% | 33.0% | 29.9% | 25.3% | 31.1% | 30.2% | 34.0% | 30.3% | 30.2% | 30.3% | |
| Entertainment/Chicago Cubs | 13.4% | -28.4% | 8.0% | 28.3% | -5.0% | 13.6% | -29.7% | 17.5% | 28.1% | -5.0% | 15.5% | 18.0% | 16.4% | |
| **TOTAL MARGIN** | **22.3%** | **19.6%** | **22.4%** | **18.5%** | **23.3%** | **21.0%** | **16.6%** | **19.7%** | **19.1%** | **23.2%** | **19.7%** | **19.4%** | **19.4%** | |
| **OPERATING INCOME** | | | | | | | | | | | | | | |
| Publishing | 811.7 | 186.2 | 208.7 | 141.2 | 236.1 | 772.2 | 139.7 | 151.0 | 126.0 | 194.1 | 610.9 | 574.3 | 560.0 | -10.2% |
| Broadcasting | 436.5 | 69.0 | 111.8 | 107.8 | 105.9 | 394.5 | 61.4 | 107.7 | 117.8 | 104.2 | 391.1 | 404.4 | 416.2 | 1.8% |
| Television | 403.1 | 74.2 | 105.2 | 74.1 | 107.4 | 360.9 | 66.9 | 89.1 | 87.1 | 105.7 | 348.8 | 359.0 | 367.7 | 0.6% |
| Entertainment/Chicago Cubs | 33.4 | (5.2) | 66.3 | 33.7 | (1.5) | 33.6 | (5.5) | 18.6 | 30.7 | (1.5) | 42.3 | 45.4 | 48.5 | |
| **OPERATING INCOME (pre-corp exp.)** | **1,248.2** | **255.2** | **320.5** | **249.0** | **342.0** | **1,166.7** | **201.1** | **258.7** | **243.8** | **298.3** | **1,002.0** | **978.7** | **976.2** | **-5.8%** |
| Corporate Expense | 52.4 | 20.4 | 14.0 | 13.7 | 14.8 | 62.7 | 19.8 | 10.9 | 11.8 | 13.4 | 55.8 | 56.5 | 58.8 | -2.1% |
| **OPERATING INCOME** | **1,195.8** | **234.9** | **306.4** | **235.3** | **327.4** | **1,104.0** | **181.5** | **247.8** | **232.2** | **284.9** | **946.4** | **922.2** | **917.4** | **-6.0%** |
| Net gain (loss) on equity investments | 41.2 | 6.5 | 20.1 | 18.7 | 29.5 | 74.9 | 12.7 | 28.7 | 26.6 | 35.0 | 103.0 | 80.0 | 83.2 | 3.6% |
| Net Interest | (147.7) | (46.5) | (44.8) | (79.5) | (88.7) | (259.8) | (80.1) | (112.1) | (161.8) | (192.0) | (556.0) | (710.0) | (692.0) | 38.6% |
| Other | 0.2 | | | | | - | | | | | - | - | - | |
| **PRETAX INCOME** | **1,088.6** | **194.8** | **281.8** | **174.4** | **268.1** | **919.1** | **114.1** | **164.4** | **76.9** | **137.9** | **493.3** | **292.2** | **308.6** | **-30.5%** |
| Rate | 39.3% | 38.2% | 40.1% | 38.4% | 38.4% | 38.9% | 40.2% | 41.8% | 40.5% | 38.5% | 40.6% | 39.5% | 39.5% | |
| Taxes | 427.8 | 74.5 | 113.1 | 86.9 | 103.0 | 357.5 | 45.9 | 68.8 | 31.2 | 54.5 | 200.2 | 115.4 | 121.9 | -30.1% |
| **CONTINUED OPERATIONS** | **661.8** | **120.3** | **168.7** | **187.5** | **165.1** | **561.6** | **68.3** | **95.7** | **45.8** | **83.4** | **293.1** | **176.8** | **186.7** | **-30.7%** |
| **NON OPERATING & EXTRAORDINARY ITEMS** | | | | | | | | | | | | | | |
| Total (after tax amount) | (127.1) | (17.5) | (80.8) | 58.8 | 73.9 | 32.4 | (83.9) | (59.4) | 107.0 | - | (38.2) | - | - | |
| **NET INCOME** | **534.7** | **102.8** | **87.9** | **164.3** | **239.1** | **594.0** | **(15.6)** | **36.3** | **152.8** | **83.4** | **256.9** | **176.8** | **186.7** | **-32.0%** |
| PREFERRED DIVDS. | 8.4 | 2.1 | 2.1 | 2.1 | | 8.3 | | | | | | | | |
| AVAIL. FOR COMMON (Basic) | 526.3 | 100.7 | 85.7 | 162.2 | 239.1 | 587.7 | (15.6) | 36.3 | 152.8 | 83.4 | 256.9 | 176.8 | 186.7 | -31.6% |
| EPS Adjustments - ESOP, etc. | 8.4 | 2.1 | 2.1 | 2.1 | - | 8.3 | - | - | - | - | - | - | - | -100.0% |
| Adjusted Net (for diluted EPS Calc.) | 526.3 | $100.7 | $85.7 | $162.2 | $239.1 | 587.7 | (15.6) | 36.3 | $152.8 | $83.4 | 256.9 | 176.8 | 186.7 | -31.6% |
| Avg. Shares-Diluted | 315.4 | 306.0 | 304.5 | 252.8 | 241.4 | 274.4 | 242.1 | 204.4 | 126.3 | 129.0 | 174.7 | 126.0 | 126.0 | -22.9% |
| **EARNINGS PER SHARE** | | | | | | | | | | | | | | |
| **Diluted** | | | | | | | | | | | | | | |
| Continuing Operations | $2.07 | 0.39 | 0.55 | 0.43 | 0.68 | $2.02 | 0.28 | 0.47 | 0.37 | 0.57 | $1.69 | $1.45 | $1.53 | -8.9% |
| Y/Y growth | -2.8% | -5.7% | -8.7% | -14.4% | 20.3% | -2.3% | -27.0% | -14.5% | -12.1% | -1.5% | -16.2% | -14.4% | 5.4% | |
| Reported | $1.57 | $0.33 | $0.28 | $0.65 | $0.99 | $2.14 | $(0.06) | $0.18 | $1.22 | $0.57 | $1.49 | $1.45 | $1.53 | -10.6% |

Notes:
3Q07: Results adjusted to exclude a $3.5m pre-tax ($0.02/sh) severance charge, a favorable $81m ($0.72/sh) tax adjustment, a $78m pre-tax ($0.38/sh) loss mostly attributable to the marking-to-market of the Phones,
a gain of $65m pre-tax ($0.53/sh) on the sale of assets, and an after-tax gain of 25m ($0.24/sh) from the TMCT transactions
2Q07: Results adjusted to exclude a $28m pre-tax ($0.06/sh) severance charge as well as a $24m pre-tax ($0.07/sh) charge for write-off of LA Times yard
Interactive advertising revenues for 2002 and 2003 are included in the appropriate publishing categories
2Q06: Discontinued operations are related to the sale of two TV stations in Atlanta and Albany. Q06 results include costs incurred to write-down the TV stations, less the cost to sell them.
   Equity investments adjusted to exclude a favorable tax gain at CareerBuilder of $5.9 million pre-tax (approximately 33m post-tax)
1Q06: Operating income adjusted to exclude a 318 m pre-tax severance charge related to a new union contract at NewsDay and a 57m on the sale of certain publishing assets

**REVENUE GROWTH**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Publishing | -0.6% | -0.9% | -1.0% | -2.4% | 3.6% | -0.1% | -6.5% | -9.0% | -9.0% | -14.8% | -10.3% | -2.5% | -1.7% | |
| Advertising | 0.5% | 0.0% | 0.0% | -2.2% | 3.8% | 0.5% | -7.2% | -12.4% | -10.8% | -18.4% | -11.6% | -3.0% | -2.0% | |
| Circulation | -7.4% | -3.9% | -5.3% | -6.0% | 1.0% | -3.5% | -7.9% | -7.2% | -6.1% | -11.8% | -8.2% | -1.0% | -1.0% | |
| Other | 0.1% | -4.3% | -3.6% | 3.4% | 7.1% | 0.5% | 4.5% | 8.4% | 7.1% | 0.0% | 4.4% | 0.0% | 0.0% | |
| Broadcasting/Entertainment | -6.1% | -2.5% | -4.7% | -7.1% | 3.9% | -3.0% | -6.5% | -2.6% | 3.4% | -4.0% | -2.1% | 3.6% | 2.3% | |
| Television | -7.6% | -2.0% | -4.3% | -9.5% | -2.0% | -3.4% | -7.0% | -10.4% | 3.0% | -4.4% | -4.7% | 3.5% | 2.0% | |
| Entertainment/Chicago Cubs | 2.4% | -9.1% | -6.3% | -0.7% | 28.2% | -0.6% | 1.4% | 27.3% | 2.4% | 0.0% | 10.4% | 4.0% | 4.0% | |
| **Total Revenues** | **-2.3%** | **-1.3%** | **-2.1%** | **-3.8%** | **3.7%** | **-0.9%** | **-6.5%** | **-8.3%** | **-5.3%** | **-12.2%** | **-8.2%** | **-0.8%** | **-0.5%** | |

Source: Company data, Goldman Sachs Research estimates.

# Reg AC

I, Peter P. Appert, CFA, hereby certify that all of the views expressed in this report accurately reflect my personal views about the subject company or companies and its or their securities. I also certify that no part of my compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

# Investment profile

The Goldman Sachs Investment Profile provides investment context for a security by comparing key attributes of that security to its peer group and market. The four key attributes depicted are: growth, returns, multiple and volatility. Growth, returns and multiple are indexed based on composites of several methodologies to determine the stocks percentile ranking within the region's coverage universe.

The precise calculation of each metric may vary depending on the fiscal year, industry and region but the standard approach is as follows:

**Growth** is a composite of next year's estimate over current year's estimate, e.g. EPS, EBITDA, Revenue. **Return** is a year one prospective aggregate of various return on capital measures, e.g. CROCI, ROACE, and ROE. **Multiple** is a composite of one-year forward valuation ratios, e.g. P/E, dividend yield, EV/FCF, EV/EBITDA, EV/DACF, Price/Book. **Volatility** is measured as trailing twelve-month volatility adjusted for dividends.

# Quantum

Quantum is Goldman Sachs' proprietary database providing access to detailed financial statement histories, forecasts and ratios. It can be used for in-depth analysis of a single company, or to make comparisons between companies in different sectors and markets.

# Disclosures

### Coverage group(s) of stocks by primary analyst(s)

Peter P. Appert, CFA: America: Media: Newspapers and Directories, America: Media: Publishing and Information Services. Peter M. Salkowski: America: Media: Newspapers and Directories.

America: Media: Newspapers and Directories: Belo Corp., E.W. Scripps Co., Gannett Company, Inc., GateHouse Media, Inc., Idearc Inc., Journal Communications Inc., The McClatchy Co., Monster Worldwide, Inc., The New York Times Co., R.H. Donnelley Corp., Tribune Company.

America: Media: Publishing and Information Services: Dolan Media Company, FactSet Research Systems Inc., Gartner, Inc., Getty Images, Inc., IHS Inc., The McGraw-Hill Companies, Inc., Moody's Corp., Scholastic Corporation, Solera Holdings, Inc., Thomson Corp..

### Company-specific regulatory disclosures

The following disclosures relate to relationships between The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs") and companies covered by the Global Investment Research Division of Goldman Sachs and referred to in this research.

Goldman Sachs beneficially owned 1% or more of common equity (excluding positions managed by affiliates and business units not required to be aggregated under US securities law) as of the month end preceding this report: Tribune Company ($33.98)

Goldman Sachs has received compensation for investment banking services in the past 12 months: Tribune Company ($33.98)

Goldman Sachs expects to receive or intends to seek compensation for investment banking services in the next 3 months: Tribune Company ($33.98)

Goldman Sachs has received compensation for non-investment banking services during the past 12 months: Tribune Company ($33.98)

Goldman Sachs had an investment banking services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs had a non-investment banking securities-related services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs had a non-securities services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs has managed or co-managed a public or Rule 144A offering in the past 12 months: Tribune Company ($33.98)

Goldman Sachs is a specialist in the relevant securities and will at any given time have an inventory position, "long" or "short," and may be on the opposite side of orders executed on the relevant exchange: Tribune Company ($33.98)

### Distribution of ratings/investment banking relationships

Goldman Sachs Investment Research global coverage universe

| | Rating Distribution | | | Investment Banking Relationships | | |
|--------|-----|------|------|-----|------|------|
| | Buy | Hold | Sell | Buy | Hold | Sell |
| Global | 29% | 59% | 12% | 39% | 32% | 29% |

EXHIBIT D — 90    5

As of Oct 1, 2007, Goldman Sachs Global Investment Research had investment ratings on 2,770 equity securities. Goldman Sachs assigns stocks as Buys and Sells on various regional Investment Lists; stocks not so assigned are deemed Neutral. Such assignments equate to Buy, Hold and Sell for the purposes of the above disclosure required by NASD/NYSE rules. See 'Ratings, Coverage groups and views and related definitions' below.

## Price target and rating history chart(s)



The price targets shown should be considered in the context of all prior published Goldman Sachs research, which may or may not have included price targets, as well as developments relating to the company, its industry and financial markets.

## Regulatory disclosures

### Disclosures required by United States laws and regulations

See company-specific regulatory disclosures above for any of the following disclosures required as to companies referred to in this report: manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/co-managed public offerings in prior periods; directorships; market making and/or specialist role.

The following are additional required disclosures: **Ownership and material conflicts of interest:** Goldman Sachs policy prohibits its analysts, professionals reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage. **Analyst compensation:** Analysts are paid in part based on the profitability of Goldman Sachs, which includes investment banking revenues. **Analyst as officer or director:** Goldman Sachs policy prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director, advisory board member or employee of any company in the analyst's area of coverage. **Distribution of ratings:** See the distribution of ratings disclosure above. **Price chart:** See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the Goldman Sachs website at http://www.gs.com/research/hedge.html. Goldman, Sachs & Co. is a member of SIPC.

### Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, except to the extent already made above pursuant to United States laws and regulations. **Australia:** This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act. **Canada:** Goldman Sachs Canada Inc. has approved of, and agreed to take responsibility for, this research in Canada if and to the extent it relates to equity securities of Canadian issuers. Analysts may conduct site visits but are prohibited from accepting payment or reimbursement by the company of travel expenses for such visits. **Hong Kong:** Further information on the securities of covered companies referred to in this research may be obtained on request from Goldman Sachs (Asia) L.L.C. **India:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (India) Securities Private Limited; **Japan:** See below. **Korea:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (Asia) L.L.C., Seoul Branch. **Russia:** Research reports distributed in the Russian Federation are not advertising as defined in Russian law, but are information and analysis not having product promotion as their main purpose and do not provide appraisal within the meaning of the Russian Law on Appraisal. **Singapore:** Further information on the covered companies referred to in this research may be obtained from Goldman Sachs (Singapore) Pte. (Company Number: 198602165W). **United Kingdom:** Persons who would be categorized as retail clients in the United Kingdom, as such term is defined in the rules of the Financial Services Authority, should read this research in conjunction with prior Goldman Sachs research on the covered companies referred to herein and should refer to the risk warnings that have been sent to them by Goldman Sachs International. A copy of these risks warnings, and a glossary of certain financial terms used in this report, are available from Goldman Sachs International on request.

**European Union:** Disclosure information in relation to Article 4 (1) (d) and Article 6 (2) of the European Commission Directive 2003/126/EC is available at http://www.gs.com/client_services/global_investment_research/europeanpolicy.html

**Japan: Goldman Sachs Japan Co., Ltd. is a Financial Instrument Dealer under the Financial Instrument and Exchange Law, registered with the Kanto Financial Bureau (Registration No. 69), and is a member of Japan Securities Dealers Association (JSDA) and Financial Futures Association of Japan (FFJAJ). Sales and purchase of equities are subject to commission pre-determined with clients plus consumption tax.** See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

### Ratings, coverage groups and views and related definitions

**Buy (B), Neutral (N), Sell (S)** -Analysts recommend stocks as Buys or Sells for inclusion on various regional Investment Lists. Being assigned a Buy or Sell on an Investment List is determined by a stock's return potential relative to its coverage group as described below. Any stock not assigned as a Buy or a Sell on an Investment List is deemed Neutral. Each regional Investment Review Committee manages various regional Investment Lists to a global guideline of 25%-35% of stocks as Buy and 10%-15% of stocks as Sell; however, the distribution of Buys and Sells in any particular coverage group may vary as determined by the regional Investment Review Committee. Regional Conviction Buy and Sell lists represent investment recommendations focused on either the size of the potential return or the likelihood of the realization of the return.

**Return potential** represents the price differential between the current share price and the price target expected during the time horizon associated with the price target. Price targets are required for all covered stocks. The return potential, price target and associated time horizon are stated in each report adding or reiterating an Investment List membership.

**Coverage groups and views:** A list of all stocks in each coverage group is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html. The analyst assigns one of the following coverage views which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and/or valuation. **Attractive (A).** The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. **Neutral (N).** The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. **Cautious (C).** The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

**Not Rated (NR).** The investment rating and target price, if any, have been removed pursuant to Goldman Sachs policy when Goldman Sachs is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances. **Rating Suspended (RS).** Goldman Sachs Research has suspended the investment rating and price target, if any, for this stock, because there is not a sufficient fundamental basis for determining an investment rating or target. The previous investment rating and price target, if any, are no longer in effect for this stock and should not be relied upon. **Coverage Suspended (CS).** Goldman Sachs has suspended coverage of this company. **Not Covered (NC).** Goldman Sachs does not cover this company. **Not Available or Not Applicable (NA).** The information is not available for display or is not applicable. **Not Meaningful (NM).** The information is not meaningful and is therefore excluded.

## Ratings, coverage views and related definitions prior to June 26, 2006

Our rating system requires that analysts rank order the stocks in their coverage groups and assign one of three investment ratings (see definitions below) within a ratings distribution guideline of no more than 25% of the stocks should be rated Outperform and no fewer than 10% rated Underperform. The analyst assigns one of three coverage views (see definitions below), which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and valuation. Each coverage group, listing all stocks covered in that group, is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html.

Definitions

**Outperform (OP).** We expect this stock to outperform the median total return for the analyst's coverage universe over the next 12 months. **In-Line (IL).** We expect this stock to perform in line with the median total return for the analyst's coverage universe over the next 12 months. **Underperform (U).** We expect this stock to underperform the median total return for the analyst's coverage universe over the next 12 months.

**Coverage views: Attractive (A).** The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. **Neutral (N).** The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. **Cautious (C).** The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

**Current Investment List (CIL).** We expect stocks on this list to provide an absolute total return of approximately 15%-20% over the next 12 months. We only assign this designation to stocks rated Outperform. We require a 12-month price target for stocks with this designation. Each stock on the CIL will automatically come off the list after 90 days unless renewed by the covering analyst and the relevant Regional Investment Review Committee.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs, and pursuant to certain contractual arrangements, on a global basis. Analysts based in Goldman Sachs offices around the world produce equity research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy.

This research is disseminated in Australia by Goldman Sachs JBWere Pty Ltd (ABN 21 006 797 897) on behalf of Goldman Sachs; in Canada by Goldman Sachs Canada Inc. regarding Canadian equities and by Goldman Sachs & Co. (all other research); in Germany by Goldman Sachs & Co. oHG; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs JBWere (NZ) Limited on behalf of Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman, Sachs & Co. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom and European Union.

**European Union:** Goldman Sachs International, authorised and regulated by the Financial Services Authority, has approved this research in connection with its distribution in the European Union and United Kingdom; Goldman, Sachs & Co. oHG, regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht, may also be distributing research in Germany.

## General disclosures in addition to specific disclosures required by certain jurisdictions

This research is for our clients only. Other than disclosures relating to Goldman Sachs, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management, and brokerage business. We have investment banking and other business relationships with a substantial percentage of the companies covered by our Global Investment Research Division.

Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and our proprietary trading desks that reflect opinions that are contrary to the opinions expressed in this research. Our asset management area, our proprietary trading desks and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

We and our affiliates, officers, directors, and employees, excluding equity analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives (including options and warrants) thereof of covered companies referred to in this research.

This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of the investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

Current options disclosure documents are available from Goldman Sachs sales representatives or at http://www.theocc.com/publications/risks/riskchap1.jsp. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Our research is disseminated primarily electronically, and, in some cases, in printed form. Electronic research is simultaneously available to all clients.

Disclosure information is also available at http://www.gs.com/research/hedge.html or from Research Compliance, One New York Plaza, New York, NY 10004.

**Copyright 2007 The Goldman Sachs Group, Inc.**

**No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.**

# EXHIBIT E

**Tribune Employee Severance Program Feb. 2008**
**2/19/2008 3:06 PM**

# Q&A Guide

## GENERAL

1. **Why is the company offering this employee severance program?**

   A difficult economy and significant advertising volume declines at our newspapers require us to reduce costs quickly. The program includes voluntary and involuntary terminations, as well as closing open positions (where applicable). The company intends to treat those employees impacted fairly by providing benefits from the existing pension plan, which was over-funded by $400 million at the end of 2007.

2. **How many employees are being eliminated?**

   Each business unit is making its own decision based on its situation. At the Los Angeles Times, we expect to let go 100 to 150 employees.

3. **Are all business units using the same program?**

   Each business unit chose which programs to implement based on its individual situation.

4. **Will there be additional staffing reductions in the future?**

   There could be. Depending on business conditions, the company may need to take additional steps, including staff reductions.

5. **Who can I contact with additional questions?**

   We encourage you to talk to your department head. You can also check with your Human Resources department.

6. **Will employees who are terminated voluntarily or involuntarily receive outplacement services?**

   Yes.

7. **How is the company paying for the cash portion of the benefit?**

   Participants will receive this portion of their benefit in the form of a contribution to their Cash Balance Pension Plan account. As a result, the pension's surplus is partially funding the program. If you have a prior frozen pension plan benefit, that benefit is secure and remains unchanged.

8. **How can we use the over-funded pension assets to pay for the new Cash Balance Plan and now this program? Won't the funds run out eventually?**

   The pension plan was over-funded by more than $400 million at the end of 2007. Projections indicate that our assets can cover both this program and the ongoing Cash Balance Plan benefit. This severance program does not have any impact on any frozen pension benefit you may have earned — that benefit is secure and remains unchanged.

9. **Will voluntary and involuntary participants all receive the cash benefit through the Cash Balance Plan?**

Not necessarily. We expect the large majority of participants to receive the benefit through the Cash Balance Plan. However, Tribune reserves the right to pay the cash portion through regular payroll payments as necessary to meet IRS non-discrimination requirements. (If this is the case, you will not receive the 3 percent benefit to offset excise taxes.)

10. **When will 2007 MIP and merit increases be communicated?**

For those eligible, MIP payments will be made on Feb. 22. Because we are conducting the voluntary and involuntary terminations and related programs, salary increases traditionally announced in February for MIP-eligible employees will be delayed until April. The goal is to properly reward key employees who are staying with the company.

# VOLUNTARY

11. **How was eligibility determined?**

Eligibility is determined by each business unit based on their goals and objectives. Department heads, working with Human Resources, assessed business needs, job functions and staffing to determine where the company could afford to allow employees to apply to leave the company. We also identified certain functional areas, as well as a limited number of specific jobs where offering voluntary separations wouldn't be in the company's best interest.

12. **Will the company offer a program like this again?**

At this time there are no definitive plans to do so.

## Benefit Formula

13. **What benefit am I eligible for under the program?**

You will receive one week of pay for every six months of service, with a minimum of six weeks pay and a maximum of 52 weeks. The cash portion of the benefit will be paid through the Cash Balance Pension Plan in the form of a contribution to your account. You can receive your benefit in a variety of distribution forms:

- Lump sum
- Roll over to an individual retirement account (IRA) or other qualified plan
- Various annuity options

Participants' benefit amount will be increased by 3 percent to help offset potential taxes.

If you would otherwise be eligible for retiree medical benefits but for your age, and you are at least age 53 with 10 years of service, the company will treat you as though you are age 55 (on an unpaid basis) so you are eligible for retiree medical (if available).

14. **When do I have to elect a payment option?**

You will be provided election forms by Hewitt Retirement Center once your participation in the program has been approved. You must return these forms to Hewitt within the timeframe they specify before payment can be made.

2

EXHIBIT E – 95

**15. How will I see my benefit payment option amounts?**

Once you are approved, the Hewitt Retirement Center will send you a packet of information including a personalized statement outlining each payment option and an estimated amount for each.

**16. Can I leave my benefit in the Cash Balance Plan and take it as a distribution later?**

Yes, you may leave your account balance in the Cash Balance Plan to earn interest and receive a distribution later at your election. However, if your account balance is less than $5,000, including the value of any prior frozen benefit, you will receive payment in a lump sum.

**17. I'm age 53 with nine years of service. Do I qualify for the "bridge" to make me age 55 eligible for retiree medical?**

No. Eligibility requirements for retiree medical through this program are age 53 with at least 10 years of service as of March 1, 2008, provided you were otherwise eligible for coverage at your business unit.

**18. So, only employees who are age 53 and 54 get an increase in their retiree medical benefit under this program, right?**

Participants who meet the criteria of age 53 or 54 with 10 years of service are being treated as though they are age 55 to be eligible for retiree medical. The company believes this is fair and reasonable.

**19. I'll be age 53 with 10 years of service in April. Can I get the "bridge" to age 55 to be eligible for retiree medical?**

No. You must be age 53 with 10 years of service as of March 1, 2008.

**20. I'm age 53 with 10 years of service and my salary is $40,000; I'm married and my spouse is age 53. What kind of benefit could I receive?**

| Cash Balance Account Payment Option | Benefit Estimate |
|---|---|
| Lump sum as cash (or roll over to an IRA or other qualified plan) | $15,846 (20 weeks of pay + 3%) |
| 50% Joint and Survivor Monthly Annuity (100% and 75% options also available) | $81.14 |
| Single life annuity | $85.01 |

Other payment options are available including a life annuity with 5 and 10 minimum payments.

**21. Can I leave my benefit in the plan for years? Is there a limit to the timeframe?**

You can leave your benefit in the plan until you reach age 70½, then you must begin receiving the benefit. You may also consider rolling it into an IRA.

**22. Do I need to be fully vested in the Cash Balance Pension Plan in order to receive my benefit under this program?**

No. There are no vesting requirements for purposes of the benefit in the Cash Balance Pension Plan.

**23. Am I eligible for retiree medical benefits?**

Retiree medical benefits are availability for Los Angeles Times employees who meet the eligibility requirements and opt to enroll.

3

**24. I'm eligible for retiree medical coverage — what's the monthly cost?**

The cost varies by which plan you elect. The COBRA rates are posted on TimesLink for your reference.

**25. If I take the lump sum option, how soon will I get paid?**

Following your Voluntary Separation Date, after you have signed the waiver and release, the seven day revocation period has expired and Hewitt has received your election, you will be paid within approximately 14 days. In order to receive payments you must have completed and submitted all necessary election forms regarding the Cash Balance Plan benefit.

**26. What is a waiver and release?**

A waiver and release is a legal document in which you waive and release claims you may have against the released parties. It's the company's standard practice to require a waiver and release in exchange for any additional benefits. Consider consulting an attorney with any specific questions.

**27. What is the seven day revocation period?**

If your application is accepted and you are a participant in the program, after you have signed your waiver and release, you have seven days to revoke it.

**28. Will I automatically begin receiving my voluntary benefits after I leave?**

Provided you have signed and not revoked your waiver and release, your benefits will be available in your cash balance plan account in April.

You will need to complete and return an election form and other paperwork that you will receive from Hewitt in order to receive a distribution.

**29. What are the tax consequences?**

Under past severance programs with salary continuation, amounts were withheld from severance payment for income taxes plus 7.65 percent FICA taxes.

This program is different because you are receiving a pension benefit. Pension benefit payments are taxed when you receive them (unless you receive it and roll it over to an IRA or another employer's qualified plan). You also may be subject to an additional 10 percent penalty tax depending on your age and the payment option you choose — you're responsible for paying the penalty tax. You may want to consult with a tax advisor.

Your cash balance plan account related to this program is being increased by 3 percent to compensate you for potential excise taxes applicable to a lump sum distribution. You are not taxed for FICA as it would have been under salary continuation. Therefore, the 3 percent increase will place you in approximately the same after-tax position as a salary continuation payment (3 percent - 10 percent excise tax = 7 percent, which is the approximate FICA rate).

**30. What happens if I die while receiving my benefit or before receiving my benefit?**

Many of the payment options provide a continuing benefit (in differing amounts) for your spouse or beneficiary after your death. You may also designate a beneficiary for your cash balance account balance. However, if you're single and choose a single life annuity, no further payments will be made after your death.

4

## Applying for the Voluntary Program

### 31. Where do I find the application and plan documents?

The Los Angeles Times is posting the application and plan documents on TimesLink. Click on the EVSP button on the home page to view and download documents.

### 32. How do I apply for the program?

Eligible employees will need to be approved for participation in the program. To apply, you must complete the application form and present it to the individual designated on the application form by noon on March 3, 2008.

### 33. What is the application due date?

You must have your completed materials submitted by noon on March 3, 2008.

### 34. Do I really have a choice about whether or not to apply? Should I take this package?

This is your decision. The voluntary separation program provides an option to receive severance benefits while leaving the company. If this is an attractive option for you, then you should consider applying.

### 35. What happens if I change my mind after I have submitted my application?

Your application is binding, and you cannot change your mind after submitting it. If your application is approved, you will be informed of the date your employment will terminate. We encourage you to study your individual situation carefully and seek appropriate guidance before making this important decision.

### 36. How will the company decide whether or not to accept my application?

Your department head, working with Human Resources, will determine whether the company can accept your application in light of the position you hold, the skills you possess, the other applications received and the company's expense reduction needs and ongoing business objectives.

### 37. When and how will I be notified about whether or not my application has been accepted?

You will be notified in writing no later than March 14, 2008.

### 38. What happens after my application is accepted and when is my last day of work?

Your employment will be terminated by March 28, 2008. Your specific termination date will be determined by your manager and department head. In order to receive the program benefits, you will be required to sign a waiver and release form within 45 days after the company receives your signed and dated application and not revoke the waiver and release during the seven day revocation period.

### 39. If I'm accepted, what's the earliest I can leave my job?

Your manager and department head will determine your termination date, but it may be as early as March 3, 2008.

### 40. If not enough employees apply for the voluntary program, will there be more layoffs?

Yes. If our voluntary goals are not met, there will be involuntary terminations. In addition, we are considering the need for targeted involuntary terminations simultaneous to the voluntary program.

EXHIBIT E - 98

**41. What happens if my application is not accepted?**

You will not be a participant in the voluntary program and your employment with the company will continue. Not being accepted does not constitute a guarantee of ongoing employment. Every employee is an "at will" employee.

**42. Why would my application be declined for the program?**

There could be several reasons including:

- Too many employees in your job classification applied and the company needs you to stay
- You do not meet the eligibility criteria
- Your specific skill set is needed going forward
- You are a single incumbent in a job the company cannot eliminate based on business needs.

**43. What happens if my application is accepted but I choose not to sign the waiver and release or I revoke it?**

Your employment with the company will be terminated and you will not receive the benefits of the program.

**44. If I apply for the program but am declined, am I marked for the future?**

The company will not retaliate against you for applying for the program.

**45. If I'm eligible for the program, but choose not to apply, could I still lose my job?**

Yes. If you don't apply and not enough employees volunteer, you may be involuntarily terminated. Decisions about involuntary terminations or layoffs will be made based on business needs.

**46. I heard the severance program will change on Jan. 1, 2009. If I'm not accepted for this program and I'm eliminated next year, will I receive reduced severance?**

The company expects to reduce severance benefits in January 2009.

**47. Will I be more financially secure with the voluntary program or if I continue working?**

Only you can answer that question. You may want to consider speaking with a financial advisor.

## Healthcare Benefits

**48. If I participate in the voluntary program, what happens to my Tribune healthcare benefits?**

You will continue to receive the same coverage as active employees for a period equal to one week for each consecutive period of six months of service with a minimum of 12 weeks and a maximum of 52 weeks, assuming you make the required premium payments for benefits. *For example:* If you have 10 years of service, you may receive healthcare benefits for twenty weeks.

Because you will be terminated and no longer eligible for payroll deductions, the company will send you a bill for the cost of your portion of healthcare; you must send a check to pay the cost. When your healthcare benefits end, you may apply for COBRA.

**49. If I find other employment with benefits before my severance period is over, will my Tribune healthcare benefits continue?**

No. You should call the Tribune Benefits Service Center to indicate that you have found other employment with benefits and on what day your new benefits will begin.

6

50. **If I don't find other employment during my severance period and I am no longer eligible for healthcare at the active employee rate, can I receive coverage through COBRA?**

Yes. Generally, you're eligible to receive COBRA coverage for up to 18 months when your benefits continuation ends. Contact the Tribune Benefits Service Center for more information about COBRA and the cost of coverage.

51. **Will my retiree medical rates always be the same?**

No. Based on rising health care costs, retiree medical rates will increase as necessary. Tribune also reserves the right to change or discontinue retiree medical coverage at any time for any reason.

52. **What happens to my healthcare coverage when I reach age 65?**

At age 65, your Tribune coverage will end and Medicare becomes your primary medical provider. Contact the Social Security Administration for information on how to apply for Medicare at 800/772-1213 or visit their website at www.ssa.gov.

53. **Can I add newly eligible dependents to my medical coverage in the program?**

If you choose coverage under the retiree medical plan, the plan will cover only those dependents that are covered under your current medical plan as of your voluntary retirement date. However, if you choose medical coverage under COBRA, you may add newly eligible dependents.

54. **Where can I get more information about COBRA and the cost of retiree medical coverage (if applicable)?**

Contact the Tribune Benefits Service Center at 800/872-2222.

## Retirement Benefits

55. **What happens to my frozen pension plan benefit?**

Any frozen pension benefit you have remains in the plan and is not changed by the voluntary severance program. You may choose from among the distribution forms and timing that were previously available. Contact the Hewitt Retirement Center for more information.

56. **What happens to my 401(k) plan account?**

Your 401(k) account will remain in the plan and will be available for distribution. Contact the Hewitt Retirement Center for more information.

57. **Can I continue contributing to my 401(k) account?**

No. You will not receive ongoing salary payments and will not be eligible to make 401(k) contributions.

58. **I have a 401(k) loan. What happens to it if I participate in the voluntary program?**

You will need to continue making loan payments or you will be taxed on the amount of your outstanding loan. You will be given coupons by which you can continue to make loan payments. If you take a distribution from your account, you won't be eligible to make loan payments — instead, you will owe taxes on your outstanding loan balance.

## Other

59. **If I leave the company under the voluntary program, will I be eligible for re-employment with Tribune?**

You will not be eligible for re-hire for two years following your last day of employment with your business unit.

7

EXHIBIT E – 100

**60. How will reference letters or inquiries be managed if I volunteer and am accepted?**

Los Angeles Times employees and any prospective new employers may verify employment using The Work Number at www.theworknumber.com. Sign in with the user name of "TRIBUNE" and follow the directions provided. The Employer Code is: 10280.

**61. Why are there birthdates listed on the eligible and ineligible lists?**

When offering a voluntary separation program, there are various laws that govern how the plan is put together and what information we are required to disclose. You can be assured that the information we have provided is required by law.

**62. I'm MIP eligible. Will I receive a bonus for my time worked in 2008 if I participate in the program?**

No.

**63. If I accept the voluntary program, can I apply for unemployment benefits?**

Because this is a voluntary program, it's unlikely that you will be able to collect unemployment. The final decision regarding your eligibility for unemployment is up to your state unemployment agency.

**64. What about my unused vacation, sick time and floating holidays?**

Accrued but unused vacation will be paid out as required upon termination.

**65. What happens to my life insurance coverage if I leave through this program?**

Depending on the life insurance plan that you are enrolled in, you may be eligible to convert it to an individual policy. Contact the Tribune Benefits Service Center for more information.

**66. Will I receive a W-2 from Tribune in 2009 for my work in 2008?**

Yes. You will receive a W-2 in Jan./Feb. 2009 for your work in 2008. If you take your benefit as a distribution, you also will receive a form 1099R. They will be sent to your address on file. If you move, be sure to update your information with the Hewitt Retirement Center.

## INVOLUNTARY

**67. What benefit am I eligible for if I am involuntarily terminated?**

You will receive one week of pay for every six months of service, with a minimum of six weeks pay and a maximum of 52 weeks. The cash portion of the benefit will be paid through the Cash Balance Pension Plan in the form of a contribution to your account. You can receive your benefit in a variety of distribution forms:

- Lump sum
- Roll over to an individual retirement account (IRA) or other qualified plan
- Various annuity options

Your benefit amount will be increased by 3 percent to help offset potential taxes.

If you would otherwise be eligible for retiree medical benefits but for your age, and you are at least age 53 with 10 years of service, the company will treat you as though you are age 55 (on an unpaid basis) so you are eligible for retiree medical (if available).

8

EXHIBIT E – 101

**68. Can I leave my benefit in the Cash Balance Plan and take it as a distribution later?**

Yes, you may leave your account balance in the Cash Balance Plan to earn interest and receive a distribution later at your election. However, if your account balance is less than $5,000, including the value of any prior frozen benefit, you will receive payment in a lump sum.

**69. I'm age 53 with nine years of service. Do I qualify for the "bridge" to make me age 55 eligible for retiree medical?**

No. Eligibility requirements for retiree medical through the program are age 53 with at least 10 years of service as of March 1, 2008, provided you were otherwise eligible for coverage at your business unit.

**70. So, only employees who are age 53 and 54 get an increase in their retiree medical benefit under this program, right?**

Those who meet the criteria of age 53 or 54 with 10 years of service are being treated as though they are age 55 to be eligible for retiree medical. The company believes this is fair and reasonable.

**71. I'll be age 53 with 10 years of service in April. Can I get the "bridge" to age 55 to be eligible for retiree medical?**

No. You must be age 53 with 10 years of service as of March 1, 2008.

**72. I'm age 53 with 10 years of service and my salary is $40,000; I'm married and my spouse is age 53. What kind of benefit could I receive?**

| Cash Balance Account Payment Option | Benefit Estimate |
|---|---|
| Lump sum as cash (or roll over to an IRA or other qualified plan) | $15,846 (20 weeks of pay + 3%) |
| 50% Joint and Survivor Monthly Annuity (100% and 75% options also available) | $81.14 |
| Single life annuity | $85.01 |

Other payment options are available including a life annuity with 5 and 10 minimum payments.

**73. Can I leave my benefit in the plan for years? Is there a limit to the timeframe?**

You can leave your benefit in the plan until you reach age 70½, then you must begin receiving the benefit. You may also consider rolling it into an IRA.

**74. Do I need to be fully vested in the Cash Balance Pension Plan in order to receive my benefit?**

No. There are no vesting requirements for purposes of the benefit in the Cash Balance Pension Plan.

**75. Am I eligible for retiree medical benefits?**

You would be eligible for retiree medical coverage under EVSP if you meet the following conditions:

- As of March 1, 2008, you have attained age 53;
- You were hired prior to January 1, 1993 with no break in service greater than 180 days;
- You have at least 10 years of service;
- You are currently enrolled in medical benefits.

You will be eligible to elect retiree medical coverage within 31 days of attaining age 55 (after your separation under EVSP). Normally eligibility requires attaining age 55 at the time of retirement.

9

EXHIBIT E – 1(

# EXHIBIT F

**CHICAGOBUSINESS**
— POWERED BY CRAIN'S —

Print Story | Close Window          Printed from ChicagoBusiness.com

## Zell sis takes ex-CEO digs in Trib Tower

By Eddie Baeb
June 12, 2008

(Crain's) — Tribune Co. boss Sam Zell has leased the 23rd floor of the Tribune Tower, the company's former executive suite, to a new investment firm headed by his sister, Leah Zell Wanger.

Ms. Wanger's new company, Lizard Investors LLC, moved in to the 7,500-square-foot, fully furnished floor near the tower's famed flying buttresses this month.

The company, an asset management firm that will focus on non-U.S. investments, signed a "two-year lease at market rates," confirms a Lizard spokeswoman who declined additional comment.

The 23rd floor was the former office of Tribune CEO Dennis FitzSimons, who announced his resignation in December, a day before real estate mogul Sam Zell took over the media giant and took the company private.

Ms. Wanger's new office is one level below the former office used by Tribune's legendary publisher, Col. Robert McCormick, who commissioned the landmark 36-story tower built in 1925 at 435 N. Michigan Ave.

The 24th floor, renowned for its dark wood paneling, limestone fireplace and vaulted ceiling, is now a conference room used by Tribune. The 25th floor used to be a public observatory until the late 1950s, according to a book about the tower by Chicago Tribune architecture critic Blair Kamin.

"The atmosphere of (Col. McCormick's) office, with its paneled, dark pine walls, is positively baronial," Mr. Kamin writes, "as if the occupant were a king surveying his realm."

The top of Tribune Tower already has several tenants, including architecture firm Eastlake Studio, but some years back, Tribune stopped renewing leases there as the company had planned on growing and taking more of the space itself. Mr. Zell's plan for the space is still being formulated, says Stephanie Pater, who joined Tribune in January as director of real estate.

She says more furnished space on the upper floors is to become available for similar short-term deals as the company plans to re-shuffle some of its staff in the tower.

Ms. Wanger and her husband, Ralph Wanger, stepped down about five years ago from the Acorn fund family, now part of Bank of America Corp.'s Columbia Management. Mr. Wanger founded the Acorn fund, while Ms. Wanger was lead portfolio manager of the $1.2-billion Liberty Acorn International Fund.

*Thomas A. Corfman contributed.*

# TRIBUNE

## Financial Information

**About Tribune**

SEC FILINGS |<
PRESS RELEASES |<
EARNINGS AND REVENUES |<
STRATEGIC INVESTMENT PORTFOLIO |<
INFORMATION REQUESTS |<
RELATED PERSON TRANSACTIONS POLICY |<
CODE OF ETHICS |<

| Financial Information | Media Relations | Career Opportunities | Sales & Advertising |

**Tribune Company**
**Related Person Transactions Policy**
**As in effect on December 20, 2007**

1. Policy. Each Related Person Transaction must be approved or ratified in accordance with the guidelines set forth in this policy (i) by the Audit Committee of the Board of Directors or (ii) if the Audit Committee of the Board of Directors determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, by such disinterested members of the Board of Directors by the vote of a majority thereof.

   In considering whether to approve or ratify any Related Person Transaction, the Audit Committee or the disinterested members of the Board of Directors, as the case may be (the "Reviewing Directors"), shall consider all factors that are relevant to the Related Person Transaction, including, without limitation, the following:

   • the size of the transaction and the amount payable to a Related Person;

   • the nature of the interest of the Related Person in the transaction;

   • whether the transaction may involve a conflict of interest; and

   • whether the transaction involves the provision of goods or services to the Company that are available from unaffiliated third parties and, if so, whether the transaction is on terms and made under circumstances that are at least as favorable to the Company as would be available in comparable transactions with or involving unaffiliated third parties.

2. Procedure. The General Counsel shall advise the Chairman of the Audit Committee of any Related Person Transaction of which he becomes aware. The Audit Committee shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such

EXHIBIT F – 104

purpose, unless the Audit Committee determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, in which case such disinterested members of the Board of Directors shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such purpose. Except as set forth below, any Related Person Transaction not approved in advance by the reviewing directors shall not be entered into by the Company unless the consummation of such Related Person Transaction is expressly subject to ratification by the reviewing directors. If the reviewing directors do not ratify such Related Person Transaction, the Company shall not consummate such Related Person Transaction.

If the Company enters into a transaction that (i) the Company was not aware constituted a Related Person Transaction at the time it was entered into but which it subsequently determines is a Related Person Transaction prior to full performance thereof or (ii) did not constitute a Related Person Transaction at the time such transaction was entered into but thereafter becomes a Related Person Transaction prior to full performance thereof, then in either such case the Related Person Transaction shall be presented for ratification in the manner set forth above. If such Related Person Transaction is not ratified by the reviewing directors, then the Company shall take all reasonable actions to attempt to terminate the Company's participation therein.

3.   Disclosure. The Company shall disclose all Related Person Transactions as may be required under applicable securities laws and regulations, including, without limitation, Item 404 of Regulation S-K. Consideration and approval of any particular transaction by the Reviewing Directors shall not be dispositive in determining whether such transaction requires disclosure under applicable securities laws. The Audit Committee shall timely advise the Board of Directors of all Related Person Transactions, if any, approved or ratified by the Audit Committee.

4.   Definitions. For purposes of this policy, the following definitions shall apply:

"Executive Officer" means the President, any Vice President in charge of a principal business unit, division or function of the Company or any officer or other person who performs a policy making function for the Company, including any executive officer of a

subsidiary of the Company if such person performs policy making functions for the Company.

"Immediate Family Member" means, with respect to any person, any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of such person, and any individual (other than a tenant or employee) sharing the household of such person.

"Related Person" means any of the following: (i) an Executive Officer or director of the Company or a nominee for director of the Company, (ii) a beneficial owner of more than 5% of any class of voting securities of the Company or (iii) an Immediate Family Member of any of the persons identified in clauses (i) or (ii) hereof.

"Related Person Transaction" means any transaction involving an amount in excess of $120,000 in which the Company is a participant and in which a Related Person has or will have a direct or indirect material interest, including without limitation any financial transaction, arrangement or relationship (including any indebtedness guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, but excluding: (i) any indebtedness incurred for the purchase of goods and services subject to usual trade terms, for ordinary business travel and expense payments and for other transactions in the ordinary course of business; (ii) any indebtedness incurred with respect to a beneficial owner of more than 5% of any class of voting securities of the Company or any Immediate Family Member thereof; (iii) any transaction in which the rates or charges involved in connection therewith are determined by competitive bids; (iv) any transaction in which a person is deemed a Related Person solely on the basis of such person's equity ownership and all holders of that class of equity receive the same benefit on a pro rata basis, or (v) any transaction involving compensation payable to an Executive Officer or director of the Company for services in such capacity which compensation has been approved by the Compensation Committee of the Board of Directors or by the Board of Directors on the recommendation of the Compensation Committee.

Copyright © 2008 Tribune Company. All Rights Reserved.

:: Site Map     :: Contact Us     :: Terms of Service     :: Help

EXHIBIT F – 106